Henry F. Bailey Jr. WY Bar #5-1681
Bailey Stock Harmon Cottam Lopez LLP
6234 Yellowstone Road
Cheyenne, WY 82009
307.638.7745
hank@performance-law.com
Counsel for Plaintiffs

Ernest G. Trakas*
MO Bar No. 33813
Mary E. McAlister*
VA Bar No. 76057
Vernadette R. Broyles*
GA Bar No. 593026
CHILD & PARENTAL RIGHTS CAMPAIGN
5805 State Bridge Road, Suite 310
Johns Creek, GA 30097
Telephone (770) 448-4525
etrakas@childparentrights.org
mmcalister@childparentrights.org
vbroyles@childparentrights.org
* Pending Admission *Pro Hac Vice*

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2023 APR 20  PM 3: 16

MARGARET BOTKINS, CLERK
CHEYENNE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| Ashley Willey,  Sean Willey, | ) | Civil Case No. 23-cv-69-S |
| Plaintiffs | ) | |
| v. | ) | |
| Sweetwater County School District #1 Board of Trustees; | ) | Verified Complaint for |
| Kelly McGovern, Superintendent of | ) | Declaratory Relief, |
| Sweetwater County School District #1, individually; | ) | Injunctive Relief and |
| Nicole Bolton, Assistant Superintendent & Human | ) | Damages |
| Resources Director of Sweetwater County School | ) | |
| District #1, individually; Kayci Arnoldi, Director of | ) | |
| Student Services of Sweetwater County School | ) | |
| District #1 individually; Bryant Blake, Principal of Black | ) | |
| Butte High School, individually, | ) | |
| Defendants | ) | |

## **INTRODUCTION**

1.     Plaintiffs file this action to vindicate and secure their fundamental parental rights to direct the upbringing of, and physical and mental health decision-making for, their children; their fundamental right to familial privacy; and their fundamental right to free exercise of religion under the United States and Wyoming constitutions.

1

2.     Defendants have been and are violating Plaintiffs' fundamental rights by establishing and implementing a protocol, procedure or guideline (generally, the "Guidance") that deliberately conceals from Plaintiffs critical information regarding their children's mental health and well-being, *i.e.,* their assertion of a discordant gender identity and request to be affirmed in that identity through the use of alternative names, pronouns and other measures, without the knowledge and consent—and even over the objection of—their parents. Implementation of the. Guidance includes engaging in "social transitioning" in the form of acceding to the requests of minor children that they be treated as the opposite sex and referred to by alternate names and pronouns and that their parents not be told.

3.     Defendant Sweetwater County School District #1 ("District") administration also mandates that school staff, including Mrs. Willey, purposefully and intentionally mislead and deceive parents by referring to their child by his or her legal name and biologically accurate pronouns when communicating with parents but using the child's assumed name and pronouns at all other times, unless the child has consented to informing his or her parents. In so doing, Defendants have violated and continue to violate Mrs. Willey's free exercise rights under the United States and Wyoming constitutions.

4.     Defendants' actions are particularly egregious with regard to Mrs. Willey's daughter, A.S., whom Defendants know or should know is a sexual trauma survivor diagnosed with ADHD and PTSD for whom affirming a discordant gender identity is antithetical to her health and well-being. Yet, despite this knowledge, Defendants purposefully and recklessly disregard the known harm to A.S. and continue to implement the Guidance as to A.S., even, in Mr. Blake's case, stating that he will lie to Plaintiffs about A.S.'s identity if A.S. asks him to.

2

5.     Plaintiffs are asking this Court to remedy the violations of their fundamental rights and the resulting harm to them and their children by granting injunctive and declaratory relief and awarding damages, including attorneys' fees and costs, to Plaintiffs.

## JURISDICTION AND VENUE

6.     This action is filed pursuant to 42 U.S.C. § 1983 seeking redress of injuries suffered by Plaintiffs from deprivation, under color of state law, of rights secured by the Fourteenth Amendment to the United States Constitution, and the laws of the United States. Plaintiffs also bring claims for violation of the laws of Wyoming. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a).

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and other applicable law because the events and omissions giving rise to the claims in this action arose in the District of Wyoming. Venue is also proper in this Court because the Defendants reside or have their principal place of business in this District.

8.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, implemented through Federal Rule of Civil Procedure 57.

9.     An actual controversy exists between the parties involving substantial constitutional issues, in that Plaintiffs allege that Defendants' policies, procedures, directives and actions taken in accordance with them, on their face and as applied, violate the United States Constitution and have infringed Plaintiffs' rights, while Defendants presumably will allege that their policies, procedures, directives, and actions comport with the Constitution.

10.     This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, under 42 U.S.C. § 1988.

**PARTIES**

11.     Plaintiff Ashley Willey is the mother and sole legal guardian of A.S., who is a student at Black Butte High School, which is part of the District.

12.     Plaintiffs Ashley and Sean Willey are the parents of four other children who attend District schools and therefore are subject to the District's protocols, policies, procedures, and guidance.

13.     Plaintiff Ashley Willey is, and at all relevant periods alleged herein was, employed by the District as a special education math teacher.

14.     Sweetwater County School District # 1 is a unified school district organized and existing as "a body corporate" under Wyo. Stat. § 21-3-101. Defendant Board of Trustees is the governing body of the District under Wyo. Stat. § 21-3-105, capable of suing and being sued under Wyo. Stat. § 21-3-111 (collectively the "District")

15.     Defendant Kelly McGovern ("Ms. McGovern") is the Superintendent of the District, operating as the chief administrative officer of the District under Wyo. Stat. § 21-3-111. She is sued in her individual capacity.

16.     Defendant Nicole Bolton ("Ms. Bolton") is the Assistant Superintendent and Human Resources Director for the District. She is sued in her individual capacity.

17.     Defendant Kayci Arnoldi ("Ms. Arnoldi") is the Director of Student Services for the District. She is sued in her individual capacity.

18.     Defendant Bryant Blake ("Mr. Blake") is the Principal of Black Butte High School, which is part of the District. He is sued in his individual capacity.

## STATEMENT OF FACTS

19.     Mrs. Willey's daughter, A.S., is 16 years old. She experienced childhood sexual trauma and has been under the care of physicians and mental health professionals since that time.

20.     A.S. was diagnosed with ADHD, for which she has in place an Accommodation Plan under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et. seq. ("504 Plan").

21.     In 2021, during her freshman year of high school, A.S. was having flashback nightmares related to her childhood sexual trauma.

22.     A.S. was already under the care of a private counselor chosen by Mr. and Mrs. Willey who was providing trauma therapy. When A.S. began having the nightmares, Mr. and Mrs. Willey increased the frequency of the therapy sessions.

23.     A.S. was also experiencing discomfort with the pubertal changes in her body and disliked her body. At the high school she was discussing her discomfort with some peers who told her that the discomfort and A.S.'s interests in sports and stereotypical "male interests" was because she was "trans."

24.     A.S. told her private counselor that she thought she might be "trans." The counselor and Mr. and Mrs. Willey began discussing that issue with A.S. and working through her feelings with her.

25.     Unbeknownst to Mr. and Mrs. Willey, at the beginning of the 2021-2022 school year, A.S. told teachers and staff at Black Butte High School that she wanted to be treated as a boy, use the male name "C" and be referred to by male pronouns. She also requested that District personnel not tell her parents.

26.     Neither Mr. nor Mrs. Willey was informed or advised by the District regarding A.S.'s request to be treated as a different sex and called by an alternate name and by male

pronouns despite A.S. having a 504 Plan, which requires parental involvement for any issues related to the child's mental health, and despite Mrs. Willey's position as a teacher in the District.

27. More than six months later, on March 29, 2022, Mrs. Willey participated in district-wide training during which she met some teachers from Black Butte High School where A.S. is enrolled.

28. Mrs. Willey asked one of the teachers from Black Butte if she knew her daughter, "A." The teacher replied, "yes, I know A. She's a sweet girl."

29. Mrs. Willey asked the other Black Butte teacher whether he knew her daughter, and he asked Mrs. Willey whether her daughter had a last name starting with "B."

30. Mrs. Willey responded no and showed the teacher a picture of A.S. The first teacher then said to the second teacher, "It goes by 'C'."

31. Mrs. Willey responded, "No, she goes by A." She then asked how long A.S. had been referred to as "C," and both teachers stated that they had done so for the entire school year.

32. That happenstance disclosure on March 29, 2022, was the first time either Mr. or Mrs. Willey heard about A.S. being "affirmed" as a boy named "C" at school, but as a girl named "A" in front of her parents. Had it not been for Mrs. Willey meeting those teachers and having that conversation, she and Mr. Willey might never have learned that their vulnerable daughter, with a 504 Plan, was being secretly and deliberately affirmed as a boy while at school.

33. Mrs. Willey spoke with A.S. Mrs. Willey told A.S. she is too young to make such decisions and that being treated as the opposite sex and the use of the alternate name at school had to stop. A.S. told her mother that she felt pressured to continue using the name and being treated as a boy because that was how District personnel at school regarded her. A.S. said she was concerned that they (District personnel) would be angry if she did not follow their direction.

34.     On March 29, 2022, Mrs. Willey sent a direct message to teachers and staff at

Black Butte:

> It has come to my attention that the teachers and staff that interact with my daughter have been referring to her as "C" and have treated her like she is a male. AND that this was knowingly something that she was hiding from her parents. "A" is in fact an "A" and she is female. You will refer to her as "A" and only "A." If this continues, then I will take this further and go to the CAB. [Central Administration Building]. She is a CHILD who is not old enough to make life changing decisions such as these. And even though this is absolutely none of anyone's business besides that of the people in our family and her counselor, she has stated multiple times that she felt pressured into calling herself a boy, and that this makes her uncomfortable. With working through this, and having people encouraging things BEHIND her parents backs instead of coming to us, has made the situation worse. Thank you for your time in this matter. I would be more than happy to come to speak with any of you in person if you have questions.
>
> You may disagree, and that is certainly your right, but the fact remains that I am her parent and she is a child.

A true and correct copy of Mrs. Willey's direct message is attached hereto, marked as Exhibit A

and incorporated herein by reference.

35.     On the same day, Mrs. Willey send an email to Principal Blake:

> It has come to my attention tonight that the entire staff that interacts with my daughter at your school, including yourself, have been referring to her as "C" and referring to her as a male. It has also come to my attention that my 15 year old CHILD has instructed you guys to hide this from us. This is written instructions, that you and your staff will no longer refer to my child as a male or "C." Her name is "A" she is a female and she is not old enough to make any decision thinking that she is anything other than what she is. I am appalled and furious that you and your staff are participating in hiding this from her PARENTS!!!! She is currently in counseling and has been working very hard to understand that she is in fact a TOMBOY which has disappeared since we were in school.  If this is going to be an issue or I find out that this is continuing, I will take this to the CAB.
>
> If you have questions, I am willing to come talk to you in person. Please respond that you understand.

A true and correct copy of Mrs. Willey's email is attached hereto, marked as Exhibit B and

incorporated herein by reference.

36.     Principal Blake responded that he had reached out to Human Resources regarding the issue, that human resources would be reaching out to the District legal team to get further clarification, and that he would reach out to Mrs. Willey when he received that clarification. A true and correct copy of Principal Blake's email is attached hereto, marked as Exhibit C and incorporated herein by reference.

37.     Mrs. Willey responded that there was no clarification needed except from her as A.S.'s parent and that she would be meeting with Ms. Bolton and Superintendent McGovern since she was interpreting Principal Blake's email as a refusal to follow written parent instructions. A true and correct copy of Mrs. Willey's email is attached hereto, marked as Exhibit D and incorporated herein by reference.

38.     Mrs. Willey requested that A.S. tell her teachers to call her "A" instead of "C," and A.S. said she did so. Mrs. Willey later learned that A.S. had told her teachers to call her "A" because her parents wanted it.

39.     At a meeting in April 2022 Ms. Bolton told Mrs. Willey that A.S. had asked teachers and staff to call her "A." Ms. Bolton said that teachers and staff were doing so but only because A.S. requested it, not because it is the parents' direction.

40.     At that time in April 2022, Ms. Bolton told Mrs. Willey that if A.S. came back to her teachers and said to call her "C," then the staff would do as A.S. requested regardless of Mrs. Willey's directions. And would not tell Mrs. Willey

41.     Ms. Bolton said that the teachers at Black Butte, and Mrs. Willey as a teacher in the District, were required to accede to the wishes of a student who said he or she was trans, wanted to be regarded as the opposite sex with an alternate name and pronouns, and did not want his or her parents told, regardless of the parents' direction or even over their objection. Ms.

Bolton told Mrs. Willey that acceding to the wishes of the student without informing parents was required to protect the child's safety. In so doing, Ms. Bolton revealed that the District had adopted and implemented a policy, custom, practice or procedure requiring that District staff unquestionably abide by student directives regarding their names and pronouns at school.

42.     Mr. and Mrs. Willey met with Ms. McGovern on April 22, 2022. Mr. and Mrs. Willey told Ms. McGovern that A.S. had suffered sexual trauma and that suppressed memories of the abuse had surfaced in 2021, causing nightmares and distress about her developing female body. They also told Ms. McGovern that A.S. was under the care of a private counselor to deal with the effects of the trauma and the feeling that she might be trans.

43.     Mr. and Mrs. Willey expressed their anger about Black Butte staff deliberately lying to them about their daughter. This included during a 504 Team meeting when staff referred to "A.S." as "A" and female while (unknown to Mr. and Mrs. Willey at the time) knowingly and intentionally calling A.S. "C" outside the earshot of her parents.

44.     Mrs. Willey also told Ms. McGovern that she (Mrs. Willey) was informed that Mr. Blake, and the other staff at Black Butte, were referring to and branding Mrs. Willey as homophobic because she will not let A.S. be "her true self."

45.     Mrs. Willey also told Ms. McGovern that Mr. Blake used her daughter to publish numerous telephonic text messages branding Mrs. Willey as homophobic.

46.     Mr. and Mrs. Willey met with Ms. McGovern and Mr. Blake on April 26, 2022. They informed Mr. Blake of A.S.'s history of childhood sexual trauma and its connection to her discomfort with her body.

47.     At that meeting, Mr. Blake said that A.S. had indicated that her parents wanted her to be called "A," but that she wanted to be called "C."

48.     Mr. Blake said that the parents' direction that A.S. be referred to by "A" and with female pronouns, as communicated by A.S., put the teachers in a "Catch-22," because teachers and staff had been told that if a child requested to be called by another name and alternate pronouns, then the teachers had to do so.

49.     Mr. Blake thus confirmed what Ms. Bolton revealed earlier, *i.e.,* that the District had adopted and implemented a policy, custom, practice or procedure requiring that District staff unquestionably abide by student directives regarding their names and pronouns at school, including concealing information from parents.

50.     At the conclusion of the April 26, 2022, meeting, Ms. McGovern said that school staff would call A.S. "A," but only because A.S. did not want to upset her parents, not because of the parents' directions.

51.     Ms. McGovern then explicitly confirmed the existence of the District-sanctioned policy, custom, practice or procedure by directing Mrs. Willey that as an employee of the District, Mrs. Willey was expected to abide by children's wishes to be called by alternate names and/or pronouns.

52.     Ms. McGovern added that, as an employee of the District, Mrs. Willey was not to inform parents about their children's requests to be called by alternate names and/or pronouns.

53.     As further confirmation of the District-sanctioned policy, custom, practice or procedure, Ms. McGovern stated that when children express issues with their gender at school, the District has decided that the student must be supported because the school has to provide a "safe environment."

54.     Mrs. Willey informed Ms. McGovern that changing how a child is identified at school without the parents' knowledge and withholding that information from parents violates her sincerely held religious beliefs, which include not being deceitful.

55.     At the beginning of the 2022-2023 school year, Mrs. Willey received written confirmation of what she had been told by Ms. Bolton, Mr. Blake and Ms. McGovern regarding a District-sanctioned policy, custom, practice or procedure regarding students' preferred names and pronouns. Contained within a document entitled "SCSD #1 Special Services Non-Negotiables August 15, 2022," which special education staff were supposed to sign, was the following description of the policy, custom, practice or procedure, denominated as the Preferred/Chosen Names Procedure.

> As you become acquainted with your students, you may encounter students wishing to use a preferred or chosen name. A preferred/chosen name is any name a student chooses to use other than their legal name. For example, a student may wish to shorten their first name (e.g. Steven to Steve) or to be referred to by their middle name or a nickname. Sweetwater County School District Number One is committed to promoting an educational environment that is supportive and respectful to all students. Calling a person by their preferred name and pronoun shows respect and contributes to the District's commitment to providing a safe and nondiscriminatory educational environment. Accordingly, staff must use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications. Staff must respect the privacy of all students regarding such choice.
>
> Violations of this procedure may constitute discrimination based on sex, and may result in discipline. Students who experience problems or discrimination related to their preferred/chosen name or pronoun shall be referred to the Title IX Coordinator for resources and assistance. This procedure does not address changes to educational records to reflect legal name changes. Any requests to amend educational records shall be referred to the Director of Human Resources.

A true and correct copy of the "Non-negotiables" document is attached hereto, marked as Exhibit E and incorporated herein by reference. Mrs. Willey manually crossed out the language regarding "Preferred/Chosen Names" from the SCSD #1 Special Services Non-Negotiables document before she signed it (Exhibit E).

11

56.     On August 15, 2022, Mrs. Willey met with Ms. Arnoldi and Ms. Bolton to advise them of her concerns and objections about the application of this Preferred/Chosen Names Procedure to her children, particularly to A.S. in light of A.S.'s history of childhood sexual trauma and mental health issues.

57.     Mrs. Willey also told Ms. Bolton about the conversation that Mr. and Mrs. Willey had with Ms. McGovern in April 2022, in which Ms. McGovern said that District staff would call A.S. "A."

58.     Ms. Arnoldi informed Mrs. Willey that the District would not honor Mrs. Willey's specific direction and would ignore her instruction that A. be addressed by her given name and female pronouns and treated as the female that she is.

59.     Ms. Arnoldi informed Mrs. Willey that pursuant to the Preferred/Chosen Names Procedure, District staff would be honoring A.S.'s (and, by extension any other of the Willey children's) requests over the parents' express objections.

60.     Mrs. Willey reminded Ms. Bolton and Ms. Arnoldi of her and her family's sincerely held religious beliefs against affirming a male identity in their daughter or Mrs. Willey being compelled to affirm a discordant gender identity in her students.

61.     Mrs. Willey also stated that her sincerely held religious beliefs prevent her from intentionally withholding information from parents or actively deceiving them about their children's identity at school

62.     Following the meeting, Ms. Arnoldi sent Mrs. Willey an email stating that "[u]nfortunately, we don't get to base our decisions on personal and religious beliefs. We have to follow the policy and procedures that are set forth by law and recent court cases. As an employee of the district, you will have to abide by the policies that are in place for SCSD#1." In

so doing, Ms. Arnoldi confirmed that the District had adopted a policy, custom, practice or procedure, calling it a "policy," that District staff must unquestionably abide by the requests of children regarding use of alternate names and pronouns. Ms. Arnoldi also revealed that the District will not permit accommodations to the "policy" for sincerely held religious beliefs.   A true and correct copy of Ms. Arnoldi's email is attached hereto, marked as Exhibit F and incorporated herein by reference.

63.      During a subsequent meeting with Mr. Blake, he told Mrs. Willey that he will in fact lie to her if A.S.  requests to be treated as a male, that an alternative name and male pronouns be used and her parents not told.

64.      On September 9, 2022, Ms. Bolton sent a district-wide email regarding children's requests to use alternative names or pronouns and to not tell their parents. A true and correct copy of Ms. Bolton's email is attached hereto, marked as Exhibit G and incorporated herein by reference.

65.      Ms. Bolton's email was a response to some social media posts that stated that District staff had been directed not to talk to parents about gender identity issues with their children. Ms. Bolton claimed that District staff were "never directed not to talk to parents or to lie to parents." Ms. Bolton went on to claim that decisions about supporting "transgender and gender nonconforming students **may** involve the student, parents and District administration" (emphasis added) and that teachers were to refer matters to the principal, who would then "involve central administration."  Notably, Ms. Bolton did not state that decisions must involve the parents.

66.      Ms. Bolton further stated in her email that

[T]he District will prioritize safeguarding the physical and psychological well-being of a student. When a student indicates that their family is not supportive of

their gender identity and/or the District is concerned for the student's safety, the **District will honor a student's request for confidentiality until the student consents to the disclosure and/or the District completes an individualized assessment and rules out any particularized and substantiated concern of real harm to the student**. The expectation is that parents will eventually be involved: the District will support the student in this process and encourage familial involvement whenever possible. For example, the District will offer the opportunity to speak with a school counselor or social worker to facilitate conversations with parents. (Emphasis added).

67.     Therefore, Ms. Bolton confirmed that District staff will honor "student confidentiality," *i.e.* the requests of a minor child to conceal information from his or her parents unless the child consents. Ms. Bolton also acknowledged that District staff will permit minor children to receive mental health counseling from school employees without parental consent.

68.     Consequently, A.S. [and other minor children] who has underlying mental health issues and trauma is given the authority to determine whether her parents are sufficiently "supportive" of her announced discordant gender identity to be informed.

69.     A.S., a child who has been diagnosed with ADHD and PTSD, is subject to a 504 Accommodation Plan, which cannot be implemented, amended or changed without parental input and consent. However, the District is admittedly giving her the authority to exclude her parents from being informed that she identifies as the opposite sex, is to be treated as a male and referred to by an alternative name and pronouns.

70.     Defendants have unilaterally determined that minor children who cannot legally consent to medical care, mental health treatment or enter into a contract under Wyoming law can decide that they identify as the other sex and change their names and pronouns without their parents' knowledge or consent. Furthermore, these minor students can require that others refer to them by discordant pronouns, including by publishing warnings on the District's attendance

and grade recording system that District personnel are not to mention a student's decision to adopt a different name and pronouns, all without the notice to or consent of their parents.

71.     At the Board of Trustees' meeting on September 12, 2022, Ms. McGovern responded to a question about whether teachers are required to keep information regarding students' gender identity from parents by saying that "[t]here are some situations that -- and, again, it is on a case-by-case basis. But if there is a fear from the student, if there are extenuating circumstances that the school is aware of, we will honor the privacy of the student." (Partial Transcript of 9/12/22 Board meeting, attached as Exhibit H and incorporated herein by reference, at p. 30 lines 11-17).

72.     Board Chairwoman Carol Jelaco confirmed during the meeting that "[i]f the student expresses a fear of telling -- of what might happen if they are -- if their parents are told, the district, from my interpretation, is bound to keep the student's -- shall we say what -- whatever the student wants is paramount."  (Exhibit H at p. 29, lines 9-14).

73.     During the meeting, both Ms. Jelaco and Ms. McGovern repeatedly claimed that the District responds to student issues related to gender identity on "a case by case basis." Ms. McGovern claimed that there was no blanket response required by district teachers. (Exhibit H, p. 28, line 24 to p. 31, line 11).

74.     That statement by Ms. McGovern contradicts the written directive given to Mrs. Willey and other staff which included language stating "staff **must** use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications. Staff **must** respect the privacy of all students regarding such choice. Violations of this procedure may constitute discrimination based on sex and **may result in discipline**." (emphasis added) (Exhibit E).

75.     The statement by Mrs. McGovern also contradicted the statement made by Ms. Bolton to District staff that the "District will honor a student's request for confidentiality until the student consents to the disclosure and/or the District completes an individualized assessment and rules out any particularized and substantiated concern of real harm to the student." (Exhibit G).

76.     The statement by Mrs. McGovern further contradicted Ms. Arnoldi's message to Mrs. Willey that "unfortunately we don't get to base our decisions on personal and religious beliefs. We have to follow the policy and procedures that are set forth by law and recent court cases. As an employee of the district you will have to abide to the policies that are in place for SCSD#1." (Exhibit F).

77.     Plaintiffs are informed and believe and based thereon allege that the School Board may not have formally enacted a policy through public hearing and board vote, but has acquiesced, and thereby accepted, the implementation of the procedure that requires staff secrecy and concealment of information regarding gender identity issues and staff facilitation of social "gender transition" actions from parents.

78.     According to Ms. McGovern's and Ms. Jelaco's public statements, the School Board and administration address gender identity issues "on a case-by-case basis," not with a "one size fits all" policy.

79.     Yet, when Mr. and Mrs. Willey requested that their daughter be treated in accordance with her biological sex and addressed by her given name instead of being treated as the opposite sex and with an alternative name and pronouns that she chose (which would be in keeping with a "case by case" policy), they were told that staff was required to follow the child's wishes, even their child who is a sexual abuse survivor with a 504 plan.

80.     Likewise, contrary to Mrs. McGovern's statements at the school board meeting, Mrs. Willey in her role as a teacher was not told to address children's requests on a case by case basis, but was directed that she must "respect" the child's wishes and not inform parents, or possibly face disciplinary action. Mrs. Willey was also told that she had to disregard her sincerely held religious beliefs regarding lying to others and the biological reality of human beings in order to keep her job as a public-school teacher.

81.     Following Mrs. McGovern's statements at the September 12, 2022, Board meeting Mr. Willey informed the School Board: "As a parent that experienced last year teachers withholding information from a parent with my daughter, it caused more issues with her at home than it did anything else. She was trying to live two lives, going to school being referred one way, coming home being referred another way, and it was causing her to have mental breakdowns, lash out at home with her siblings, and causing lots of other issues." (Exhibit H, p. 42, line 17 to 25).

82.     Mr. Willey further said, "Now, I understand case-by-case scenario, if you -- you guys aren't psychologists. You're not licensed counselors. So how can you make the judgment call whether to notify a parent or not on what is going on with their student?" (Exhibit H, p. 43, lines 1 to 5).

83.     Mr. Willey told the Board:

So I guess my question for the school board and the school is, if you're going to withhold this information from parents, which is -- is law, is your guys' right, are you guys going to provide counseling for these students from a licensed counselor outside of the school that they can talk to to get the help that they need? Because not all students that go through this transgender, that go through these situations, are okay. They're having issues mentally, and it's a constant battle internally for them.

If …you're taking that – that right for a parent to help their -- their child, then is the school going to start providing counseling, outside counseling for these

students so they can talk to somebody, so they can get the help they need so it doesn't cause further issues?. (Exhibit H, page 43, line 10 to 44, line1).

84.    Mr. Willey continued:

I was told over a dozen times it was for the health and safety of my child. As teachers, you guys are required to report if you think there's any abuse or any harm that are going to come to a student within the home. No -- nothing was filed. Nothing -- no claims were made. But they flew under the flag that they were doing it for my child's safety and protection. If that's the case, then why was there no claims filed with DFS or the authorities in terms of the protection of my child? I understand they're scared. They don't know how to come out and -- open dialogue with their parents. That was the case of my daughter. But we weren't given the opportunity to. And like I said, if -- you're going to withhold that information from parents and make that judgment call, then those students need to be paired up not with a school counselor, but with a certified counselor outside of the school that's licensed in that field to help them through this issue. Is the district going to be willing to start paying for counseling services for all these students? Because you're taking that away from parents so they can't help their students. They can't help their kids, because they're not informed. They don't know what's going on. (Exhibit H, p. 44, line 25 to p. 45 line 12.).

85.    Mr. Willey informed the Board and Ms. McGovern that Defendants' actions created a rift in the parent-child relationship as well as negatively affecting A.S.'s mental and emotional health, which was already adversely affected by childhood trauma. (Exhibit H, p. 42, line 16 to p. 46, line 16).

86.    Defendants continue to implement the Preferred/Chosen Names Procedure requiring that District staff 1) accede to the wishes of minor children regarding being treated as the opposite sex and addressed by alternative names and pronouns, 2) withhold that information from parents, and 3) actively deceive parents by treating the child as the other sex and using a child's requested alternative name and pronouns at school but treating the child as their biological sex and using the child's given name and pronouns when speaking with parents.

87.    Plaintiffs are informed and believe and based thereon allege that Defendants are continuing to implement the Preferred/Chosen Names Procedure with Plaintiffs' daughter A.S.,

despite being informed of her childhood sexual trauma and mental health issues and the adverse effects that affirming a discordant gender identity has had on A.S.'s mental health, emotional health, and relationship with her parents and siblings. Since the Procedure requires that the child's wishes be honored and parents not informed without the child's consent, Plaintiffs have no way of knowing for certain whether and to what extent the Procedure is being implemented on A.S.

88.     Plaintiffs also have no way of knowing whether the Preferred/Chosen Names Procedure is being implemented as to their other children who are students in the District, thereby infringing their sincerely held religious beliefs and their fundamental right to direct the upbringing of their children.

89.     Plaintiffs are informed and believe and based thereon allege that Defendants are continuing to adhere to a rigid "one size fits all" protocol regarding gender identity even to the detriment of A.S. (and perhaps other children) despite repeated public statements by Mrs. McGovern and Mrs. Jelaco at the September 12, 2022, meeting that the District addresses such issues on a case by case basis.

90.     Mrs. Willey is aware that up to the present time, when a student is using a preferred name or pronouns, then a notice comes up on the teacher portal. That notice states that the student goes by another name and that the parents are not to be told. She has learned that principals are attending parent-teacher conferences to make sure that teachers adhere to the Chosen/Preferred Names Procedure by not telling parents that their children are being treated as the opposite sex and referred to by alternate names and pronouns at school.

91.     Defendants are continuing to withhold from Plaintiffs information critical to their children's health and well-being, *i.e.*, whether their minor children are asserting a discordant

gender identity and requesting to affirm that identity at school. Mrs. Willey has requested to review A.S.'s educational records, including records of counseling sessions with District counselors, as is Mrs. Willey's right under the Federal Educational Rights and Privacy Act ("FERPA"). However, Defendants have failed and refused to provide Mrs. Willey with the information from A.S.'s educational records that would inform her and Mr. Willey of the ongoing actions being taken by Defendants regarding A.S.., who Defendant know is a trauma survivor with mental health issues requiring parental oversight.

92.     In developing and implementing the Preferred/Chosen Names Procedure that requires District staff and administration to affirm a child's assertion of a discordant gender identity and request to be treated as the other sex with an alternative name and pronouns and other measures, Defendants are facilitating "social transitioning" of minor children, which is recognized as a medical/mental health intervention for children who assert a discordant gender identity.[1] Dr. Hilary Cass performed an independent review of "gender-affirming" care for minors for the United Kingdom's National Health Service and concluded:

> [I]t is important to view [social transition] as an active intervention because it may have significant effects on the child or young person in terms of their psychological functioning. There are different views on the benefits versus the harms of early social transition. Whatever position one takes, it is important to acknowledge that it is not a neutral act, and better information is needed about outcomes.[2]

---

[1]     By describing gender affirmation as a medical/mental health intervention for gender dysphoria, plaintiffs are not waiving any claims to challenge the medical or scientific validity of such interventions.

[2]     *See* Expert Affidavit of Erica Anderson in Support of Plaintiffs' Motion for Preliminary Injunction, at ¶ 33, citing H. Cass, *Independent review of gender identity services for children and young people: Interim report* (February 2022), https://cass.independent-review.uk/publications/interim-report/ (footnotes omitted). As a result of Dr. Cass's review, the NHS has suspended "gender-affirming" care for minors and is reviewing its standards.

93.     The World Professional Association for Transgender Health (WPATH), which has established guidelines for treatment of transgender people that are relied upon by many practitioners,[3] encourages health professionals to defer to parents "as they work through the options and implications," **even "[i]f parents do not allow their young child to make a gender role transition."**[4]

94.     WPATH further states that "[s]ocial transitions in early childhood" are "controversial," that "health professionals" have "divergent views," and that there is insufficient evidence "to predict the long-term outcomes of completing a gender role transition during early childhood." The latest version of WPATH's standards states "there is a dearth of empirical literature regarding best practices related to the social transition process."[5]

95.     In facilitating "social transitioning" without informing parents, Defendants are directly interfering with the parent-child relationship by prohibiting parents from exercising their fundamental rights as the primary decisionmakers for their children, by prohibiting children from receiving advice and input from their parents who have the maturity and historical knowledge to discern whether particular actions, such as changing a name or pronoun, will detrimentally affect a child's mental health. In implementing the Preferred/Chosen Names Procedure and in

---

[3]     Plaintiffs are not acknowledging that the WPATH document is a scientifically accepted standard of care or guidelines but are citing the information as exemplars for what gender-affirming practitioners rely on when making decisions and for the proposition that the social transitioning being undertaken by Defendants is in fact mental health intervention.

[4]     *See* Anderson Affidavit at ¶ 69, citing  The World Professional Association for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("WPATH SOC7") at 17 (Version 7, 2012), available at https://www.wpath.org/media/cms/Documents/          SOC%20v7/SOC%20V7_English.pdf (emphasis added).

[5]     *See* Anderson Affidavit at ¶36 citing WPATH SOC 7 at 17. *See also, Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, WPATH, 23 INTERNATIONAL J. TRANS. HEALTH 2022 S1–S258, at S76 (2022), available at https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644.

particularly promising confidentiality to the child as to his or her parents Defendants are further directly interfering with the parent-child relationship by driving a wedge between parent and child in a manner contrary to establish mental health protocols.[6]

96.     In facilitating "social transitioning" and withholding such information from parents as required by their Preferred/Chosen Names Procedure, Defendants are "implementing a psychosocial treatment..."[7] for minor children without the knowledge or consent of their parents.

97.     Under Wyoming law, children under 18 cannot consent to mental health or medical procedures unless the child is emancipated, married, in the military, age 12 and seeking smoking cessation, or the parents cannot be located and the matter is urgent. Wyo. Stat. § 14-1-101. Absent proof that one of the exceptions applies, children cannot receive mental health care without their parents being informed and consenting.

98.     None of the exceptions in Section 14-1-101 applies to A.S. or any of the Plaintiffs' other children. Therefore, they cannot request and receive mental health treatment, including social transitioning, without the knowledge and consent of their parents.

99.     Wyo. Stat. § 14-2-206 provides:

(a) The liberty of a parent to the care, custody and control of their child is a fundamental right that resides first in the parent.
(b) The state, or any agency or political subdivision of the state, shall not infringe the parental right as provided under this section without demonstrating that the interest of the government as applied to the parent or child is a compelling state interest addressed by the least restrictive means.

---

[6]      Anderson Affidavit at ¶ 74.

[7]      *See* Anderson Affidavit at ¶31, citing Kenneth Zucker, *The Myth of Persistence: Response to "A Critical Commentary on Follow-Up Studies & 'Desistance' Theories about Transgender & Gender Non-Conforming Children" by Temple Newhook et al.*, 19:2 INTERNATIONAL JOURNAL OF TRANSGENDERISM 231 (2018), https://www.researchgate.net/publication/325443416.

100.    Defendants' Preferred/Chosen Names Procedure, which deliberately conceals information from parents regarding the social transitioning of their children, violates Section 14-2-206 and evidences a reckless disregard for Plaintiffs' fundamental parental rights which is not supported by a compelling state interest.

101.    Plaintiffs have sincerely held religious beliefs that human beings are created male or female and that the natural created order regarding human sexuality cannot be changed regardless of individual feelings, beliefs, or discomfort with one's identity, and in biological reality, as either male or female.

102.    Plaintiffs also have sincerely held religious and moral beliefs that parents have the non-delegable duty to direct the upbringing and beliefs and religious training of their children, including concerning human sexuality and identity.

103.    Plaintiffs also have the sincerely held religious belief based on Judeo-Christian principles and commandment that children are to honor their father and mother, which means that they are not to lie to their parents or act in contravention to their parents' direction and instruction.

104.    Plaintiffs have informed Defendants about their sincerely held religious beliefs and how Defendants' conduct is infringing those beliefs. Nevertheless, Defendants continue to implement the procedure and thereby are refusing to respect Plaintiffs' requests that A.S. be treated and recognized as a girl named "A".

105.    Defendants furthermore refuse to respect that Mrs. Willey not be required to affirm a falsehood, deceive parents regarding their children's identities, or facilitate a child's rebellion and deception toward his or her parents.

106.    Defendants' statements and actions evidence a reckless disregard and disdain for the fundamental religious free exercise rights of Plaintiffs as parents and of Mrs. Willey as an individual employed by the District.

107.    Defendants' usurpation of Plaintiffs' rights has impermissibly supplanted the fundamental rights of parents to make mental health decisions and direct the upbringing of their children, interfered with the privacy rights of the family, created uncertainty and distrust between parents and children and between parents and educators, and infringed Plaintiffs' religious free exercise rights.

108.    Unless and until Defendants, inter alia, a) cease communicating to and instructing District staff that parents are not to be notified when their children seek to socially transition to a discordant gender identity through, *inter alia,* treating children as a different sex, including with  alternate names and pronouns; b) publicly establish and adopt a formal policy that parents will be notified when children raise issues related to their mental health, including expression of a discordant gender identity; c) cease deceiving parents by treating and referring to children one way  when communicating with parents and another way at school, and d) abide by parents' instructions concerning their child's mental health treatment and assertion of a discordant gender identity, Plaintiffs' fundamental rights to direct the upbringing of their children, to make decisions regarding their children's medical and mental health, right of familial privacy, and free exercise rights will continue to be violated.

109.    Defendants' ongoing violations of Plaintiffs' fundamental parental rights have caused and will continue to cause irreparable harm unless and until discontinued.

**FIRST CAUSE OF ACTION**
**VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983**
**(Violation of Plaintiffs' Substantive Due Process Fundamental Parental Right to**
**Direct the Upbringing of Their Children under the U.S. Constitution)**
**(By All Plaintiffs Against all Defendants)**

110.    Plaintiffs incorporate the preceding factual allegations in paragraphs 1-109 by reference as if set forth in full.

111.    At the time of the events described in this Complaint, Supreme Court precedent and Tenth Circuit precedent had established that the Due Process Clause in the 14th Amendment to the United States Constitution protects the fundamental right of parents to direct the upbringing, care, custody, and control of their children. *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Troxel v. Granville*, 530 U.S. 57, 68 (2000); *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182 (10th Cir. 2010); *Thomas v. Kaven*, 765 F.3d 1183 (10th Cir. 2014).

112.    At the time of the events described in this Complaint, Supreme Court precedent and Tenth Circuit precedent had established that the fundamental right of parents to direct the upbringing, care, custody, and control of their children under the 14th Amendment to the United States Constitution includes the fundamental substantive due process right of parents to direct the medical and mental health decision-making for their children. *Parham v. J. R.*, 442 U.S. 584 (1979); *PJ v. Wagner*, 603 F.3d 1182 (10th Cir. 2010); *Doe v. Woodard*, 912 F.3d 1278 (10th Cir. 2019).

113.    At the time of the events described in this Complaint, Wyoming law provided that, with certain exceptions not present here, parents must be informed of and consent to medical/mental health care for their children who are under age 18. Wyo. Stat. § 14-1-101

114.    Defendants have violated and are continuing to violate Plaintiffs' fundamental right to make decisions regarding the upbringing, custody, care, and control of their children in establishing and implementing a policy, custom, practice or procedure that prohibits informing

parents regarding their children's assertions regarding a discordant gender identity and attendant requests to affirm alternate identities, *i.e.*, socially transition, unless their minor children consent.

115.    Defendants have acted and are continuing to act with reckless disregard for Plaintiffs' fundamental parental rights by purposefully and intentionally concealing critical information and decisions regarding the upbringing, care and control of their children, particularly their daughter A.S., *i.e.*, that their child is asserting a discordant gender identity, has requested to be treated as the other sex and addressed by an alternate name and pronouns and other information and decisions associated with affirming the child's gender discordance.

116.    Defendants have taken away—and continue to take away—from parents their right to receive critical information related to their children's health and well-being and to exercise their parental rights to direct their children's upbringing and provide appropriate care to address the children's healthcare issues, including those regarding their gender identity.

117.    Defendants are usurping Plaintiffs' role as parental decision makers by deciding whether and how their children will receive support and care for issues of profound importance to his or her identity, personhood, religious beliefs, and emotional and mental well-being, *i.e.*, his or her preferred name, pronouns and sexual treatment, thereby depriving Plaintiffs of their right to consent to and direct that care.

118.    Defendants, and each of them, have acted and are acting with reckless disregard for Plaintiffs' fundamental parental rights as described *infra*.

**Defendants School Board Is Acting with Reckless Disregard for Plaintiffs' Fundamental Parental Rights.**

119.    Defendant School Board knows or should know that the U.S. Constitution, as interpreted by the Supreme Court of the United States and Tenth Circuit, provides that the fundamental right to direct the care, custody, and control of children resides first in the parent

and cannot be infringed by state actors absent a finding that the parents are unfit or that the state has a  state interest that supersedes the parents' interest.

120.    Defendant School Board has acted with reckless disregard for those established fundamental rights by failing to adequately train or supervise District administration and staff that parental rights must be respected when addressing critical issues involving children's mental health and emotional well-being such as a child's assertion of a discordant gender identity and request for social transitioning in the form of being treated as the other sex including the use of alternate names and pronouns at school.

121.    Defendant School Board sanctioned and permitted District administrators to implement and maintain a policy, custom, practice or procedure (the Chosen/Preferred Names Procedure) that grants children the authority to make decisions regarding socially transitioning to another gender identity at school and conceal the information from their parents and requires District staff to adhere to the child's decision under penalty of professional discipline.

122.    The Board recklessly disregarded the fundamental rights of Mr. and Mrs. Willey to direct the care, custody, and control of their children when it sanctioned and permitted District administrators to develop and implement the Chosen/Preferred Names Procedure transferring decision making authority regarding gender identity issues from the parents to the children and compelling District staff to comply with the child's decision or face discipline..

123.    As a direct result of the Board's acts, the fundamental parental rights of Mr. and Mrs. Willey to direct the upbringing, care and custody of their children, and particularly to make medical and mental health care decisions, have been infringed and continue to be infringed.

**Defendant McGovern Is Acting with Reckless Disregard for Plaintiffs' Fundamental Parental Rights.**

124.    Defendant McGovern knows or should know that the U.S. Constitution, as interpreted by the Supreme Court of the United States and Tenth Circuit, provide that the fundamental right to direct the care, custody, and control of children resides first in the parent and cannot be infringed by state actors absent a finding that the parents are unfit or that the state has an interest that supersedes the parents' interest.

125.    Defendant McGovern has acted with reckless disregard for those established fundamental rights by failing to adequately train or supervise District staff that parental rights must be respected when addressing critical issues involving children's mental health and emotional well-being such as a child's assertion of a discordant gender identity and request for social transition in the form of being treated as the other sex including the use of alternate names and pronouns at school.

126.    Defendant McGovern has sanctioned, instructed and authorized District staff to implement a policy, custom, practice or procedure  that requires, *inter alia,* that information related to children's requests to socially transition to another gender be concealed from parents unless their minor children consent.

127.    Defendant McGovern has explicitly instructed District staff that they will not inform Mr. and Mrs. Willey or other parents of critical information related to their children's mental health, *i.e.*, his or her professed discordant gender identity and request to socially transition and has thereby exhibited reckless disregard for Mr. and Mrs. Willey's fundamental parental rights.

128.    In the case of A.S., Ms. McGovern instructed District staff that they will not, without A.S.'s consent, inform Mr. and Mrs. Willey of A.S.'s professed discordant gender

identity and request to socially transition despite her knowledge of A.S.'s history of sexual trauma and diagnoses of ADHD and PTSD. Ms. McGovern has thus exhibited reckless disregard for Mr. and Mrs. Willey's fundamental parental rights, as well as A.S.'s mental health and wellbeing.

129.    The implementation of the policy, custom, practice or procedure by Ms. McGovern has infringed and continues to infringe the fundamental parental rights of Mrs. and Mrs. Willey to direct the care, custody and control of their children, including A.S., in a manner that has irreparably harmed them and continues to irreparably harm them.

**Defendant Bolton Is Acting with Reckless Disregard for Plaintiffs' Fundamental Parental Rights.**

130.    Defendant Bolton knows or should know that the U.S. Constitution, as interpreted by the Supreme Court of the United States and Tenth Circuit, explicitly provides that the fundamental right to direct the care, custody, and control of children resides first in the parent and cannot be infringed by state actors absent a finding that the parents are unfit or that the state has an interest that supersedes the parents' interest.

131.    Defendant Bolton has acted with reckless disregard for those established fundamental rights by failing to adequately train or supervise District staff under her supervision that parental rights must be respected when addressing critical issues involving children's mental health and emotional well-being such as a child's assertion of a discordant gender identity and request for social transition in the form of being treated as the other sex including the use of alternate names and pronouns at school.

132.    Defendant Bolton knowingly and purposefully sanctioned and/or drafted and implemented or permitted District staff under her supervision to implement a policy, custom, practice or procedure that violates the Constitution in that it requires, *inter alia,* that information

related to children's requests to socially transition to another gender be concealed from parents unless their minor children consent.

133.    The implementation of the policy, custom, practice or procedure by Ms. Bolton has infringed and continues to infringe the fundamental parental rights of Mr. and Mrs. Willey to direct the care, custody and control of their children, including A.S., in a manner that has irreparably harmed them and continues to irreparably harm them.

**Defendant Arnoldi Is Acting with Reckless Disregard for Plaintiffs' Fundamental Parental Rights.**

134.    Defendant Arnoldi knows or should know that the U.S. Constitution, as interpreted by the Supreme Court of the United States and Tenth Circuit, provides that the fundamental right to direct the care, custody, and control of children resides first in the parent and cannot be infringed by state actors absent a finding that the parents are unfit or that the state has an interest that supersedes the parents' interest.

135.    Defendant Arnoldi has acted with reckless disregard for those established fundamental rights by failing to adequately train and direct District staff under her supervision that parental rights must be respected when addressing critical issues involving children's mental health and emotional well-being such as a child's assertion of a discordant gender identity and request for social transition in the form of being treated as the other sex including the use of alternate names and pronouns at school.

136.    Defendant Arnoldi knowingly and purposefully implemented a policy, custom, practice or procedure that violates the Constitution in that it requires, *inter alia,* that information related to children's requests to socially transition to another gender be concealed from parents unless their minor children consent.

137.    Defendant Arnoldi has explicitly instructed and directed District staff under her supervision to not inform Mr. and Mrs. Willey and other parents of critical information related to their children's mental health, *i.e., his or* her professed discordant gender identity and request to socially transition. Therefore, Mrs. Arnoldi has acted with reckless disregard for Mr. and Mrs. Willey's fundamental parental rights.

138.    The implementation of the policy, custom, practice or procedure by Ms. Arnoldi has infringed and continues to infringe the fundamental parental rights of Plaintiffs to direct the care, custody and control of their children, including A.S., in a manner that has irreparably harmed them.

**Defendant Blake Is Acting with Reckless Disregard for Plaintiffs' Fundamental Parental Rights.**

139.    Defendant Blake knows or should know that the U.S. Constitution as interpreted by the Supreme Court of the United States and Tenth Circuit provides that the fundamental right to direct the care, custody, and control of children resides first in the parent and cannot be infringed by state actors absent a finding that the parents are unfit or that the state has an interest that supersedes the parents' interest.

140.    Defendant Blake has acted with reckless disregard for those established fundamental rights by failing to adequately train and direct school staff under his supervision that parental rights must be respected when addressing critical issues involving children's mental health and emotional well-being such as a child's assertion of a discordant gender identity and request for social transition in the forms of being treated as the other sex including the use of alternate names and pronouns at school.

141.    Defendant Blake knowingly and purposefully implemented a policy, custom, practice or procedure that violates the Constitution in that it requires, *inter alia,* that information

related to children's requests to socially transition to another gender be concealed from parents unless their minor children consent.

142.    Defendant Blake has evidenced his knowing implementation of the policy, custom, practice or procedure that interferes with parental rights in his statement to Mrs. Willey that he will lie to her about her daughter's assertion of a discordant gender identity if her daughter asks that Mrs. Willey not be told.

143.    Defendant Blake has explicitly stated that he will not inform Mr. and Mrs. Willey of critical information related to their daughter's mental health and emotional well-being despite his knowledge of A.S.'s history of trauma and diagnoses of ADHD and PTSD.

144.    The implementation of the policy, custom, practice or procedure by Mr. Blake has infringed and continues to infringe the fundamental parental rights of Plaintiffs to direct the care, custody and control of their children, including A.S. in a manner that has irreparably harmed them and continues to irreparably harm them.

### General allegations for all Defendants

145.    All Defendants' reckless disregard for Mr. and Mrs. Willey's rights has resulted in deprivation of their fundamental constitutional rights in that Defendants are explicitly and intentionally excluding Plaintiffs from significant decision-making directly related to their children's care.

146.    Plaintiffs' constitutionally protected right to direct the upbringing of their child was violated as the plainly obvious consequence of Defendants' actions in a) directing District staff that students are entitled to confidentiality with respect to their own parents when they raise issues related to gender identity; b) withholding mental health information regarding A.S from Mr. and Mrs. Willey; c) promoting and facilitating social transition of a discordant gender

identity for A.S without her parents' knowledge or consent, and even over Mrs. Willey's objections; and d) taking or failing to take other actions of which Plaintiffs are presently unaware.

147.    Defendants cannot assert a superseding interest for disregarding Plaintiffs' long-established fundamental constitutional right to direct the upbringing, care, and education of their children, and Defendants' prohibition against parental notification and obtaining consent is not narrowly tailored.

148.    Defendants' violation of Plaintiffs' fundamental constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

149.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

## SECOND CAUSE OF ACTION
## VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983
### (Violation of Plaintiffs' Substantive Due Process Right to Familial Privacy Under the U.S. Constitution)
### (By Plaintiffs Against All Defendants)

150.    Plaintiffs incorporate the factual allegations in paragraphs 1-109 by reference as if set forth in full.

151.    The Due Process Clause in the 14th Amendment to the United States Constitution protects the sanctity of the family as an institution deeply rooted in this Nation's history and tradition, through which moral and cultural values are passed down to children. *Moore v. East Cleveland*, 431 U.S. 494, 503-04 (1977). The Constitution protects the private realm of the family from interference by the state. *Prince v. Massachusetts*, 321 U.S. 158 (1944); *Thomas v. Kaven,* 765 F.3d 1183 (10th Cir. 2014).

152.    Defendants have violated and are violating Mr. and Mrs. Willey's fundamental constitutional right to familial privacy in approving, sanctioning, and implementing a District

policy, custom, practice or procedure that requires, *inter alia*, that information related to minor children's mental health including children's assertion of a discordant gender identity and requests to socially transition to another gender be concealed from parents unless their minor children consent.

153.    In approving, sanctioning and implementing the policy, custom, practice or procedure, Defendants acted intentionally to deprive Plaintiffs of their protected relationship with their children by supplanting Defendants' judgment for the judgment of Plaintiffs as fit parents regarding decision-making related to their children's mental health regarding assertion of a discordant gender identity and social transitioning.

### Defendant School Board Acts to Deprive Plaintiffs of the Right to Familial Privacy

154.    Defendant School Board acted intentionally to deprive Mr. and Mrs. Willey of their protected relationship with their children by approving and condoning the policy, custom, practice or procedure that conceals information from parents and by refusing to honor parental instructions, thereby supplanting Defendants' judgment for the judgment of Mr. and Mrs. Willey as parents regarding decision-making related to their children's assertion of a discordant gender identity and social transitioning.

155.    Defendant School Board acted intentionally to deprive Mr. and Mrs. Willey of their protected relationship with their children by approving and condoning the policy, custom, practice or procedure that creates dueling identities for children that exacerbate children's confusion and promotes discord with their parents.

### Defendant McGovern Acts to Deprive Plaintiffs of the Right to Familial Privacy

156.    Defendant McGovern acted intentionally to deprive Mr. and Mrs. Willey of their protected relationship with their children by approving and implementing the policy, custom, practice or procedure that intentionally conceals information from parents and by refusing to

honor parental instructions, thereby supplanting Defendants' judgment for the judgment of Plaintiffs as fit parents regarding decision-making related to their children's assertion of a discordant gender identity and social transitioning.

157.    Defendant McGovern acted intentionally to deprive Mr. and Mrs. Willey of their protected relationship with their children by approving and implementing the policy, custom, practice or procedure that creates dueling identities for children that exacerbate children's confusion and promotes discord with their parents.

158.    Defendant McGovern has explicitly instructed and directed District staff to not inform Mr. and Mrs. Willey of critical information related to their daughter's mental health, *i.e.,* her professed discordant gender identity and request to socially transition to the opposite gender, despite her knowledge of A.S.'s history of sexual trauma and diagnoses of ADHD and PTSD. Ms. McGovern has thus exhibited reckless disregard for Mr. and Mrs. Willey's protected familial relationship with their children.

**Defendant Bolton Acts to Deprive Plaintiffs of the Right to Familial Privacy**

159.    Defendant Bolton acted intentionally to deprive Mr. and Mrs. Willey of their protected relationship with their children by approving and implementing the policy, custom, practice or procedure that conceals information from parents and by refusing to honor parental instructions, thereby supplanting Defendants' judgment for the judgment of Mr. and Mrs. Willey as fit parents regarding decision-making related to their children's assertion of a discordant gender identity and social transitioning.

160.    Defendant Bolton acted intentionally to deprive Mr. and Mrs. Willey of their protected relationship with their children by approving and implementing the policy, custom,

practice or procedure that creates dueling identities for children that exacerbate children's confusion and promotes discord with their parents.

**Defendant Arnoldi Acts to Deprive Plaintiffs of the Right to Familial Privacy**

161.    Defendant Arnoldi acted intentionally to deprive Plaintiffs of their protected relationship with their children by implementing the policy, custom, practice or procedure that conceals information from parents and by refusing to honor parental instructions, thereby supplanting Defendants' judgment for the judgment of Me. and Mrs. Willey as fit parents regarding decision-making related to their children's assertion of a discordant gender identity and social transitioning.

162.    Defendant Arnoldi acted intentionally to deprive Mr. and Mrs. Willey of their protected relationship with their children by implementing the policy, custom, practice or procedure that creates dueling identities for children that exacerbate children's confusion and promotes discord with their parents.

163.    Defendant Arnoldi has explicitly instructed and directed District staff not to inform Mr. and Mrs. Willey of critical information related to their daughter's mental health, *i.e.,* her professed discordant gender identity and request to socially transition to the opposite gender, despite her knowledge of A.S.'s history of sexual trauma and diagnoses of ADHD and PTSD. Ms. Arnoldi has thus exhibited reckless disregard for Mr. and Mrs. Willey's fundamental parental rights.

**Defendant Blake Acts to Deprive Plaintiffs of the Right to Familial Privacy**

164.    Defendant Blake acted intentionally to deprive Plaintiffs of their protected relationship with their children by implementing the policy, custom, practice or procedure that conceals information from parents, thereby supplanting Defendants' judgment for the judgment

of Mr. and MRs. Willey as fit parents regarding decision-making related to their children's assertion of a discordant gender identity and social transitioning.

165.    Defendant Blake acted intentionally to deprive Mr. and Mrs. Willey of their protected relationship with their children by approving and implementing the policy, custom, practice or procedure that creates dueling identities for children that exacerbate children's confusion and promotes discord with their parents.

166.    Defendant Blake's intentional acts are evidenced in his statement to Mrs. Willey that he will lie to her about A.S.'s identity at school.

167.    Defendant Blake has explicitly instructed and directed school staff that they will not inform Mr. and Mrs. Willey of critical information related to their daughter's mental health, *i.e.,* her professed discordant gender identity and request to socially transition to the opposite gender, despite his knowledge of A.S.'s history of trauma and diagnoses of ADHD and PTSD. Mr. Blake has thus exhibited reckless disregard for Mr. and Mrs. Willey's fundamental parental rights.

**General allegations for all Defendants**

168.    All Defendants have acted and are acting with reckless disregard for Mr. and Mrs. Willey's rights to family privacy by their actions in assuming that parents are unfit and will not respond appropriately to their children's expression of a discordant gender identity and excluding parents from decision-making related to their children's health and welfare, including questions regarding their sex and gender identity.

169.    All Defendants have unduly burdened and are unduly burdening Mr. and Mrs. Willey's protected relationship and have and are effecting an unwarranted intrusion into that

relationship through concealment of facts critical to children's health and well-being and creation of dueling identities that cause distress to A.S. and discord between A.S. and her parents.

170.    All Defendants have unduly burdened and are unduly burdening Mr. and Mrs. Willey's protected relationship and have and are effecting an unwarranted intrusion into that relationship by depriving A.S. of her right to have decisions regarding her mental health and well-being made by her parents.

171.    All Defendants have also infringed Mr. and Mrs. Willey's right to family privacy by implying that A.S.'s parents will not act in her best interest in response to her assumption of a fictitious male identity and therefore cannot be trusted to be informed of or involved in decision-making related to her mental health and identity. Defendants have erected a veil of secrecy between A.S. and her parents, thereby creating discord and division in the parent-child relationship that infringes Mr. and Mrs. Willey's right to family privacy.

172.    Defendants' reckless disregard for Plaintiffs' rights resulted in deprivation of their constitutional right to familial privacy.

173.    Plaintiffs' constitutionally protected right to familial privacy was violated as the plainly obvious consequence of Defendants' actions in a) directing District staff to conceal from parents information regarding their children's assertion of a discordant gender identity and request to socially transition to the opposite gender, a recognized mental health treatment; b) maintaining the policy, custom, practice or procedure that forecloses parental involvement in critical decision-making related to their children unless the children consent; c) facilitating and maintaining the creation of dueling identities for children that create confusion and discord; and d) taking or failing to take other actions of which Mr. and Mrs. Willey are presently unaware.

174.   Defendants cannot assert a superseding state interest for violating Mr. and Mrs. Willey's fundamental constitutional right to familial privacy. Defendants' prohibitions against parental notification and involvement in children's mental health decisions related to gender identity are not narrowly tailored.

175.   Defendants' violation of Mr. and Mrs. Willey's fundamental constitutional rights has caused and continues to cause Mr. and Mrs. Willey undue hardship and irreparable harm in that Mr. and Mrs. Willey were denied their right to make mental health decisions for their daughter without interference from the state, to make decisions in keeping with their family values and sincerely held religious beliefs, and to provide comfort, care, and direction to their daughter.

176.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

### THIRD CAUSE OF ACTION

**Violation of Civil Rights, 42 U.S.C. § 1983**
**(Violation of Plaintiffs' Right to Free Exercise of Religion**
**Under the U.S. Constitution)**
**(By All Plaintiffs Against All Defendants)**

177.   Plaintiffs incorporate the factual allegations of paragraphs 1-109 by reference as if set forth in full.

178.   The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Mr. and Mrs. Willey's right to free exercise of religion.

179.   Mr. and Mrs. Willey have sincerely held religious beliefs that human beings are created male or female and that the natural created order regarding human sexuality cannot be

changed regardless of individual feelings, beliefs, or discomfort with one's identity and biological reality as either male or female.

180.    Mr. and Mrs. Willey have sincerely held religious beliefs that parents have the non-delegable duty to direct the upbringing and beliefs, religious training, and medical and mental health care of their children and any intrusion of the government into that realm infringes upon the free exercise of their religion.

181.    Mr. and Mrs. Willey have sincerely held religious beliefs that all people are to be treated with respect and compassion, and that respect and compassion includes refraining from misrepresenting an individual's natural biological and created identity as either a male or a female.

182.    Mr. and Mrs. Willey have sincerely held religious beliefs that individuals are to speak the truth, including speaking the truth regarding matters of sexual identity and biological reality as a male or female.

183.    Mr. and Mrs. Willey also have the sincerely held religious belief based on Judeo-Christian principles and Biblical commandment that children are to honor their father and mother, which means that they are not to lie to their parents or act in contravention to their parents' instructions.

184.    Defendants' actions in excluding Mr. and Mrs. Willey from decision making regarding their daughter because of a perceived lack of "affirmation" targets Mr. and Mrs. Willey's religious beliefs regarding the created order, biological reality, human nature, sexuality, gender, ethics, and morality which constitute central components of their sincerely held religious beliefs.

185.    Defendants were aware of the family's sincerely held religious beliefs and that such beliefs would conflict with socially transitioning A.S., untruthfully treating their daughter as, and calling their daughter, a male named "C," and using male pronouns.

186.    Defendants' actions have caused a direct and immediate conflict with Mr. and Mrs. Willey's sincerely held beliefs by failing to require notification and by failing to implement appropriate safeguards for parental rights, thus preventing Mr. and Mrs. Willey from being informed of the mental health issues A.S was experiencing and seeking counseling and guidance for A.S in a manner that is consistent with the beliefs held by Mr. and Mrs. Willey and A.S.

187.    Defendants' actions have impermissibly burdened Mr. and Mrs. Willey's sincerely held religious beliefs by communicating to A.S. that her parents cannot be trusted so that she should not honor their instructions and should question whether adherence to the family's sincerely held religious beliefs is beneficial and healthy.

188.    Defendants' actions are neither neutral nor generally applicable, but rather specifically and discriminatorily target the religious speech, beliefs, and viewpoint of Mr. and Mrs. Willey and thus expressly constitute a substantial burden on sincerely held religious beliefs that are contrary to Defendants' viewpoint regarding gender identity and transition of a discordant gender identity.

189.    No compelling state interest justifies the burdens Defendants imposed on Mr. and Mrs. Willey's rights to the free exercise of religion.

190.    Defendants' actions are not the least restrictive means to accomplish any permissible government purpose Defendants seek to serve.

191.    Defendants' violation of Mr. and Mrs. Willey's rights to free exercise of religion has caused, is causing, and will continue to cause Mr. and Mrs. Willey to suffer undue and actual

hardships. Said hardships include exacerbation of A.S.'s mental health issues, confusion, diminution of the parent-child relationship, invasion of familial privacy, and physical and emotional injuries to all Plaintiffs.

192. Defendants' violation of Mr. and Mrs. Willey 's rights to free exercise of religion has caused, is causing, and will continue to cause Plaintiffs to suffer irreparable injury. Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

**FOURTH CAUSE OF ACTION**
**Violation of Civil Rights, 42 U.S.C. § 1983**
**(Violation Right to Free Exercise of Religion Under the U.S. Constitution)**
**(Plaintiff Ashley Willey Against All Defendants)**

193. Plaintiff incorporates the factual allegations of paragraphs 1-109 by reference as if set forth in full.

194. The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiff's right to free exercise of religion. This right was well-established based on U.S. Supreme Court and Tenth Circuit precedent at the time of the offending conduct alleged herein.

195. By threatening to punish Mrs. Willey, as a special education teacher within the Sweetwater County School District, for exercising her sincerely held religious beliefs in the way she discusses issues or refrains from discussing issues regarding gender identity, Defendants have violated and are violating her right to free exercise of religion under the First Amendment.

196. Mrs. Willey's views and expression related to gender identity are motivated by her sincerely held religious beliefs, are avenues through which she exercises her religious faith, and constitute a central component of her sincerely held religious beliefs.

197.    Expressing the District's mandated message regarding gender identity would require Mrs. Willey to violate her sincerely held religious beliefs.

198.    Defendants' practices are neither neutral nor generally applicable but allow Defendants to target religious expression and activities specifically and to express hostility to such expression as exemplified by Ms. Arnoldi's message that Mrs. Willey could not follow her religious beliefs when children request that she affirm a false identity and conceal information from the children's parents.

199.    Defendants violated Mrs. Willey's right to free exercise of religion when they compel her to communicate views that violate her religious beliefs, and they continue to do so by threatening to punish her if she continues to communicate her beliefs or if she continues to refuse to communicate views on those same subjects that violate her religious beliefs.

200.    Defendants' enforcement of the policy, custom, practice or procedure violates Mrs. Willey's right to free exercise of religion as guaranteed by the First Amendment to the United States Constitution.

201.    Defendants' actions are neither neutral nor generally applicable, but rather specifically and discriminatorily target the religious speech, beliefs, and viewpoint of Mrs. Willey and thus expressly constitute a substantial burden on sincerely held religious beliefs that are contrary to Defendants' viewpoint and Guidance regarding gender identity and social transitioning for children.

202.    Defendants violated Mrs. Willey's right to free exercise of religion when they established the policy, custom, practice or procedure that coerces and compels Mrs. Willey, under the threat of professional discipline, including termination of her employment, to violate

her religious beliefs by communicating and implementing the District's prescribed message and Guidance regarding children's requests to social transition without parental approval.

203. Defendants violate Mrs. Willey's right to free exercise of religion when they compel Mrs. Willey, under the threat of professional discipline, including termination of her employment, to violate her religious beliefs by requiring that Mrs. Willey lie to and deliberately deceive parents regarding their child's gender identity against her sincerely held ethical and religious beliefs.

204. Defendant Arnoldi explicitly and knowingly violated Mrs. Willey's right to free exercise of religion when she told Mrs. Willey that she cannot make decisions based on her religious beliefs if she wanted to continue working for the District. (Exhibit F).

205. By conditioning Mrs. Willey's status as a teacher in good standing with the District (and ultimately her employment with the District) on her willingness to surrender her constitutional rights, Defendants have imposed and are imposing an unconstitutional burden on her in violation of her First Amendment rights.

206. No compelling state interest justifies the burdens Defendants impose on Mrs. Willey's right to the free exercise of religion.

207. Defendants' actions are not the least restrictive means to accomplish any permissible government purpose Defendants seek to serve.

208. Defendants' violation of Mrs. Willey's rights to free exercise of religion has caused, is causing, and will continue to cause Mrs. Willey to suffer undue and actual hardships.

209. Defendants' violation of Mrs. Willey's right to free exercise of religion has caused, is causing, and will continue to cause Mrs. Willey to suffer irreparable injury. Mrs.

Willey has no adequate remedy at law to correct the continuing deprivation of her cherished constitutional rights.

## FIFTH CAUSE OF ACTION
### Violation of Civil Rights, 42 U.S.C. § 1983
### (Violation of the Right to Free Speech Under the U.S. Constitution)
### (Plaintiff Ashley Willey Against All Defendants)

210.    Plaintiff incorporates the factual allegations of paragraphs 1-109 by reference as if set forth in full.

211.    The Free Speech Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Mrs. Willey's right to freedom of speech.

212.    Mrs. Willey's right to freedom of speech includes both the decision of what to say and what not to say. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31,*138 S. Ct. 2448, 2463 (2018)

213.    As a teacher in public school, Mrs. Willey does not "shed [her] constitutional rights to freedom of speech of expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506 (1969).

214.    As a teacher in public school, Mrs. Willey cannot be compelled by Defendants to affirm a belief or speak a message with which she disagrees. *See, W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 631 (1943).

215.    Referring to students using preferred names and pronouns that differ from their biological sex carries the message that "People can have a gender identity inconsistent with their sex at birth." That is a message with which Mrs. Willey disagrees and which violates her sincerely held religious beliefs.

216.   The discussion of gender identity, including whether it is appropriate to use preferred names and pronouns that differ from biological sex, is a matter of public concern.

217.   Using or not using preferred names and pronouns to refer to students is not curricular speech or part of Mrs. Willey's official duties.

218.   Defendants have developed and implemented a policy, custom, practice or procedure, (the Chosen/Preferred Names Procedure) which requires that District staff, including Mrs. Willey, use students' preferred names and pronouns and thereby personally affirm and communicate Defendants' preferred message and viewpoint about gender identity.

219.   Defendants, in particular Ms. McGovern, Ms. Arnoldi and Ms. Bolton, have threatened to discipline District staff who do not use students' preferred pronouns, including ones that differ from the students' biological sex, to personally affirm and communicate Defendants' preferred message and viewpoint about gender identity.

220.   Mrs. Willey cannot comply with Defendants' mandate to personally affirm and communicate Defendants' preferred message and viewpoint about gender identity, *i.e.,* that students can have a gender identity different from their sex and their assertion of such a differential identity must be affirmed.

221.   As a teacher for the District, Mrs. Willey speaks with parents and thereby communicates messages about the parents' children.

222.   Lying to or deceiving parents is a matter of public concern and is neither curricular speech nor a part of Mrs. Willey's official duties. *See Janus*, 138 S. Ct. at 2471-73.

223.   Defendants have developed and implemented a policy, custom, practice or procedure, (the Preferred/Chosen Names Procedure) which requires that District staff, including Mrs. Willey, lie to or deceive parents regarding their children's gender identity, preferred name

and pronouns unless the children have consented to the staff member revealing the gender identity and preferred name and pronouns to their parents.

224.    Defendants, in particular, Ms. McGovern, Ms. Arnoldi and Ms. Bolton, have threatened to discipline District staff, including Mrs. Willey, if staff members do not lie to or deceive parents under those circumstances.

225.    Mrs. Willey cannot comply with the custom, policy, practice or procedure compelling her to lie or deceive those parents when speaking to them about their children.

226.    Defendants have no compelling or even legitimate interest in compelling Mrs. Willey to lie to or deceive parents.

227.    The custom, policy, practice or procedure is not narrowly tailored to serve a compelling governmental interest, nor does it serve a compelling governmental interest that cannot be achieved through means significantly less restrictive of Mrs. Willey's free speech rights.

228.    The custom, policy, practice or procedure unlawfully compels, and threatens to compel, Mrs. Willey to personally affirm and communicate messages with which she disagrees, contrary to the First Amendment of the United States Constitution.

229.    The custom, policy, practice or procedure has caused and is continuing to cause irreparable injury to Mrs. Willey by depriving her of her constitutional rights. Mrs. Willey has no adequate remedy at law to correct the continuing deprivation of her cherished constitutional rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

**Under The First Cause of Action:**

1.      A declaration that Defendants violated Plaintiffs' fundamental rights as parents, to direct the care, custody and control of their children under the United States Constitution through development and implementation of the policy, custom, practice or procedure and associated policies and procedures, to the extent that they: (a) enabled Plaintiffs' child to change gender identity at school by, *inter alia,* being treated as the opposing sex including selecting a new "affirmed name and pronouns," without parental notification and consent; (b) prohibited teachers and other staff from communicating with parents about their children's discordant gender identity, including any desired change in treatment, name and pronouns, without first obtaining the children's consent; and (c) instructed, directed, or permitted teachers and other staff to deceive parents by, *inter alia*, using different names and pronouns around parents than are used in school;

2.      A preliminary injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Treating A.S. as any sex or gender other than female or referring to A.S. by any name other than "A." or by any pronouns other than female pronouns without the prior written consent of Plaintiffs; b) Having any private discussions with A.S. related to mental health issues, including but not limited to her assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs;   c) Referring to any of Plaintiffs' other children by any name other than their legal name or by pronouns other than those appropriate for their sex without the prior written consent of Plaintiffs; d) Having any private discussions with any of Plaintiffs' other children related to mental health issues, including but not limited to assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs.

3.      A permanent injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Treating A.S. as any sex or gender other than female or referring to A.S. by any name other than "A." or by any pronouns other than female pronouns without the prior written consent of Plaintiffs; b) Having any private discussions with A.S. related to mental health issues, including but not limited to her assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs;   c) Referring to any of Plaintiffs' other children by any name other than their legal name or by pronouns other than those appropriate for their sex without the prior written consent of Plaintiffs; d) Having any private discussions with any of Plaintiffs' other children related to mental health issues, including but not limited to assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs.

4.      For nominal damages for violation of Plaintiffs' constitutional rights;

5.      For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions, including a) emotional distress, b) exacerbation of A.S.'s psychological and educational difficulties requiring ongoing counseling and other interventions, c) ongoing emotional and psychological damage to their family dynamic, requiring therapeutic interventions to rebuild trust between parents and child, and other injuries as proven at trial;

**Under The Second Cause of Action:**

1.      A declaration that Defendants interfered with Plaintiffs' fundamental right to familial privacy under the United States Constitution, through development and implementation of the policy, custom, practice or procedure and associated policies and procedures, to the extent that they: (a) enabled Plaintiffs' child to change gender identity at school by, *inter alia*, being treated as the opposing sex including selecting a new "affirmed name and pronouns," without

parental notification and consent; (b) prohibited teachers and other staff from communicating with parents about their children's discordant gender identity, including any desired change in treatment, name and pronouns, without first obtaining the children's consent; and (c) instructed, directed, or permitted teachers and other staff to deceive parents by, *inter alia*, using different names and pronouns around parents than are used in school;

2.    A preliminary injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Treating A.S. as any sex or gender other than female or referring to A.S. by any name other than "A." or by any pronouns other than female pronouns without the prior written consent of Plaintiffs; b) Having any private discussions with A.S. related to mental health issues, including but not limited to her assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs;  c) Referring to any of Plaintiffs' other children by any name other than their legal name or by pronouns other than those appropriate for their sex without the prior written consent of Plaintiffs; d) Having any private discussions with any of Plaintiffs' other children related to mental health issues, including but not limited to assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs.

3.    A permanent injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Treating A.S. as any sex or gender other than female or referring to A.S. by any name other than "A." or by any pronouns other than female pronouns without the prior written consent of Plaintiffs; b) Having any private discussions with A.S. related to mental health issues, including but not limited to her assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs;  c) Referring to any of Plaintiffs' other children by any name other than their legal name of by

pronouns other than those appropriate for their sex without the prior written consent of Plaintiffs;

d) Having any private discussions with any of Plaintiffs' other children related to mental health issues, including but not limited to assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs.

4.      For nominal damages for violation of Plaintiffs' constitutional rights;

5.      For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions, including a) emotional distress, b) exacerbation of A.S.'s psychological and educational difficulties requiring ongoing counseling and other interventions, c) ongoing emotional and psychological damage to their family dynamic, requiring therapeutic interventions to rebuild trust between parents and child, and other injuries as proven at trial;

**Under the Third Cause of Action:**

1.      A declaration that Defendants violated Plaintiffs' fundamental right to free exercise of religion under the United States Constitution, through development and implementation of   the policy, custom, practice or procedure and associated policies and procedures, to the extent that they: a) enabled Plaintiffs' child to change gender identity at school by, *inter alia,* being treated as the opposing sex including selecting a new "affirmed name and pronouns," without parental notification and consent; b) prohibited teachers and other staff from communicating with parents about their children's discordant gender identity, including any desired change in treatment, name and pronouns, without first obtaining the children's consent; c) instructed, directed, or permitted teachers and other staff to deceive parents by, *inter alia,* using different names and pronouns around parents than are used in school; d) refused to accommodate Plaintiffs' religious beliefs by referring to A.S. by her given name and female pronouns but instead following the contrary wishes of A.S.

2.     A preliminary injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Treating A.S. as any sex or gender other than female or referring to A.S. by any name other than "A." or by any pronouns other than female pronouns without the prior written consent of Plaintiffs; b) Having any private discussions with A.S. related to mental health issues, including but not limited to her assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs;   c) Referring to any of Plaintiffs' other children by any name other than their legal name or by pronouns other than those appropriate for their sex without the prior written consent of Plaintiffs; d) Having any private discussions with any of Plaintiffs' other children related to mental health issues, including but not limited to assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs.

3.     A permanent injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Treating A.S. as any sex or gender other than female or referring to A.S. by any name other than "A." or by any pronouns other than female pronouns without the prior written consent of Plaintiffs; b) Having any private discussions with A.S. related to mental health issues, including but not limited to her assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs;   c) Referring to any of Plaintiffs' other children by any name other than their legal name or by pronouns other than those appropriate for their sex without the prior written consent of Plaintiffs; d) Having any private discussions with any of Plaintiffs' other children related to mental health issues, including but not limited to assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs.

4.     For nominal damages for violation of Plaintiffs' constitutional rights;

5.     For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions, including a) emotional distress, b) exacerbation of A.S.'s psychological and educational difficulties requiring ongoing counseling and other interventions, c) ongoing emotional and psychological damage to their family dynamic, requiring therapeutic interventions to rebuild trust between parents and child, and other injuries as proven at trial;

**Under the Fourth Cause of Action:**

1.     A declaration that Defendants violated Plaintiff's fundamental right to free exercise of religion under the United States Constitution, through development and implementation of the policy, custom, practice or procedure and associated policies, practices, and procedures, to the extent that they: a) Compel Mrs. Willey to accede to the wishes of a child that the child be treated as a different sex or gender or referred to by an alternative name and pronouns which do not match the child's legal name and sex absent written consent from parents; b) Prohibits Mrs. Willey from communicating with parents about their children's discordant gender identity, including any desired change in name and pronouns, without first obtaining the children's consent; c) Directs Mrs. Willey to deceive parents by, *inter alia*, using different names and pronouns around parents than are used in school.

2.     A preliminary injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Compelling Mrs. Willey to refer to any student by any sex or gender other than their biological sex, by any name other than his or her legal name or by any pronouns other than those appropriate for his or her biological sex absent prior written consent of parents; b) Compelling Mrs. Willey to refrain from informing parents about their children's assertion of a discordant gender identity and request for social transition absent documented evidence of abuse or neglect or imminent abuse or neglect by the parents; c)

53

Compelling Mrs. Willey to deceive others by referring to a child as one sex and by one name and set of pronouns at school and as another sex and by another name and set of pronouns in conversations with parents.

3.      A permanent injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Compelling Mrs. Willey to refer to any student by any sex or gender other than their biological sex, by any name other than his or her legal name or by any pronouns other than those appropriate for his or her sex absent prior written consent of parents; b) Compelling Mrs. Willey to refrain from informing parents about their children's assertion of a discordant gender identity and request for social transition absent documented evidence of abuse or neglect or imminent abuse or neglect by the parents; c) Compelling Mrs. Willey to deceive others by referring to a child by one name and set of pronouns at school and another name and set of pronouns in conversations with parents.

4.      For nominal damages for violation of Plaintiff's constitutional rights;

5.      For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions as proven at trial;

**Under the Fifth Cause of Action:**

1.      A declaration that Defendants violated Plaintiff's fundamental right to freedom of speech under the United States Constitution, through development and implementation of the policy, custom, practice or procedure and associated policies, practices, and procedures, to the extent that they: a) Compel Mrs. Willey to accede to the wishes of a child that the child be eferred to by an alternative name and pronouns which do not match the child's legal name and sex absent written consent from parents; b) Prohibits Mrs. Willey from communicating with parents about their children's discordant gender identity, including any desired change in name and pronouns,

without first obtaining the children's consent; c) Directs Mrs. Willey to deceive parents by, *inter alia*, using different names and pronouns around parents than are used in school.

2.      A preliminary injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Compelling Mrs. Willey to refer to any student by any sex or gender other than their biological sex, by any name other than his or her legal name or by any pronouns other than those appropriate for his or her biological sex absent prior written consent of parents; b) Compelling Mrs. Willey to refrain from informing parents about their children's assertion of a discordant gender identity and request for social transition absent documented evidence of abuse or neglect or imminent abuse or neglect by the parents; c) Compelling Mrs. Willey to deceive others by referring to a child as one sex and by one name and set of pronouns at school and as another sex and by another name and set of pronouns in conversations with parents.

3.      A permanent injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Compelling Mrs. Willey to refer to any student by any sex or gender other than their biological sex, by any name other than his or her legal name or by any pronouns other than those appropriate for his or her sex absent prior written consent of parents; b) Compelling Mrs. Willey to refrain from informing parents about their children's assertion of a discordant gender identity and request for social transition absent documented evidence of abuse or neglect or imminent abuse or neglect by the parents; c) Compelling Mrs. Willey to deceive others by referring to a child by one name and set of pronouns at school and another name and set of pronouns in conversations with parents.

6.      For nominal damages for violation of Plaintiff's constitutional rights;

7.     For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions as proven at trial;

**Under All Causes of Action:**

1.   For attorneys' fees and costs under 42 U.S.C. § 1988;

2.   For such other relief as the Court deems proper.

Dated:  April 20, 2023.


/s/*Henry F. Bailey Jr.*    NJB; FOR
Henry F. Bailey Jr. WY Bar #5-1681
Bailey Stock Harmon Cottam Lopez LLP
6234 Yellowstone Road
Cheyenne, WY 82009
307.638.7745
hank@performance-law.com

Ernest G. Trakas*
MO Bar No. 33813
Mary E. McAlister*
VA Bar No. 76057
Vernadette R. Broyles*
GA Bar No. 593026
CHILD & PARENTAL RIGHTS CAMPAIGN
5805 State Bridge Road, Suite 310
Johns Creek, GA 30097
Telephone (770) 448-4525
etrakas@childparentrights.org
mmcalister@childparentrights.org
vbroyles@childparentrights.org
* Pending Admission *Pro Hac Vice*
*Counsel for Plaintiffs*

## VERIFICATION

I, Sean Willey, declare as follows:

I. I am a Plaintiff in the present case, a citizen of the United States of America, and a resident of the State of Wyoming.

2. I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Verified Complaint for Injunctive Relief; and if called on to testify I would competently testify as to the matters stated herein.

3. I have personal knowledge of the actions of the Board of Education, administrators and employees of the Sweetwater County School District #1, their activities, and their intentions, including those set out in the foregoing Verified Complaint for Injunctive Relief, and if called on to testify I would competently testify as to the matters stated herein.

4. I verify, under penalty of perjury under the laws of the United States of America, that the factual statements in this Complaint concerning myself, my activities, and my.intentions are true and correct, as are the factual statements concerning the Board of Education, administrators and employees of the Sweetwater County School District #1.

Executed on April 10 , 2023

Sean Willey

I, Ashley Willey, declare as follows:

1.      I am a Plaintiff in the present case, a citizen of the United States of America, and a resident of the State of Wyoming. I am eligible to vote in an election for the office of the President of the United States.

2.      I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing Verified Complaint for Declaratory and Injunctive Relief; and if called on to testify I would competently testify as to the matters stated herein.

3.      I have personal knowledge of the actions of the Board of Education, administrators and employees of the **Sweetwater** County School District #1, their activities, and their intentions, including those set out in the foregoing Verified Complaint for Injunctive Relief, and if called on to testify I would competently testify as to the matters stated herein.

4.      I verify, under penalty of perjury under the laws of the United States of America, that the factual statements in this Complaint concerning myself, my activities, and my intentions arc true and correct, as are the factual statements concerning the Board of Education, administrators and employees of the Sweetwater County School District #1.


Executed on April 10, 2023

Ashley Willey

# EXHIBIT A

**EXHIBIT A**

← Back

**Direct Messages between: Shari Kumer, Hope Downs Lewis, Ashley Willey, Derek Allison, Chelsea Lund, Andrew Grossmann, Kaleigh Hannah**

👥 Group Message

**Ashley Willey**                                                                                    Tue 3/29/22, 6:48 pm

Good Evening,

It has come to my attention that the teachers and staff that interact with my daughter have been referring to her as "C████" and have treated her like she is a male. AND that this was knowingly something that she was hiding from her parents. ████ is in fact an ████ she is a female. You will refer to her as ████ and only ████ If this continues, I will take this further and go to the CAB. She is a CHILD who is not old enough to make life changing decisions such as these. And even though this is absolutely none of anyone's business besides that of the people in our family and her counselor, she has stated multiple times that she felt pressured into calling herself a boy, and that this makes her uncomfortable. With working through this, and having people encouraging things BEHIND her parents backs instead of coming to us, has made the situation worse.

Thank you for your time in this matter, I would be more than happy to come and speak with any of you in person if you have questions.

You may disagree, and that is certainly your right, but the fact remains that I am her parent and she is a child.

**EXHIBIT B**

# A.S.

AW  **Ashley Willey**

**To:** Bryant Blake

Tuesday, March 29, 2022 at 6:39 PM

Show Forward

You forwarded this message on 3/30/22, 11:35 AM.

This message is high priority.

Good Evening,

It has come to my attention tonight, that the entire staff that interacts with my daughter at your school, as well as yourself, have been referring to her as "C███" and referring to her as a male. It has also come to my attention that my 15 year old CHILD has instructed you guys to hide this from us. This is written instructions, that you and your staff will no longer refer to my child as a male or C███. Her name is ███ she is a female and she is not old enough to make any decision thinking that she is anything other than what she is. And I am appalled and furious that you and your staff are participating in hiding this from her PARENTS!!!! She is currently in counseling, and has been working very hard to understand that she is in fact a TOMBOY which has disappeared since we were in school.

If this is going to be an issue, or I find out that this is continuing, I will take this to the CAB.

If you have questions, I am willing to come in and speak to you in person. Please respond that you understand.

Thank you,
Ashley Willey
7th/8th Grade Math Resource
Rock Springs Jr. High School
School - 307-352-3474

# EXHIBIT C

Wednesday, March 30, 2022 at 11:24 AM

Show Reply

Show Forward

↰ You forwarded this message on 3/30/22, 11:35 AM.

To:  ○ Ashley Willey

↩ You replied to this message on 3/30/22, 11:30 AM.

↱ You forwarded this message on 3/30/22, 11:35 AM.

Mrs. Wiley,

Thank you for reaching out with your concern. I have already reached out to Human Resources regarding your concern. Human resources will be reaching out to the district legal team to get more clarification on this.  Once I get more clarification from Human Resources on this issue, I will reach out to you.

Thanks,

**Bryant Blake**

Black Butte High School Principal
Sweetwater County School District #1
Phone: 307-352-3290
blakeb@sw1.k12.wy.us



SWEETWATER COUNTY
SCHOOL DISTRICT #1

**From:** Ashley Willey <willeya@sw1.k12.wy.us>
**Date:** Tuesday, March 29, 2022 at 6:39 PM
**To:** Bryant Blake <blakeb@sw1.k12.wy.us>

# EXHIBIT D

Wednesday, March 30, 2022 at 11:30 AM

Show Forward

**Ashley Willey**

**To:** ○ Bryant Blake

AW

→ You forwarded this message on 3/30/22, 11:35 AM.

! This message is high priority.

There is no clarification, the only clarification you need is from me her PARENT Period.

You all were actively encouraging my child to lie to me and participating in a lie. I will be going to talk with Nicole Bolton and Kelly McGovern today since I am taking this as a refusal on your part to follow written Parent instructions.

Thank you,
Ashley Willey
7th/8th Grade Math Resource
Rock Springs Jr. High School
School - 307-352-3474



"Like so many things,
it is not what's outside, but
what is inside that counts."

MERCHANT
ALADDIN

POPSUGAR.

**EXHIBIT E**

**SCSD #1 Special Services Non-Negotiables**
**August 15, 2022**

**Time Expectations:**
1. Be on time to all IEP meetings.
2. All services must follow the scheduled dates included on the IEP including starting and end dates/times. Therefore, if the student's IEP begins on or has a date encompassing the first day of school, student services will begin the first day of school.
3. Arrival and departure time each day for certified staff is determined by the Home School schedule for all special education staff as per Policy GCJ. Itinerant staff may need to adjust specific days to accommodate for changes in times due to schedules needing to be varied to provide services in buildings with different start/end times.
4. All itinerant staff will need to submit home school and daily arrival/departure schedule to Doris by August 30st, 2022.
5. Itinerant staff will clock in and out of buildings as they travel throughout the district.

**Department Expectations:**
1. According to district policy JFC, certified staff need to have a classroom management plan in place by the first day of school. The plan needs to be signed off by your supervising administrator. Send your plan to your appropriate supervising administrator, building principal, Tiffany Gunter (OSS Asst. Director), or Kayci Arnoldi, (OSS Director).
2. All absences must be entered into Frontline per negotiated agreement.
3. Lesson Plans, in Plan Book, need to be completed for all staff.
4. Confidentiality needs to be maintained with students, parents, and other staff members. This includes Paraprofessionals.
5. Please review the following district policies:
   a. Policy GBCC– Staff Bullying Policy
   b. Policy JFCL – Student Bullying Policy
   c. Policy GBCH – Staff Harassment and Violence Policy
   d. Policy JFCB – Student Harassment and Violence Policy
   e. Policy GBEE- Seclusion and Restraint
   f. Policy DJH- Allowable purchases under Federal Grant Funds
6. Communication needs to be done in a professional manner. The best form of communication is face to face or on the phone. Please do your best to contact individuals via WebEx, in -person, telephone or Google. This will eliminate any feelings and help develop and sustain relationships between staff members.
7. Preferred/Chosen Names Procedure. As you become acquainted with your students, you may encounter students wishing to use a preferred or chosen name. A preferred/chosen name is any name a student chooses to use other than their legal name. For example, a student may wish to shorten their first name (e.g. Steven to Steve) or to be referred to by their middle name or a nickname. Sweetwater County School District Number One is committed to promoting an educational environment that is supportive and respectful to all students. Calling a person by their preferred name and pronoun shows respect and contributes to the District's commitment to providing a safe and nondiscriminatory educational environment. Accordingly, staff must use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications. Staff must respect the privacy of all students regarding such choice.

Violations of this procedure may constitute discrimination based on sex, and may result in discipline. Students who experience problems or discrimination related to their preferred/chosen name or pronoun shall be referred to the Title IX Coordinator for resources and assistance. This procedure does not address changes to educational records to reflect legal name changes. Any requests to amend educational records shall be referred to the Director of Human Resources.

8. Special Services Paras and subs are only to be utilized for Sped. They can only be used for special education student services. They cannot be used in the school office or in classrooms that do not have any identified students. This is a federally funded position. Schools will have to pay back the money for paras who are not utilized correctly.

## IEP Expectations:

1. Parental Safeguards will be mailed out to all parents of identified IDEA students at the beginning of the school year.

2. For new referrals, change of placement, change of identification, and change of program, a copy of procedural safeguards will be mailed with the Notification of Meeting. There are **new** Parental Safeguards. These will replace the current safeguards at your building.

3. The deadline for completion of proposed IEP documentation in SEAS is 3 full student contact days (not in-service, weekends or holidays). This will give the TOR, IEP Coach, and Special Services Office the opportunity to look it over prior to meeting. We will be holding true to this unless teams have approval from the Office of Special Services. **Remember: Any changes to the Annual IEP after the meeting has been held, requires an amendment or new meeting. Coaches will be reviewing IEPS within these three days. Wyoming Department Education will have access to all students IEPs this year and will be doing compliance checks monthly on newly held IEP meetings.**

4. Advanced approval is needed for all resources recommended that are not available through building resources. Resources needing approval are: personnel, itinerant staff supplies, materials, Professional Development Opportunities, Out of District Placements, Outside Evaluations, and technology.

5. For all identified students on IEPs, Extended School Year (ESY) services should be established in the regular annual IEP. Remember, ESY is not about how far a student gets during a school year. It is only for cases where a child has demonstrated regression during breaks or recoupment of skills. Since ESY is to maintain, you **MUST** use the current goals as a basis for ESY services. ESY checklists **will be used** for each student during the IEP meeting. This will allow the district to service the students that meet the criteria. ESY is not summer school.

6. All services must be rendered. Please document any deviations on time, duration, and location from the IEP.

7. Related Service Providers need to maintain service logs. These service logs need to be uploaded into SEAS.

8. Progress monitoring needs to happen as defined in each IEP goal. Progress monitoring should happen more than one time per quarter. This allows teachers to get enough data to support progress, and document the need for amending or rewriting a new IEP.

9. IEP Quarterly updates must be completed by the reporting date. This date correlates with the date general education staff are required to submit grades. This is usually the Tuesday following the end of the quarter.

10. IEP Quarterly updates will be distributed through the Office of Special Services.

11. All accommodations will be copied and distributed at the beginning of the year or when IEPs are amended, class schedule changes, and when newly developed . Accommodations need to be distributed to the general education teachers, music, art, PE, Title, ELL, itinerant staff, school nurses, bus drivers, and bus aides. This will be done by the TOR not paraprofessionals. This allows those staff members required to provide the accommodation the opportunity to ask questions and get clarification. Signatures will be collected by those individuals receiving a copy of the accommodations. These signatures will be uploaded into SEAS. Use face to face discussion.

12. Health Plans, Safety Plans, Evacuation Plans, and Behavior Plans must be signed by the parents and staff members servicing these individual students prior to implementation. These plans must be developed and presented at the annual IEP meeting. If a plan changes, an amendment needs to be done and signatures need to be collected. After signatures are collected they need to be uploaded into SEAS.

13. Assistive Technology must go through the AT Team prior to being written in the IEP unless the tech is available at the school level.

14. Excusal forms must be completed for any team members unable to attend the IEP meeting. The parent must be notified in advance of the meeting with new proposals and changes to the IEP. These signed excusals must be uploaded into the IEP meeting.

15. IEP meeting notes need to have all discussions documented. TOR's need to ensure all information discussed is reported in the minutes.

16. Notify the Office of Special Services if students are transferring to new buildings due to new reporting requirements.

17. Notify the Office of Special Services for changes in IDEA status (eligibility, discontinuation of services).

18. As required by federal law, each teacher and provider who works with students identified with special needs is informed of responsibilities related to implementing this student's IEP (including accommodations, modifications, and supports) and has access to a copy of the comprehensive IEP. Accommodations need to be available to all individuals working with the individual students. These accommodations need to be visible to substitute teachers, bus drivers, bus aides, nutrition's services, etc.

19. Failure to address a section of the IEP that is not compliant can lead to a letter of warning and a letter of reprimand. The procedure for corrections will be done through the IEP

20. LRE packets need to be completed appropriately. We will not be accepting any LRE paperwork without the proper steps and completion of tasks. For example, Level 1 needs to be submitted and approved in order to progress to Level II. No checklist, behavior tracking logs or IEP documents will be accepted. Please refer to the manual.

21. Coach to the building administrator and Director of Special Services. If the IEP Coach finds a procedural error or compliance issue, they will directly notify those staff members. These corrections should be done within 5 school days.

## COVID/Pandemics:

1. All services must be provided. There are no federal exceptions granted that waive services identified under IDEA during a pandemic.

2. Service times must be rendered for all services under any school closures due to pandemic.

3. If a parent refuses services under school closures, this needs to be documented through a PWN and compensatory education will need to be provided upon return to school.

4. Staff need to provide all services as outlined in individual students IEPs. They must find alternate modes to provide the service during school closures if needed. Reconvene IEP teams to discuss a new plan for those services that ensures the student is making progress.
5. Service logs will be filled out after each student and reviewed.
6. If a student is not making progress, reconvene the IEP teams to discuss additional supports and services that may be needed to make progress.
7. If there is any deviation to services or times, this needs to be documented through a PWN with noted parent consent and relevant factors.
8. Refer to Adaptive Learning Plan for district information regarding Covid.

I have reviewed the SCSD#1 Special Services Department Non-Negotiables. I was given the opportunity to ask any clarifying questions pertaining to these Non-Negotiables.

Ashley Willey
(Printed Name)                                               9/19/22
                                                              (Date)

_Ashley Willey_ (Signature)                                  9/19/22
(Signature)                                                  (Date)

_____          _____
(Signature District Representative)               (Date)

# EXHIBIT F

# Follow up conversation



○ **Kayci Arnoldi**

**To:** ○ Ashley Willey;  **Cc:** ○ Nicole Bolton  ≫

Monday, August 15, 2022 at 1:01 PM

Good afternoon Ashley,

After reflecting on our conversation from this morning, I wanted to follow up with you and your concern. Unfortunately, we don't get to base our decisions on personal and religious beliefs. We have to follow the policy and procedures that are set forth by law and recent court cases. As an employee of the district, you will have to abide to the policies that are in place for SCSD#1.

Thank you,

Kayci



**SWEETWATER COUNTY**
**SCHOOL DISTRICT #1**

KAYCI ARNOLDI
Director of Special Services

Sweetwater County School District Number 1
Office of Special Services
3550 Foothill Blvd., Rock Springs, WY 82901
Phone: 307-352-3400 ext. 1231
Fax: 307-352-3411
Email: arnoldik@sw1.k12.wy.us
Web: sweetwater1.org

# EXHIBIT G

**From:** Nicole Bolton <boltonn@sw1.k12.wy.us>
**Date:** Friday, September 9, 2022 at 7:55 AM
**Subject:** Preferred/Chosen Names Procedure Questions and Clarification

Dear Sweetwater School District Number One Employees,

It has come to our attention that there are some misunderstandings or misinterpretation of the "Preferred/Chosen Names Procedure" and it has escalated to where we feel we need to send clarification for the District. The screen shot that circulated on social media was shared without complete explanation and the discussion that occurred with staff. The District policies prohibiting discrimination mirror federal civil rights laws. The information circulating is the result of requests for clarification on how federal courts and agencies, such as the US Department of Education, are currently interpreting those laws. The District Preferred/Chosen Names Procedure for the District is below and this is what was read in the slide show presented. At no time has it been said or encouraged to keep things from parents or lie to parents. What was said was, *"Staff must respect the privacy of all students regarding such choice".* Please see the procedure below with further clarifying information that may explain this in more depth of when or why we may or may not communicate such a choice with parents, along with the steps that we take with each individual situation.

***Preferred/Chosen Names Procedure:*** *As you become acquainted with your students, you may encounter students wishing to use a preferred or chosen name. A preferred/chosen name is any name a student chooses to use other than their legal name. For example, a student may wish to shorten their first name (e.g. Steven to Steve) or to be referred to by their middle name or a nickname. Sweetwater County School District Number One is committed to promoting an educational environment that is supportive and respectful to all students. Calling a person by their preferred name and pronoun shows respect and contributes to the District's commitment to providing a safe and nondiscriminatory educational environment. Accordingly, staff must use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications. Staff must respect the privacy of all students regarding such choice.*

*Violations of this procedure may constitute discrimination based on sex, and may result in discipline. Students who experience problems or discrimination related to their preferred/chosen name or pronoun shall be referred to the Title IX Coordinator for resources and assistance. This procedure does not address changes to educational records to reflect legal name changes. Any requests to amend educational records shall be referred to the Director of Human Resources.*

Generally, the guidance given to staff is that the District prohibits discrimination based on sex. District policies mirror federal civil rights laws such as Title IX, which prohibits discrimination based on sex. District discussions involved the recent Notice of Interpretation issued by the United States Department of Education Office for Civil Rights ("OCR"), which explained that

OCR will enforce Title IX's prohibition on discrimination on the basis of sex to include: (1) discrimination based on sexual orientation; and (2) discrimination based on gender identity. Depending on the case, misgendering a student could violate both District policy and Federal law.

The complexity and sensitivity of issues surrounding gender identity preclude a one-size fits-all approach. Staff were never directed not to talk to parents or to lie to parents. Decisions regarding how to support transgender and gender nonconforming students may involve the student, parents, and District administration. Teachers are expected to immediately refer such matters to their building principal, who will involve central administration. Teachers will then be informed of the District's plan for supporting the individual student and will be responsible for supporting that student. Again, student needs will be met with an individualized response and specific support.

That being said, the District will prioritize safeguarding the physical and psychological well-being of a student. When a student indicates that their family is not supportive of their gender identity and/or the District is concerned for the student's safety, the District will honor a student's request for confidentiality until the student consents to the disclosure and/or the District completes an individualized assessment and rules out any particularized and substantiated concern of real harm to the student. The expectation is that parents will eventually be involved: the District will support the student in this process and encourage familial involvement whenever possible. For example, the District will offer the opportunity to speak with a school counselor or social worker to facilitate conversations with parents.

To summarize, the District supports the needs of transgender and gender nonconforming students on a case-by-case basis to ensure a safe, supportive, and inclusive learning environment free from discrimination. Harassment and discrimination will not be tolerated.

The District's response to students requesting the use of a preferred/chosen name or pronoun has no bearing on requests regarding facilities use, formal changes to academic records, etc. This was simply meant to provide guidance for staff in addressing students informally by their chosen name or pronoun.

Please remember in addition to this information that what we choose to say at work with other colleagues if overheard or directed at another person or student, or that information is shared with another student or staff member that it offends or creates a hostile work environment can result in a harassment, discrimination, or Title IX complaint. Please remain professional.  Thank you.

The one place our students should feel emotionally and physically safe is at school and in your care.  Thank you for your hard work and this environment that you create for them every day.

Sincerely,
*Kelly and Nicole*

This e-mail message, which is from Sweetwater County School District Number one, State of Wyoming, contains CONFIDENTIAL and PRIVILEGED INFORMATION. In addition, the information may be protected by applicable Federal and State laws including, without limitation, the provisions of the Family Educational Rights and Privacy Act (FERPA) which prohibits unauthorized disclosures.

If you have received this communication in error (you are not the addressee or authorized receiver for the addressee), you may not use, copy, or disclose the message or any information contained in the message. If you have received this e-mail in error, please advise the sender immediately by reply e-mail and delete this message.

# EXHIBIT H

1

IN RE:  ASHLEY AND SEAN WILLEY


TRANSCRIPT OF EXCERPT OF VIDEO-RECORDED FILE

TIME STAMPS 1:33 TO 2:35

1          CHAIRMAN JELACO:  Further public

2  comment, please?

3          MS. EGGEBRATEN:  Good evening.  Woo.

4  I have a big voice.  That's a little loud.  Can you

5  hear me without feedback?

6          Okay.  Good evening, lady [sic] and

7  gentlemen.  My name is Susan Eggebraten.  I'm a

8  retired teacher.

9          I came to the Board with some questions.  I

10  would like to know how this district will handle the

11  changes, upcoming proposed changes by the U.S.

12  Department of Education concerning Title IX

13  specifically.  I would like to get some answers

14  about that.

15          Are teachers going to be required to

16  address students by their preferred pronouns?  Are

17  females -- or excuse me -- are males going to be

18  allowed to use female bathrooms?  Are males going to

19  be participating in fem- -- female sports?  How will

20  the district be dealing with these changes should

21  they occur?

22          CHAIRMAN JELACO:  We actually have

23  Kari Moneyhun here tonight, who is part of the -- of

24  our legal team.  And so I'm going to ask her to

25  discuss the legal standard that directs the

1   district's actions in this area.

2               MS. EGGEBRATEN:  Okay.

3               CHAIRMAN JELACO:  Okay?  Kari, if

4   you'd come to the microphone, please.

5               MS. EGGEBRATEN:  Would you like me to

6   sit down while this person addresses the audience?

7               CHAIRMAN JELACO:  Do you have other

8   questions or --

9               MS. EGGEBRATEN:  Possibly.

10              CHAIRMAN JELACO:  Okay.  Why don't you

11  just have a seat there close by.  Thank you.

12              MS. MONEYHUN:  Sorry, Zach.  I'm going

13  to be bumping this for a second.

14          Thank you, Chair Jelaco, board members,

15  Superintendent McGovern.

16          Before I jump into it, I -- are there any

17  other questions regarding Title IX, transgender

18  rights, that sort of thing?  Okay.

19              CHAIRMAN JELACO:  I see some --

20              MS. MONEYHUN:  Oh, yes.

21              CHAIRMAN JELACO:  I see some heads

22  nodding.

23              MS. MONEYHUN:  Do you want to get

24  those out of the way, then, before I --

25                   (Inaudible voices.)

1          MS. MONEYHUN:  Okay.  Well, to start,

2   I can address the board.  I can provide you a

3   summary of the law.  I don't give legal advice in

4   public.

5          CHAIRMAN JELACO:  Uh-huh.

6          MS. MONEYHUN:  The board is the

7   client, so any legal advice would be attorney-client

8   privilege.  That would be provided in private, in

9   executive session, or I could follow up if you had

10  questions and advise you later.

11          I'm not direct -- addressing the public and

12  I can't engage in a dialogue with the public,

13  because I am -- am representing the board as -- as

14  their legal counsel.  But they have asked me to

15  prepare a short summary of the law.  And I'm -- I'm

16  laughing because a summary usually is short, and in

17  area of law unfortunately I can't just give you a

18  black and white answer.  This is an area that is

19  evolving and it is rapidly evolving and we are

20  watching it.

21          You referenced the -- the Title IX changes.

22  There are proposed regulations that are in draft

23  form.  We expect those to be adopted probably for

24  the next school year.  We -- we -- we don't know yet

25  when those will be adopted.  But the district's

1  policy has always been to adhere to the law and

2  follow the law as it has been written and

3  implemented.  And as you know, Title IX is a federal

4  law.  It's a civil rights law.  And so I want to get

5  into a little bit of that background.

6        There's a couple laws that we discuss when

7  we're talking about transgender rights especially.

8  We have Title VII, which comes from the Civil Rights

9  Act of 1964.  So that governs discrimination in

10  employment.  And it says that, at that time, 1964,

11  congress out- -- outlawed discrimination in the

12  workplace based on race, color, religion, sex, or

13  national origin.  Now, note that there's no

14  protection for political beliefs or personal

15  preferences beliefs.

16        And that -- that law was recently -- well,

17  there was a U.S. Supreme Court case called Bostock

18  versus Clayton County, which you probably have heard

19  about.  That was decided in 2020, where the Supreme

20  Court held that sex discrimination encompasses

21  discrimination on the basis of both sexual

22  orientation and transgender status or gender

23  identity.

24        So it -- I don't want to say that it

25  necessarily expanded that protection, because courts

6

1   have already been interpreting it that way, but now

2   we have a Supreme Court saying that across the

3   nation this is the standard.

4          So we also have Title IX, which is big in

5   schools.  That was enacted in 1972 as part of the

6   education amendments to the Civil Rights Act.

7   Again, it also prohibits sex-based discrimination,

8   but it is specific to schools.  And it also covers

9   employment, but it also covers our students.

10         So the two -- the two laws, the two federal

11  laws, they're very similar, so courts borrow the

12  jurisprudence from, say, Title VII and apply it to

13  Title IX, because they're essentially the same.

14         So we've known for quite a while that under

15  Title IX and Title VII, that sex-based

16  discrimination covers sexual harassment.  That's

17  where a lot of the focus has been recently, because,

18  you know, we had the new Title IX regulations a

19  year, two years ago that we -- that we rapidly

20  implemented and we've been following.  Those are the

21  sexual harassment policies.

22         And since that time, there's been a lot of

23  action in the federal courts, in the state courts,

24  and then also in the federal agencies that enforce

25  and implement those -- those laws.

1        But back to my -- my point about sexual

2   harassment, that includes misgendering a person.

3   It's -- for example, there is a case recently where

4   a teacher -- the courts found that she was subject

5   to sexual harassment from both students and

6   coworkers.  The teacher, Jennifer Eller, she began

7   socially transitioning to begin living as a woman in

8   accordance with her gender identity in 2011.

9        From the time that she began transitioning

10  until she resigned, she was subject to threats,

11  insults, physical assaults even, frequently included

12  misgendering, which means just being referred to by

13  names or pronouns that are associated with a

14  different gender identity, and the use of derogatory

15  names and slurs.  Like I said, it was from both

16  students and -- and coworkers.

17       The district ignored her complaints.  She

18  complained over and over.  Eventually she sought

19  counseling for PTSD.  This was after she resigned.

20  But through this process, the district ignored her

21  complaints and they actually requested that she tone

22  it down and dress less feminine.  So the court said

23  given these facts, it's a clear case of sexual

24  harassment.

25       So that's been settled law for quite a

1  while.  Misgendering, harassing someone based on

2  their either sexual orientation or gender identity

3  is considered sexual harassment not only under Title

4  IX but also Title VII for employees.

5           And to back up a little bit, so Title IX,

6  which, you know, is schools, it's enforced by the

7  U.S. Department of Education, Office of Civil

8  Rights.  That is the agency that has drafted the new

9  proposed regulations.  And I'm going to address

10  those here in a minute, but they evaluate,

11  investigate, and then they resolve complaints of sex

12  discrimination.  And they can launch their own

13  independent evaluation and investigation or they can

14  come in after somebody files a complaint.  They also

15  provide guidance so we know how to interpret the

16  federal -- the federal civil rights laws.

17           And recently -- actually last year, it's

18  been a year now, in June of 2021, OCR issued a

19  notice of interpretation that applied that Bostock

20  case that said discrimination based on sex includes

21  gender identity, transgender status, or sex- --

22  sexual orientation.  So now we've got that status

23  applied or that definition also applied to Title IX

24  and how OCR interprets it.

25           So that's kind of the status of the

1  overarching laws and what the district's policies

2  detail, because, you know, we always start when we

3  look at an issue what are our own policies.  So we

4  have our general policy AC, which is the general

5  nondiscrimination policy.  And that essentially

6  parrots the -- the Civil Rights Act.  We've got ACA,

7  which is nondiscrimination on the basis of sex.

8  That parrots Title IX.  And then ACA-R, which is our

9  procedure regarding sexual harassment.

10          So within the last couple months, there

11  have been numerous cases that have gone to mostly

12  local state courts.  We haven't seen anything hit

13  the Supreme Court yet, the United States Supreme

14  Court yet.  We haven't seen anything in Wyoming yet.

15          If there hasn't -- if -- if we're looking

16  at case law, we look at first of all, you know, our

17  state.  If we don't have something in our state,

18  then we look at our jurisdiction, which would be the

19  Tenth Circuit.  We almost had a case that we were

20  following closely in the Tenth Circuit, and I'm

21  going to address that one in a minute.  That's the

22  Canvas -- or Kansas case, which you guys are

23  probably familiar with.  It's been making its rounds

24  in the media lately.

25          So we have to look to these other states

1   and what they're doing to get an idea of how courts

2   are interpreting these -- these laws, because

3   ultimately our policies just parrot the federal

4   civil rights laws, so we interpret them the same way

5   that the federal agencies and the federal courts do.

6          So the hard part is, like I said, it's not

7   black and white.  So you've got the rights of the

8   transgender person, either the student or the

9   employee, but you also have other rights, teacher

10   rights, potentially other staff members, parents.

11   And so we have to look at the individual facts to

12   figure out how to balance those rights.

13          So there is some -- some case law.  There

14   was a case decided in the Southern District of

15   Indiana last year regarding a teacher's -- the

16   requirement for a teacher to use students' preferred

17   names and pronouns.  And in that case, it was a

18   music teacher.  He claimed that he was forced to

19   resign for misgendering transgender students.  He

20   said that he was discriminated against for failure

21   to accommodate his religious beliefs.  So we've got

22   transgender, you know, don't discriminate based on

23   sex, gender identity, and then we've got the teacher

24   who's saying, well, in order to do that, you're --

25   you're discriminating against my religious beliefs.

1          That school, their policy was it required

2   all staff to address students by their name that

3   appeared in PowerSchool.  And the district allowed

4   students to change their first names, gender marker,

5   and their pronoun in PowerSchool to align with their

6   gender identity.  So he told the administration he

7   couldn't do that.  He said it violated his religious

8   beliefs.

9          The school initially accommodated him.

10  They said we understand, that we'll allow you to

11  just address your students by their last names, but

12  you can't use honorifics such as Mr. or Ms., it's

13  just Jelaco or Jackman, like a coach might do, I

14  suppose, on a field.

15          That didn't work out so well.  The

16  transgender students that were in that classroom

17  knew that he was only referring to them by their

18  last names because he'd been told that he

19  couldn't -- or that he wouldn't -- he had told the

20  district he wouldn't honor their -- their first

21  names.  Everybody else knew.  It was becoming

22  distressing.  They found it insulting,

23  disrespectful.  It made them feel isolated and

24  targeted, you know, because everybody in the class

25  knew why he was doing that and why he had changed

1   from calling students by their first name and then

2   the next day it's last name only.

3          So the principal met with -- with the

4   teacher.  And, again, well, this is the issue, we're

5   trying not to discriminate against our students,

6   encouraged him to resign.  He resigned.  And then he

7   brought this case.

8          So the court treated it as a religious

9   discrimination case, which means that the person

10   claiming discrimination has to prove their case

11   first.  And the court said he did it.  He -- he

12   showed that he had a sincerely held religious

13   belief, which meant that the school had the

14   obligation to accommodate him, to reasonably

15   accommodate him.

16          So then it goes to the school to show that

17   they can't reasonably accommodate him.  And in that

18   case, the court said that his religious opposition

19   to transgenderism is directly at odds with the

20   district's policy of respect for transgender

21   students, which is grounded in supporting and

22   affirming those students.

23          So even with the last name only

24   accommodation, there was undue hardship.  It wasn't

25   a reasonable accommodation.  It conflicted with the

1   school's philosophy of creating a safe and

2   supportive environment for all students.  And then

3   the court goes so far to say, As a matter of law,

4   the evidence of impacts on those transgender

5   students in his class -- apparently there were

6   two -- that it did cause emotional harm sufficient

7   to demonstrate that there was an undue hardship and

8   therefore no reasonable accommodation, and

9   continuing to allow an accommodation that resulted

10  in complaints that students felt targeted and

11  dehumanized could potentially -- it didn't actually,

12  but it could potentially have subjected the district

13  to a Title IX discrimination lawsuit by those

14  students.

15          So the district got to weigh the potential

16  of the harassment discrimination claim with the --

17  with the accommodation that it was providing to the

18  staff member for the religious beliefs.

19          And the court cited other circuits, saying

20  that courts agree that an employee is not liable --

21  I'm sorry -- an employer is not liable when

22  accommodating employees' religious beliefs if it

23  would require that employer to violate state or

24  federal law, like the Civil Rights Act, Title VII

25  and Title IX.  And that's pretty well settled across

1  all cir- -- circuits.

2         He also brought a retaliation claim.  The

3  court didn't buy it.  He said it's not unreasonable

4  for a school to expect that instructors will teach

5  classes in a professional manner that doesn't

6  distress students.  And nothing in the record showed

7  that they were acting with any motive other than to

8  protect their students.

9         Finally, the court leaves us with a -- with

10  a quote that I -- I think is pretty instructional.

11  But it says when you work in a public school, you

12  sign up to follow the law and the policies and the

13  practices of that organization, and that might mean

14  following practices that are different than your

15  beliefs.

16         So it's a balancing test.  And it's -- it's

17  not black and white.  You know, it's going to be --

18  if -- if you're confronted with a situation like

19  this, it's going to be on a case-by-case basis.

20         Sorry.  I'm just getting started.  I told

21  you this isn't a brief summary.

22         So that's how the courts are handling the

23  issue of requiring a -- a teacher to honor a

24  student's request for -- for the use of a preferred

25  name or pronoun.  So that's -- that's -- that's one

1    right.

2              The other right that we are seeing a lot of

3    interest in the courts right now is what some courts

4    or some advocates are calling honest communication

5    policies and balancing that with student privacy and

6    student safety policies.  And this area is a little

7    less settled than the requirement to use preferred

8    name or pronoun.

9              These policies are the policies that say if

10   a student comes to you, tells you they have a

11   preferred name or pronoun, you don't tell the

12   parent, and end of story.  So what's happening is

13   the -- the teachers or the staff are saying, well,

14   that violates my religious belief and, you know, I

15   want to tell the truth, it's against my religion to

16   lie to parents.

17             And that's the one that we're seeing on --

18   on Facebook, on social media.  Fox News covered it.

19   The Today Show covered it.  It's the -- the teacher

20   out of Canvas -- or Kansas.  I keep saying Canvas.

21   It's the teacher out of Kansas.  And the news

22   articles say, you know, teacher wins $95,000 because

23   the court -- or the district violated her -- her

24   religious rights.

25             The -- the reporting on that is pretty

1   misleading, because it never went through the full

2   litigation process.   The parties settled.   And they

3   settled after the -- the teacher petitioned the

4   court for an injun- -- well, two injunctions.   One

5   was to say that, district, you can't discipline the

6   teacher for using the preferred -- or not using the

7   preferred name or pronoun.   And, two, district, you

8   cannot discipline the teacher for not telling the

9   parents what the child has requested.

10          And the court kind of split it down the

11   middle.   They said we -- we don't -- we're not

12   really going to buy your argument that -- regarding

13   the use of pronouns, partly because that's -- that's

14   somewhat settled, but also because there wasn't any

15   evidence that they were going to -- to discipline

16   her, because there were other options.   She could

17   choose to use last names.   They had potentially

18   discussed other accommodations that the district

19   could offer.   So they said you're -- you're probably

20   not going to prevail on -- on that issue.

21          The second issue, however, they said there

22   is a likelihood that you could prevail on the

23   communications policy.   And ultimately it came down

24   to the policy was really poorly written.   The court

25   said it was overinclusive, because it prohibits the

1   disclosure of preferred name and pronoun information

2   to parents without any assessment of whether

3   disclosure would actually pose a risk.  And then

4   they said it's also underinclusive, because it

5   permits administrators to disclose preferred name

6   and pronoun if parents simply ask.  And they said,

7   well, how is that protecting safety if you can tell

8   them if the parents ask.  So they -- they crafted it

9   poorly.

10        Like I said, this never went through the

11   litigation process.  The teacher had retired

12   previously, so we don't know how this one would

13   have -- would have come out.  We were -- I was kind

14   of hoping that it would go to the court, get

15   appealed, go to the Tenth Circuit, because Kansas is

16   in the Tenth Circuit with us, and then we would have

17   some, you know, black and white case law.  But we

18   don't.

19        So that's not really all that instructive.

20   All we know is that the court said that there was a

21   likelihood that based on their policy, the way it

22   was written, the teacher could have prevailed.  But

23   the court never actually came down and -- and sided

24   with the parent or the district one way or the

25   other.

1          We have quite a few other cases that we're

2    watching.  There's a case in Iowa that was filed by

3    a parent group.  Similar, the school district will

4    not disclose a transgender -- or a student's

5    transgender status to parents unless the student

6    expressly authorizes it.

7          And then there is a -- a disciplinary piece

8    that says intentional and/or persistent refusal by

9    staff or students could lead to discipline.  That

10   was just filed in April, so we haven't seen any

11   briefing or anything on that one.

12         There's a case out of New Hampshire, where

13   the parent, who's also a teacher, reportedly found

14   out that her child was using a different gender

15   identity at school, and the parent claims it was

16   kept a secret from her by the school.  According to

17   the suit, the mother confronted school staff about

18   the issue and made it clear that she wanted her

19   child referred to by the biological gender that they

20   were assigned at birth.  The -- the school initially

21   agreed to do that, but then the principal e-mailed

22   the mother saying that it couldn't comply with the

23   mother's demands, because that would violate the

24   school's transgender policy, which most likely was

25   the Title IX sexual harassment policy, and would

1  prohibit misgendering a student.

2        So we don't know where that one's going

3  yet.  The school district just filed a motion to

4  dismiss, asking the court to dismiss the parents'

5  claims, saying that -- and they cited a bunch of

6  case law, but they said that the parents -- the

7  school district has no duty to inform the parent of

8  students about their child's transgender identity or

9  behaviors and they -- the parent is not entitled to

10 know if their child is experiencing transgender

11 ideation or dysmorphia at school.  So that's what

12 the school district just filed.  The court hasn't

13 ruled on that motion to dismiss yet.  I don't know

14 if they will or not or if they will just let that go

15 to trial.

16        But it is interesting, the district also

17 just revised its policy, so the court may say it's

18 moot and deal with it that way.  But the policy

19 originally stated that school personnel should not

20 disclose information that may reveal a student's

21 transgender status or gender nonconforming

22 presentation to others unless legally required to do

23 so or unless the student has authorized disclosure.

24 So that was the previous policy.  That's what is in

25 dispute under the -- lawsuit.

1          But they just changed it and said that they

2     removed the phrase "including parents or other

3     school personnel."  So I don't know, you know, if

4     that is going to weigh in on the court's decision or

5     not, but it -- but it could.  And they also added

6     "nothing herein shall be construed to change the

7     obligation of the school to take action when student

8     safety is concerned."

9          So they -- they -- I think maybe -- I don't

10    know.  It would -- they may have considered it

11    overbroad and then they -- they limited to safety.

12    But they don't -- they don't define safety either,

13    so I don't know.

14          There's a case out of Wisconsin that was

15    filed in June.  In that case, the court denied the

16    school district's motion to dismiss.  So that one's

17    going to go to -- to a lawsuit unless they settle.

18          There was a case in Virginia that was also

19    filed in June.  And we're waiting for briefing on

20    that to see -- to see where that goes.

21          So you can see, there's -- with that

22    specific issue, there is a lot of action in the

23    courts right now.  And we are just waiting to see.

24    I don't -- I doubt any of these cases are going to

25    be decided before the new Title IX regulations are

1   formally adopted.  And those regulations may give us

2   some clear guidance with how to address some of

3   these issues.  They may not and we may be waiting

4   for another, you know -- for either OCR to issue

5   another notice of interpretation like they did in --

6   for the definition of sex, which, you know, includes

7   gender identity now, but we're waiting to see.  So

8   that's teacher rights, parent rights regarding

9   information.

10          And then we've got parental rights to the

11   care, custody, and control of their student, which

12   is -- generally it's another constitutional claim

13   that we have to balance.  In Wyoming, we have the --

14   a statute that says -- the protection of parental

15   rights statute, which says the liberty of a parent

16   to the care, custody, and control of their child is

17   a fundamental right that resides first in the

18   parent.  It doesn't state education.  A lot of

19   states, their parental rights statute does specify

20   education.  I don't know if that -- if that matters.

21          The Wyoming Supreme Court has said,

22   although we've sometimes described the child's best

23   interest as having constitutional pre-eminence,

24   meaning it falls below the parents, we've done so in

25   light of an adjudication of neglect or abuse.  The

1   Wyoming Supreme Court will elevate the child's

2   interest above the individual claims of the parent

3   for safety purposes.

4           The Supreme Court has found it evident

5   beyond the need for elaboration that a state's

6   interest in safeguarding the physical and

7   psychological well-being of a minor is compelling.

8   So the courts will allow safety considerations,

9   which is what a -- a court in Maryland decided just

10  recently, just in -- in August.  So we have a

11  federal court considering this right, this -- the

12  parental right to care, custody, and control.

13          And in that case, the court dismissed the

14  lawsuit.  So the district filed the motion to

15  dismiss.  The court found that there was no legal

16  basis to continue with the case, so they dismissed

17  the lawsuit which was brought by a group of parents

18  against a school district that alleged the district

19  guidelines.  It wasn't an actual formally adopted

20  policy, but the guidelines providing support and

21  resources to transgender and gender nonconforming

22  students, the parents said it violates the parents'

23  constitutional rights to direct the care, custody,

24  education, and control of their -- of their

25  children.

1          The court said -- they -- they went through

2     a long explanation of why the -- the parents'

3     arguments weren't persuasive in that case, but

4     ultimately they said that the plaintiffs, they --

5     they were trying to take it to the extreme.  And

6     that's not the way the guidelines were written.  The

7     guidelines were meant to be implement -- implemented

8     on a case-by-case basis.  They encouraged family

9     involvement.  They encouraged a gender support plan.

10    And it said that family involvement is preferred and

11    encouraged unless a student indicates that their

12    family is not supportive of their gender identity.

13          Again, it said the -- the parents just --

14    they based their argument on a selective reading of

15    the -- the policy.  It wasn't a one size fits all

16    type of thing there that they were -- they were

17    applying.  So the court dismissed it and dismissed

18    the parents' claims.

19          So it's hard to, you know, really see that

20    they're going to go one way or the other, but in the

21    Maryland case they said that safety is a legitimate

22    concern and a reason to withhold.  We've got the

23    Wyoming Supreme Court and the U.S. Supreme Court

24    saying that, you know, safety is a state interest

25    in, you know, safeguarding physical and the

1    psychological well-being of a minor.  So there is --

2    there is plenty of case law to support those

3    decisions, so I don't know.

4           In summary, there's a lot of rights that

5    the district is balancing.  There's some pretty

6    settled case law and agency guidance for some, and

7    on the other hand we're watching to see what

8    happens.

9           So we know that it's well settled that

10   misgendering an employee or a student is sexual

11   harassment.  I mean, there's a long history of -- of

12   case law there.  And the trend seems to be that

13   courts are going to uphold the district's action in

14   requiring teachers to use that student's chosen name

15   or pronoun even if it violates the teacher's

16   religious beliefs and especially if there isn't a

17   reasonable way to accommodate those religious

18   beliefs, like we saw with the teacher who couldn't

19   just use the -- the last names in his classroom.

20          So we also see that the courts will put

21   students' rights to safety over parents' rights to

22   control child's upbringing, you know, to -- to

23   receive that knowledge and information.  And we'll

24   have to wait and see how the trend is applied

25   regarding those parent communication policies.  But

1    if they're going to follow the same approach that we

2    see with the -- the transgender, you know, to uphold

3    and to avoid the -- the sexual harassment piece,

4    it's going to come down to accommodation.  So we'll

5    wait and see where that -- where that shakes out.

6           And, you know, it's -- it's -- there really

7    isn't a black and white rule.  And that's what your

8    procedures and policies -- you don't have a black

9    and white rule.  You -- your policies just parrot

10   the -- the Civil Rights Act and the civil rights

11   laws.  And I can give you legal advice in executive

12   session or a follow-up summary on a legal analysis

13   of your -- your procedures if -- if that's what you

14   want, but at least that's what we're seeing as far

15   as policies.

16          As far as the -- the current regulations,

17   we don't know what those are going to be yet.

18   They -- they have changed some of the reporting

19   procedures, but ultimately, you know, the district's

20   policy has always been to follow -- follow the law.

21   So if Title IX, if they change the law, we -- we

22   follow the law.  We don't -- we don't violate that.

23   And you would adopt it within whatever time period

24   they give you to adopt it.  Last -- last time they

25   gave you three months.  And they said that because

1  we were in the middle of a global pandemic, that was

2  generous, so I don't know how -- how much time they

3  will give you this time, but we'll see.

4          We don't have guidance from the -- from

5  OCR, from the Department of Education regarding

6  athletics or facilities yet.  They have said that

7  they will be coming out with guidance.  We haven't

8  seen it yet.  We're watching for that.  So, you

9  know, as far as that goes, we'll -- it's wait and

10  see.  Once we know, then we can address those type

11  of questions, but. . .

12          CHAIRMAN JELACO:  I -- I see two

13  things.

14          MS. MONEYHUN:  Uh-huh.

15          CHAIRMAN JELACO:  Okay?  Is it fair to

16  say the student safety, both physical and/or

17  emotional, is paramount?

18          MS. MONEYHUN:  Uh-huh.

19          CHAIRMAN JELACO:  And secondly, on a

20  case-by-case basis.

21          MS. MONEYHUN:  Yeah.  Yeah.  I

22  think -- I think that's a fair summary.  A lot more

23  succinct than I was, so yes.

24          CHAIRMAN JELACO:  I'm not -- I'm

25  not --

```
1                    MS. MONEYHUN:  But --
2                    CHAIRMAN JELACO:  -- you know, legal
3    counsel by any means, but to me that's what it
4    sounds like it boils down to, is that the student
5    safety --
6                    MS. MONEYHUN:  Uh-huh.
7                    CHAIRMAN JELACO:  -- is paramount --
8                    MS. MONEYHUN:  Uh-huh.
9                    CHAIRMAN JELACO:  -- and, you know,
10   the fact that it's a case-by-case basis.
11                   MS. MONEYHUN:  Yeah.
12                   CHAIRMAN JELACO:  So every situation
13   can be just that little bit different that there's a
14   different approach that has to be taken.
15                   MS. MONEYHUN:  Yeah.  I think until we
16   have a court that says otherwise, that's where
17   they're going and that's -- that's what we have.  So
18   I think that's fair to say.
19                   CHAIRMAN JELACO:  Any other questions?
20                        (Inaudible voices.)
21                   CHAIRMAN JELACO:  Please.
22                   FEMALE SPEAKER:  I have a question.
23   You said the case that was decided was the Supreme
24   Court as far as it's considered harassment to use
25   the wrong pronoun.  Is that the U.S. Supreme Court
```

1    or a state Supreme Court (inaudible)?

2                 MS. MONEYHUN:  Okay.  So just to

3    clarify my --

4                      (Inaudible voices.)

5                 MS. MONEYHUN:  Well, there's Bostock v

6    Clayton County.  That was the U.S. Supreme Court

7    case I mentioned that decided that the definition of

8    discrimination on the basis of sex included sexual

9    orientation and transgender status.  So that's a

10   U.S. Supreme Court.  And then that is what U.S.

11   Department of Education Office for Civil Rights has

12   issued a notice of interpretation applying to Title

13   IX, saying that that's how they are enforcing and

14   interpreting Title IX.

15                MS. EGGEBRATEN:  I have a few more

16   questions.  May I?

17                CHAIRMAN JELACO:  Please.

18                MS. EGGEBRATEN:  While your lawyer was

19   speaking, it brought up some other questions in my

20   mind.  It sounds as if -- okay, number one, I don't

21   have my questions answered yet, so I don't know how

22   the district is approaching these things.  I'm just

23   hearing court case --

24                CHAIRMAN JELACO:  Case-by -- it's a

25   case-by-case basis.

1          MS. EGGEBRATEN:  What does that mean?

2          CHAIRMAN JELACO:  When a situation

3    arises, administration will deal with it, keeping

4    the law in mind, following the law, and trying to

5    accommodate whatever the needs are.

6          MS. EGGEBRATEN:  Now, when you address

7    student safety, does that mean that the parents will

8    not be told if a student is having gender confusion?

9          CHAIRMAN JELACO:  If the student

10   expresses a fear of telling -- of what might happen

11   if they are -- if their parents are told, the

12   district, from my interpretation, is bound to keep

13   the student's -- shall we say what -- whatever the

14   student wants is paramount.

15         MS. EGGEBRATEN:  Huh.  So has the

16   district required teachers to keep this information

17   from parents?

18         CHAIRMAN JELACO:  Mrs. McGovern, I

19   think what we've been doing is referring those cases

20   to administration.

21         MS. EGGEBRATEN:  So can you tell me

22   how the district is handling these situations?  Are

23   teachers contracted or expected to keep that

24   information from parents?

25         CHAIRMAN JELACO:  Mrs. McGovern?

1             SUPERINTENDENT McGOVERN:  Madam Chair,
2   members of the board.  I'm going to echo exactly
3   what -- I'm going to echo exactly what Mrs. Moneyhun
4   had mentioned.  At no time do we want to put our
5   teachers in a difficult situation, but it is
6   important as employees of a public school system
7   that we do adhere to the law and that we do provide
8   a safe and secure environment that is conducive to
9   learning for each and every student.
10             And so we want to work together with our
11   parents.  We want to keep them informed.  And that
12   usually occurs most of the time.  There are some
13   situations that -- and, again, it is on a
14   case-by-case basis.  But if there is a fear from the
15   student, if there are extenuating circumstances that
16   the school is aware of, we will honor the privacy of
17   the student.
18             But, again, I think what's important here
19   is it is not a blanket response that what we do for
20   one student, we do for the other in this situation.
21   It's very unique.  The student needs are very
22   different.  And the best thing that we can do is
23   surround our teachers with the tools of how to
24   handle those situations.  And when they're asked
25   those questions, that they need to work with their

1    administrator.

2         We have not asked our teachers to go out on

3    a limb to make those decisions solely on their own.

4    And we haven't asked our principals to do so either.

5    So when those situations come forward, they bring

6    them to the administrator, and the building

7    administrator works with us at the central office.

8         So I wish I could give you this certain

9    answer for every single time, but unfortunately in

10   this situation, based on the law that we have so

11   far, those are the decisions that we make.

12             MS. EGGEBRATEN:  So if I'm hearing you

13   correctly, you're telling me that teachers have not

14   been aform -- informed to keep this information from

15   the parents as a blanket decision.

16             CHAIRMAN JELACO:  Mrs. McGovern.

17             SUPERINTENDENT McGOVERN:  Madam Chair,

18   members of the board and the community.  Our

19   teachers at every one of our schools, when we

20   started the school year, we had training for our

21   administrators.  And following that training, we had

22   communication that went out to our principals.  In

23   turn, they had staff meetings with all of their

24   employees in each of the buildings to go over this

25   information.  And so the communication has reached

1    all of our teachers with the best information that

2    we have at this time that conforms with Title VII

3    and Title IX.

4              And our policies for discrimination include

5    sex discrimination and also Office of Civil Rights

6    to the best that we can at this time.  If more

7    information comes forward, then the district will be

8    happy to take a look at those regulations and then

9    align what we do to those.

10             MS. EGGEBRATEN:  So regardless of if

11   that would violate someone's religious freedom, for

12   example, if they were Christian and believed that

13   there's male and female only and that they are not

14   allowed to lie, and then that might be a violation

15   of their religious freedom, and if the board or

16   district is demanding that a teacher violate their

17   religious rights in calling somebody something that

18   they're not, or their conscience, that would be a

19   constitutional violation of their rights, as I see

20   it.

21             SUPERINTENDENT McGOVERN:  Do you want

22   me to answer?

23             CHAIRMAN JELACO:  Mrs. McGovern?

24             MS. EGGEBRATEN:  Just bringing that to

25   your attention.

1        CHAIRMAN JELACO:  But I think there's

2    a case that Mrs. Moneyhun already gave where the

3    religious rights did not --

4        MS. EGGEBRATEN:  And there's a case in

5    Virginia, too, that she did not reference that I've

6    heard about recently where --

7        CHAIRMAN JELACO:  Again, it's evolving

8    law.

9        MS. EGGEBRATEN:  It's an evolving law.

10       CHAIRMAN JELACO:  It's evolving law.

11       MS. EGGEBRATEN:  Exactly.

12       CHAIRMAN JELACO:  So we -- we are

13   committed to following the law.

14       MS. EGGEBRATEN:  Yes.  My -- my

15   interest is just in clarifying what the district is

16   demanding of teachers at this point in time and a

17   clarification so that it's very clear what is going

18   to be demanded of teachers, what types of

19   accommodations are going to be allowed or demanded.

20       CHAIRMAN JELACO:  Mrs. McGovern.

21       SUPERINTENDENT McGOVERN:  I think an

22   answer for your question is we take each one of

23   those circumstances on a case-by-case basis and we

24   handle those accordingly to the law and what is best

25   for the student on a case-by-case basis.

1          MS. EGGEBRATEN:  Is there anything in

2  the contract that a teacher would be signing that

3  might go against their constitutional religious

4  rights of freedom or freedom of speech?  In other

5  words, this is what I'm trying to get at.  I would

6  consider it a violation of my freedom of speech

7  personally, my constitutional right to speak freely,

8  if I was forced to lie or speak a pronoun that was

9  not in accordance with the biological.  That's my

10  personal opinion.  Okay.

11          CHAIRMAN JELACO:  But as Mrs. Moneyhun

12  said, when your personal feelings, when you're hired

13  to fill a public school position, you follow the

14  laws of that institution and the federal law.

15          MS. EGGEBRATEN:  I guess my question

16  is, can the school district put into place something

17  that violates constitutional rights?

18          CHAIRMAN JELACO:  It's that balancing

19  act.  You know, it --

20          MS. EGGEBRATEN:  Are you --

21          CHAIRMAN JELACO:  It's -- it's the

22  balancing act.  And for students -- again, school

23  should be a safe place for students.  They are the

24  priority.  Okay?

25          MS. EGGEBRATEN:  You know, having been

a lifelong teacher, it was always that we were to keep open communication with parents.

CHAIRMAN JELACO:  And that's what we try to do.

MS. EGGEBRATEN:  And this is a great concern to me, because it would destroy parent-teacher relationships.  And that is another of my concerns.

CHAIRMAN JELACO:  Well, and that's why if a teacher is found to be in such a situation, that they're going to work with their administrator, and hopefully the district and the family can work together to come to some resolution.  That's -- that's the ultimate goal.  That would be the best -- best of all worlds.

MS. EGGEBRATEN:  I guess another of my concerns that was brought up so much in legal cases referring to parents as if they were dangerous to the student.  That seems like a -- a stretch in most cases.  I believe in most cases, parents are going to want to work with their student and their -- their child if they're confused and would be supportive in trying to help them.  And I think it's a mistake to refer to parents as -- in such a way that they appear to be dangerous to students.

1  That's -- that was a concern in the way things have

2  been voiced tonight.

3          So I would just bring that to the attention

4  of the board.  I believe most parents are very much

5  on board with their students and love their children

6  and want the very best for them and would help them

7  in any way that they could.

8                  CHAIRMAN JELACO:  That's the ideal

9  situation.  That is the ideal situation.

10                 MS. EGGEBRATEN:  Of course.  Of

11  course.

12                 CHAIRMAN JELACO:  Un- --

13  unfortunately, sometimes we have to deal with

14  situations that are not ideal.

15                 MS. EGGEBRATEN:  Yes.  I'm aware of

16  that as well.  Well, I appreciate your attention.  I

17  would like you to think about the things I've been

18  saying.  I hope that -- and maybe have some more

19  information provided to me.  I will look into it a

20  little further, see what I can find.  I still don't

21  understand what the school policies are per each

22  school concerning bathrooms, locker rooms, sports.

23  I would like some more information on that.

24          I thank you very much for your attention

25  and giving your time.

1     CHAIRMAN JELACO:  Thank you.

2         Further public comment?

3         ASHLEY:  My name's Ashley.  I'm a

4     parent.  And I had an issue a few weeks ago with my

5     son being kicked off the bus because there wasn't

6     enough room, because there wasn't enough buses

7     for -- to accommodate all the kids that needed to be

8     bussed to school.

9         Yes, that has been settled and my son was

10    able to get on a bus, but what about all those other

11    kids that are not able to be on a bus, that live

12    outside the boundary that -- that would allow them

13    to be bussed to school and, like, for parents that

14    are single parents that have nobody else to

15    transport their children and because they have to go

16    to work at 4, 5 o'clock in the morning.  I'm just

17    wondering, is there something being done about that?

18        CHAIRMAN JELACO:  Have you contacted

19    the bus barn, the transportation department?

20        ASHLEY:  I have.

21        CHAIRMAN JELACO:  Okay.

22        ASHLEY:  But, I mean, it -- it comes

23    down to you guys to make those changes.  As I was

24    told, is it falls onto the school board.

25        CHAIRMAN JELACO:  We do approve the

1  bus routes.  Okay?  And we have approved them, but

2  that -- you know, if there are situations that need

3  to be brought to our attention, the first step is to

4  contact transportation.  And we have made a -- we

5  have made changes --

6                ASHLEY:  Okay.

7                CHAIRMAN JELACO:  -- when things have

8  been brought to our attention that need to be

9  addressed.

10                ASHLEY:  Okay.  I just want to make

11  sure, because I -- like I just worry about those

12  little kids, too, that if they don't have a bus

13  because buses were -- either there's not enough

14  drivers or, you know, the schools start at the same

15  time, so it makes it harder to get those kids to

16  school because lack of transportation.  So I just

17  worry about them, like, when winter comes.  Little

18  kids, how is that okay that they walk to school two

19  miles to get to school or whatever.  It's -- you

20  know, I feel like that's an issue.

21                CHAIRMAN JELACO:  So, you know, take

22  it to the transportation department.  They will try

23  to work through it.  And we will, you know, look at

24  what they recommend to us.

25                ASHLEY:  Okay.  Thanks.

1          CHAIRMAN JELACO:  Uh-huh.

2          Further public comment?

3          MR. SELLEROLI:  Madam Chair,

4   superintendent, members of the board.  Just want to

5   give you guys a brief update.  We've had some

6   questions about some of the projects that I'm

7   currently involved in.  And I wanted to make sure

8   that -- some of the questions came from the public

9   concerning playground equipment.

10          Now that Lincoln is almost done, that

11   playground equipment is staying at that site.  We

12   know that the kids in that area like that

13   playground.  And between that playground at the old

14   Lincoln site plus Eastside, they've got plenty of

15   equipment to kind of keep them out of trouble.

16          Overland, the playground equipment is

17   staying at the Overland -- Overland with the

18   exception of the equipment that was in between what

19   I call the west wing and the gym.  That was really

20   pretty old stuff.  I was buried by about 3 feet of

21   woodchips.  It had been rotted out by the -- on the

22   pipes down on the bottom.  So we removed that over

23   the last two days and removed, resalvaged the -- the

24   woodchips where we'll use at other places.

25          Some of the other projects that we have

1  going on, the chillers.  Chillers have been

2  installed at Desert View, Overland.  We're still

3  waiting for the chiller to arrive at Walnut.  The

4  chillers have -- when I say they're installed, the

5  pipes, everything.  They're ready to go.  The only

6  thing we're waiting for is we're still waiting for

7  transformers.  And I guess that's kind of a

8  nationwide wait.

9          I've been told by some of the folks at

10  PacifiCorp that we -- we might have a location on a

11  transformer, but that's only one.  We need a total

12  of three.  When the one comes in, it was actually

13  sized for Overland, so that's where that transformer

14  will go so we can get that school up and running.

15          Painting.  That was another concern with

16  some of the principals.  We had a crew go throughout

17  the summer, whenever they could break away from

18  various projects, and go in and patch and -- and

19  retexture the walls throughout the district.

20          There was a lot of holes, a lot of walls

21  that needed to be repaired.  And I don't even think

22  we've gotten up to the high school yet, but I'll bet

23  you I've got probably a year's worth of painting to

24  do.  And we're going to do that in the evenings.

25  After we get Overland opened up, I'll be meeting

1   with the principals of the schools that I know that
2   we're going to be hitting first.  And we'll go in
3   there and schedule, because it's really hard getting
4   help, let alone help that will work through the
5   night.  So we're going to get with the principals.
6   I want to talk with them and see if there's areas of
7   the school that we can do possibly during the day,
8   then there is Friday and Saturday and Sunday that
9   the crews will work.  If they have to come in
10  Thursdays and work Thursday evenings, you know, then
11  they can get their 40 or 50 hours.
12         Most of our crews that we -- that we've
13  hired over the last month have put -- been putting
14  in 55 to 60 hours a week.  So, I mean, it's --
15  there's a lot of work to be done.  And painting
16  all -- all the rooms in the district is quite the
17  task, so. . .
18         Other than that, we've got a lot of
19  projects.  Overland is wrapping up.  Tomorrow will
20  be the first day for the kids in there.  And so
21  we're excited.  I'll be over there early tomorrow
22  morning, make sure that everything is where it needs
23  to be.  I know Lisa's crew has been over there.
24  They've been helping us clean.  We had other
25  district people go over there and clean.  We've had

1   Elwood people in there cleaning.  There's still

2   some -- a little -- some electrical issues that

3   we've got to resolve in the main office area, but it

4   will be ready to greet kids and parents tomorrow

5   morning.

6           Any questions?

7           CHAIRMAN JELACO:  Then we have the

8   open house on the 28th for Overland; correct?

9           MR. SELLEROLI:  Open house on the

10  28th.  Yes, ma'am.

11          CHAIRMAN JELACO:  Any questions for

12  Mr. Selleroli?

13          MR. SELLEROLI:  Okay.  Thank you.

14          CHAIRMAN JELACO:  Thank you.

15      Further public comment?

16          MR. WILLEY:  Sean Willey.  I'm going

17  to speak in regards to the Title IX.  As a parent

18  that experienced last year teachers withholding

19  information from a parent with my daughter, it

20  caused more issues with her at home than it did

21  anything else.  She was trying to live two lives,

22  going to school being referred one way, coming home

23  being referred another way, and it was causing her

24  to have mental breakdowns, lash out at home with her

25  siblings, and causing lots of other issues.

1           Now, I understand case-by-case scenario, if

2    you -- you guys aren't psychologists.  You're not

3    licensed counselors.  So how can you make the

4    judgment call whether to notify a parent or not on

5    what is going on with their student?

6           If we would have been known, we -- what --

7    she sat down with a counselor, talked.  We got

8    called in.  She told us what was going on.  So it

9    opened up dialogue with us and her.

10          So I guess my question for the school board

11   and the school is, if you're going to withhold this

12   information from parents, which is -- is law, is

13   your guys' right, are you guys going to provide

14   counseling for these students from a licensed

15   counselor outside of the school that they can talk

16   to to get the help that they need?  Because not all

17   students that go through this transgender, that go

18   through these situations, are okay.  They're having

19   issues mentally, and it's a constant battle

20   internally for them.

21          If they're -- and if you're taking that --

22   that right for a parent to help their -- their

23   child, then is the school going to start providing

24   counseling, outside counseling for these students so

25   they can talk to somebody, so they can get the help

1   that they need so it doesn't cause further issues?

2                    CHAIRMAN JELACO:  That would be the

3   process, as -- as I understand it, when the

4   assessment is made, that there could be counselors

5   involved, school counselors involved, but trying to

6   work with families.  And I -- I don't know your

7   circumstances and I'm -- I'm probably generalizing

8   too much here, but the preferred way would be to

9   work with the student and the families to try to

10  resolve --

11                   MR. WILLEY:  I was told over a dozen

12  times it was for the health and safety of my child.

13  As teachers, you guys are required to report if you

14  think there's any abuse or any harm that are going

15  to come to a student within the home.  No -- nothing

16  was filed.  Nothing -- no claims were made.  But

17  they flew under the flag that they were doing it for

18  my child's safety and protection.  If that's the

19  case, then why was there no claims filed with DFS or

20  the authorities in terms of the protection of my

21  child?

22                   I understand they're scared.  They don't

23  know how to come out and -- and open dialogue with

24  their parents.  That was the case of my daughter.

25  But we weren't given the opportunity to.  And like I

1  said, if -- if you're going to withhold that

2  information from parents and make that judgment

3  call, then those students need to be paired up not

4  with a school counselor, but with a certified

5  counselor outside of the school that's licensed in

6  that field to help them through this issue.

7  Is the district going to be willing to

8  start paying for counseling services for all these

9  students?  Because you're taking that away from

10  parents so they can't help their students.  They

11  can't help their kids, because they're not informed.

12  They don't know what's going on.

13  (Inaudible voices.)

14  CHAIRMAN JELACO:  It's -- like -- you

15  know, this is -- this is delicate -- a delicate

16  subject.  I don't know why your daughter didn't want

17  to tell.  I -- I don't know --

18  MR. WILLEY:  I explained it.  She

19  didn't know how to.  But we had her in counseling,

20  she talked to the counselor, they brought us in, and

21  she informed us what was going on and all the -- the

22  issues, and it made sense.  What I'm saying is

23  you're not informing the parents.  These kids need

24  counseling.  If you guys are taking the role of --

25  taking that away from parents and acting as parents,

1   thinking that you can withhold information, then

2   they need to be provided with counsel.  They should

3   be provided with counsel going through these

4   transitions, going through these issues.  And if the

5   parents don't know about it, how are they going to

6   get that help?

7              CHAIRMAN JELACO:  And what I'm

8   suggesting is working with the student and trying to

9   help them realize that maybe their parents could be

10  a support to them if they knew and that is the

11  preferred way to go.  I can't speak to your specific

12  situation.  I don't know why you were not involved.

13             MR. WILLEY:  Because she was scared,

14  so she told her teachers, I want to be called this,

15  but don't tell my parents.  And they're, like, okay.

16             CHAIRMAN JELACO:  Mrs. McGovern?

17             SUPERINTENDENT McGOVERN:  Chair

18  Jelaco, members of the board, Sean.  In this case,

19  we have school counselors and social workers that

20  can help, but we can also connect with some outside

21  resources for that.  But to guarantee that --

22  whether the district would pay or not, I think your

23  situation -- and I would caution the board on the

24  confidentiality.  I know Sean is -- is open to

25  discussing their situation, but I would advise the

1   board not to do that out of confidentiality.

2           But I -- I can answer for you about the

3   school and the social work and we can connect to

4   outside resources, but more than -- than that, Sean,

5   please know out of respect and confidentiality we

6   would -- I would highly recommend not to discuss

7   anymore.

8                   CHAIRMAN JELACO:   Thank you.

9                       (End of excerpt of video-recorded

10  file.)

1                   C E R T I F I C A T E

2          I, SABRINA TREVATHAN, a Registered

3   Diplomate Reporter, do hereby certify that I

4   transcribed the video-recorded proceedings contained

5   herein and that the foregoing 47 pages constitutes a

6   full, true, and correct transcript, to the best of

7   my ability.

8          I further certify that I am not related in

9   any manner to any party, witness, or counsel, and

10  have no financial or other interest in the outcome

11  of the above-entitled cause.

12         Dated this 23rd day of January, 2023.

13

14  _____

15                    SABRINA TREVATHAN
                 Registered Diplomate Reporter
16

17

18

19

20

21

22

23

24

25