

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

ASHLEY WILLEY and
SEAN WILLEY,

        Plaintiffs,

VS.

SWEETWATER COUNTY SCHOOL
DISTRICT NO. 1 BOARD OF
TRUSTEES, KELLY MCGOVERN,
NICOLE BOLTON, KAYCI ARNOLDI,
and BRYANT BLAKE,

        Defendants,

Case No.  23-CV-069-SWS

---

## ORDER GRANTING IN PART AND DENYING IN PART
## MOTION FOR PRELIMINARY INJUNCTION

---

This matter comes before the Court on the *Motion for a Preliminary Injunction*
(ECF No. 6) (the "Motion") filed by Plaintiffs Ashley Willey and Sean Willey (collectively
"Plaintiffs" or the "Willeys"). Defendants Sweetwater County School District No. 1
("SCSD") Board of Trustees; Kelly McGovern, SCSD Superintendent ("Ms. McGovern");
Nicole Bolton, SCSD Assistant Superintendent and Human Resource Director ("Ms.
Bolton"); Kayci Arnoldi, SCSD Director of Student Services ("Ms. Arnoldi"); and Bryant
Blake, Principal at Black Butte High School ("Principal Blake") (collectively

"Defendants" or the "District"[1]) were served notice of the Motion and provided supporting documentation on April 24, 2023, via electronic mail. (*See* ECF No. 13.) The District responded (ECF No. 16), and the Willeys replied (ECF No. 21). Both parties submitted affidavits and other evidence in support of their positions. Having considered the motion and the parties' submissions in support thereof, reviewed the record, and being otherwise fully advised, the Court finds the motion for a preliminary injunction must be GRANTED IN PART AND DENIED IN PART.

## SUMMARY OF ISSUES AND DISPUTES

The thorny Constitutional issues in this case revolve around a policy adopted by the District at the beginning of the 2022-23 school year. The policy directed how school district personnel are required to handle a student's request to be called by a preferred or chosen name and/or pronoun, including if contrary to their given legal name or gender. (ECF No. 1 at 68-69.) In relevant part, the policy provides that district personnel "must use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications. Staff must respect the privacy of all students regarding such choice." *Id*. at 68. District personnel are advised that "violations of this procedure may constitute discrimination based on sex, and may result in discipline." *Id*. at 69. As detailed below, the claims presented in this case raise issues concerning the entitlement of a parent to be informed of a student's request

---

[1] During all times relevant to the Complaint the Defendants were acting on behalf of the SCSD. Although the school district itself is not a named defendant, this Order refers to the Defendants collectively as the "District" for simplicity purposes. Where appropriate, this Order will identify the actions of individual defendants.

under this policy as well as the parents "right" to override the policy. Issues are also raised as to an employee's obligation to adhere to the policy despite religious conflicts.

On April 20, 2023, the Willeys filed their Complaint (ECF No. 1) alleging violations of numerous constitutional rights through 42 U.S.C. § 1983.[2] Specifically, the Willeys allege as applied this policy violates: (1) their Fourteenth Amendment fundamental substantive due process right to direct the upbringing of their children; (2) their Fourteenth Amendment fundamental substantive due process right to familial privacy; and (3) their First Amendment right to free exercise of religion (collectively the "Joint Claims"). Additionally, in her capacity as a teacher for the District, Plaintiff Ashley Willey ("Mrs. Willey") alleges the Policy violates: (1) her First Amendment right to free exercise of religion; and (2) her First Amendment right to free speech (collectively the "Individual Claims").

On April 21, 2023, the Willeys filed the instant motion seeking a preliminary injunction enjoining the District from enforcing and implementing this policy. (*See* ECF No. 6.) Specifically, they ask the Court to enjoin the Defendants from: (1) referring to one of their children by any name other than their legal birth name or by pronouns inconsistent with their birth sex without their prior written consent; and (2) having private discussions with any of their children regarding mental health issues without their prior written consent. (*See* ECF No. 6 at 2.). Approaching the issues from her angle as a teacher, Mrs. Willey seeks an injunction enjoining Defendants from: (1) compelling her to refer to any student

---

[2] Although the Complaint references both federal and Wyoming state statutes, the Willeys do not seek relief on any federal statutory or state law grounds.

by any name other than his or her legal name or by any pronouns other than those "appropriate for his or her sex;" (2) compelling her to refrain from informing parents of their child's assertion of a "discordant gender identity and request for social transitioning" absent evidence of an investigation by child protective services regarding alleged abuse; and (3) compelling her to deceive parents by referring to any child by one set of names and pronouns at school and another set of names and pronouns in conversations with parents. (*Id.* at 2–3.)

## FACTUAL BACKGROUND

### A.   The Parties and Dispute

The Willeys are married and reside in Sweetwater County, Wyoming. Together, the Willeys are the parents of four children that attend schools within the Sweetwater County School District. In addition, Mrs. Willey is the parent and guardian of a 16-year-old that attends Black Butte High School (the "Student")[3], which is part of the SCSD. While Mrs. Willey claims to be the mother and sole legal guardian of the Student (ECF No. 1 ¶ 11)[4], the District refutes this allegation, claiming the Student's biological father maintains a parental role in the Student's life (*see* ECF No. 16 at 3). In addition, Mrs. Willey is employed as a special education math teacher in the District. (ECF No. 1 ¶ 13.)

---

[3] Because Mrs. Willey's child is identified by at least three sets of initials—A.S., C.S., and R.S.— throughout the various filings, the Court will simply refer to her child as the "Student."
[4] Mr. and Mrs. Willey have verified the Complaint under oath (ECF No 1 at 57–58) so it will be referred to and considered as part of the evidence submitted in support of Plaintiffs' motion for preliminary injunction. *See Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1163 (10th Cir. 2021) (district court did not error in treating verified complaint as an affidavit and testimonial evidence).

The Willeys allege the Student has been diagnosed with ADHD, PTSD, and is under the care of a private counselor. (*Id.* ¶¶ 19–22.) The Student is also under an Accommodation Plan under Section 504 of the Rehabilitation Act of 1973. (ECF No. 1 at 5.) At the beginning of the 2021-22 school year, despite being born biologically female, the Student told teachers at Black Butte High School that the Student wanted to be treated as a male and be referred to by male pronouns. (*Id.* ¶ 25.) The Willeys were unaware of the Student's request at that time, and were not informed or advised of the Student's request. (*Id.*) On March 29, 2022, while participating in a district-wide training, Mrs. Willey asserts that for the first time she discovered—when two of the Student's teachers at Black Butte disclosed—that the Student was being referred to by a male name and male pronouns at school, and had been for the entire school year. (ECF No. 1 ¶¶s 27-32.) Upon learning this Mrs. Willey informed the Student that the Student was "too young to make such decisions" and the conduct at school needed to stop. (*Id.* ¶ 33.) That same day, Mrs. Willey sent emails to teachers and staff at Black Butte High School and to Principal Blake, reflecting her position that the Student was too young to make such "life changing decisions." (*Id.* ¶¶ 34–35.) Mrs. Willey's emails directed staff and teachers to refer to the Student by her given birth name and female pronouns only, and threatened to take the issue to the District's central administration should any teacher or staff member defy her instructions. (*Id.*) In response Principal Blake advised that he had reached out to Human Resources concerning her request for further clarification and would be in touch with her upon receipt of that clarification. *Id.* at ¶ 36.

Following Mrs. Willey's email directive, the Student changed course and requested to be called by the Student's given name and female pronouns. (*Id.* ¶ 38–39; ECF No. 16-2 ¶¶ 3–5.) The District both respected the Student's initial wishes to be called by a male name and male pronoun, and the Student's subsequent request to be referred to by the Student's given female name and female pronoun. (ECF No. 16-2 ¶¶ 3–5.) Mrs. Willey alleges that in a meeting in April 2022, Ms. Bolton told Mrs. Willey that if the Student came back to the Student's teachers and requested to be called by a male name and pronoun the staff would do as the Student requested, regardless of Mrs. Willey's directions. (ECF No. 1 at ¶ 39; see also ECF No. 21-1 at ¶ 7.) In addition, Ms. Bolton stated they would not tell Mrs. Willey of the Student's request. *Id.*

As to her role as a teacher, the District maintains no student taught by Mrs. Willey has ever requested to use any name or pronoun other than their legal name and corresponding sex assigned at birth. (ECF No. 16-3 at ¶ 9.) The District contends it is unlikely Mrs. Willey will ever be faced with such a situation. (*Id.* ¶ 10.) The Complaint does not contain any allegations that Mrs. Willey has been required to apply this policy as a teacher. However, Defendants have not stated and do not assert that this policy is not applicable to Mrs. Willey.

**B.    The Policy**

At the beginning of the 2022-23 School year the District sent teachers a document entitled "SCSD #1 Special Services Non-Negotiables August 15, 2022" which in pertinent part provides:

7. **Preferred/Chosen Names Procedure.** As you become acquainted with your students, you may encounter students wishing to use a preferred or chosen name. A preferred/chosen name is any name a student chooses to use other than their legal name. For example, a student may wish to shorten their first name (e.g. Steven to Steve) or to be referred to by their middle name or a nickname. Sweetwater County School District Number One is committed to promoting an educational environment that is supportive and respectful to all students. Calling a person by their preferred name and pronoun shows respect and contributes to the District's commitment to providing a safe and nondiscriminatory educational environment. *Accordingly, staff must use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications. Staff must respect the privacy of all students regarding such choice.* Violations of this procedure may constitute discrimination based on sex, and may result in discipline. Students who experience problems or discrimination related to their preferred/chosen name or pronoun shall be referred to the Title IX Coordinator for resources and assistance. This procedure does not address changes to educational records to reflect legal name change. Any request to amend educational records shall be referred to the Director of Human Resources.

(the "Policy") (*See* ECF No. 1 at 68–71 (Exhibit E); 16-2) (emphasis added). A copy of the Policy was provided to Mrs. Willey in September of 2022, at which time she reviewed and crossed out paragraph 7 before signing and returning it to the District. (ECF No. 1 at 11, 68-71.) The District maintains it adopted the Policy to comply with Title IX of the Education Amendments of 1972 ("Tile IX"). (*See* ECF No. 16 at 3–4.)

Central to the Plaintiff's claims are two distinct aspects of the Policy. First, District personnel—including teachers such as Mrs. Willey—are required use a student's preferred name or pronoun at their request (the "Preferred Names Policy"). Second, District staff,—including teachers such as Mrs. Willey—must respect the privacy of all students regarding such choice (the "Student Privacy Policy") and not disclose their request to others absent consent.

In August of 2022, Mrs. Willey met with Ms. Arnoldi and Ms. Bolton to express her concerns and objections to the application of the Policy to any of her children and in her capacity as a teacher. Mrs. Willey alleges that following this meeting Ms. Arnoldi emailed her reaffirming the District's adherence to the Policy and its application to Mrs. Willey and all staff. (ECF No. 1 at 73.)  In addition, on September 9, 2022, Ms. Bolton sent out an email to SCSD employees "clarifying" the Policy and its application:

> The complexity and sensitivity of issues surround gender identity precludes a one-size fits-all approach.  Staff were never directed not to talk to parents or lie to parents. Decisions regarding how to support transgender and gender nonconforming students may involve the student, parents, and District administration. Teachers are expected to immediately refer such matters to their building principal, who will involve central administration. Teachers will then be informed of the District's plan for supporting the individual student and will be responsible for supporting the student. Again, student needs will be met with an individualized response and specific support.

(ECF No. 1 at ¶ 66; Ex. G at 76.) However, that statement was then seemingly immediately walked back:

> *That being said*, the District will prioritize safeguarding the physical and psychological well-being of a student. *When a student indicates that their family is not supportive of their gender identity and/or the District is concerned for the student's safety, the District will honor a student's request for confidentiality until the student consents to the disclosure and/or the District completes an individualized assessment and rules out any particularized and substantiated concern of real harm.*[5]

(*Id.*) (emphasis added) Statements made by District administrators and school board members at a school board meeting on September 12, 2022, reflected that each student's situation would be handled on a case-by-case basis, with the student's safety paramount.

---

[5] The use of the conjunctive and disjunctive make it unclear whether one or both conditions are required to be met before disclosure can be made to a student's unsupportive family.

(*See e.g.*, ECF No. 1 at 107–08.) The record is void of any evidence of the application of either aspect of the Policy to any student or situation other than the Student.[6]

## PRELIMINARY INJUNCTION LEGAL STANDARD

"Under the traditional four-prong test for a preliminary injunction, the party moving for an injunction must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013), *aff'd* 573 U.S. 682 (2014).

Although courts use "a bewildering variety of formulations . . . for showing some likelihood of success" on the merits, all courts agree that a "plaintiff must present a prima facie case but need not show a certainty of winning." *City of Albuquerque v. Barr*, 515 F.Supp.3d 1163, 1176 (D.N.M. 2021) (quoting *Coal. Of Concerned Citizens to Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of Trans.*, 843 F.3d 866, 901 (10th Cir. 2016)).

In First Amendment cases, the likelihood of success on the merits will often be the determinative factor. *Id.* at 1145 (quoting *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012), *cert. denied*, 133 S.Ct. 651 (2012)). As the Tenth Circuit has explained, this is because:

- "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury, *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (internal quotation marks omitted);

---

[6] Ms. Bolton's affidavit notes students often request to use their middle names or shorter versions of legal names, without objection from Mrs. Willey. (*See* ECF No. 16-3 ¶¶ 11–12.) While such a request *technically* comes within the ambit of the Preferred Names Policy, it is not a focus of the current motion.

• "when a law is likely unconstitutional, the interests of those the government represents, such as voters do not outweigh a plaintiff's interest in having its constitutional rights protected," *Awad v. Ziriax*, 670 F.3d 1111, 1131–32 (10th Cir. 2012) (cleaned up); and

• "it is always in the public interest to prevent the violation of a party's constitutional rights," *id.* at 1132.

*Hobby Lobby*, 723 F.3d at 1145.

A preliminary injunction is an extraordinary remedy never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In every case, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding the requested relief," paying particular regard to the public consequences of deploying an injunction. *Id.* (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). An injunction may only issue upon a clear showing the plaintiff is entitled to such relief. *Id.* at 22 (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

Preliminary injunctions that do not simply preserve the parties position pending trial are particularly disfavored. *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.* 916 F.3d 792, 797 (10th Cir. 2019). Disfavored injunctions are ones that mandate action rather than prohibit it, change the status quo, or grant all the relief the movant would be entitled to if victorious at trial. *Id.* The status quo is defined as "the last peaceable uncontested status existing between the parties before the dispute developed . . ." *Id.* at 798, n.3 (internal citations omitted.) In this case Plaintiffs seek a disfavored injunction and consequently bear a heavier burden on the likelihood of success on the merits and balance

of harm factors. *Id.* Plaintiffs are required to make a strong showing that these factors tilt in their favor. *Id.*

Evidence that goes beyond the unverified allegations in the pleadings and motion papers must be presented to support or oppose a motion for a preliminary injunction. *See Societe Comptoir De L'Industrie Cotonniere, Etablissements Boussac v. Alexander's Dept. Stores, Inc.*, 190 F. Supp. 594, 601 (S.D.N.Y. 1961), *order aff'd*, 299 F.2d 33 (2d Cir. 1962) ("As support for a preliminary injunction the court can consider only facts presented by affidavit or testimony and cannot consider facts provable under the modern liberal interpretation of the complaint but which have not been proved."); *see* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2949 (3d. Ed. 2023). To meet this requirement, the parties may rely on affidavits and hearsay materials that would not normally be admissible, but the mere unverified allegations in the Complaint are not sufficient. *See e.g.*, *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987); *Complete Angler, LLC v. City of Clearwater*, 607 F.Supp.2d 1120, 1123 (M.D. Fla. 2009).

Conversely, where the pleadings are properly verified, they may serve as evidence for a preliminary injunction if the allegations therein are based on personal knowledge. *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1163 (10th Cir. 2021); *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). Additionally, while a court may consider affidavits based on hearsay when evaluating requests of preliminary injunctions, courts should not overlook the reliability of this evidence when weighing it against other evidence. *See, e.g.*, *Pharmanex, Inc. v. HPF*, 221 F.3d 1352 (table), 2000 WL 703164, at *3 (10th Cir. 2000);

*Farm Bureau Prop. & Cas. Ins. Co. v. Biggs*, No. 2:20-CV-2558-HLT-KGG, 2021 WL 1348317, at *4 (D. Kan. Feb. 25, 2021).

"An evidentiary hearing is not always required before the issuance of a preliminary injunction." *Moon v. Med. Tech. Assocs., Inc.*, 577 F.App'x 934, 936 (11th Cir. 2014) (citing *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1538 (11th Cir.1989). This is especially true where the parties have not requested a hearing and the material facts are not in dispute. *See Mission Air Support, Inc. v. KSNL Aero, LLC*, No. CIV-21-1034-D, 2022 WL 1296081, at *1 n.1 (W.D. Okla. Apr. 29, 2022) (citing *Reynolds & Reynolds Co. v. Eaves*, 149 F.3d 1191 (10th Cir. 1998) (finding that a district court is not required to hold an evidentiary hearing prior to resolving a preliminary injunction motion)); *Robinson v. City of Edmond*, 160 F.3d 1275, 1286 (10th Cir. 1998) (noting that "a district court does not abuse its discretion in deciding not to hold an evidentiary hearing when no such request is ever made.")). But, where the injunction turns on the resolution of bitterly disputed facts, an evidentiary hearing is normally required to decide credibility issues." *Moon*, 577 F.App'x at 936. It is with these standards and requirements in mind the Court analyzes Plaintiffs' Motion.

## ANALYSIS

As a preliminary matter, the Court finds an evidentiary hearing is not necessary to resolve this motion. No party specifically requested a hearing, and the material facts are not in dispute. Insofar as evidence is concerned, the Court finds the Complaint is properly verified by the Willeys, who both attested to their personal knowledge of the facts set forth therein under penalty of perjury. (ECF No. 1 at 57–58); *see Vette*, 989 F.3d at 1163. The

Court will therefore treat the factual allegations in the Complaint to which the Willeys have

personal knowledge as evidence in this matter. The Court will also consider the affidavits

of Ms. Bolton (ECF No. 16–3), Mrs. Willey (ECF No. 21-1), and Dr. Erica Anderson (ECF

No. 6-1) as evidence.

### A.      Prong One: Likelihood of Success on the Merits

The Court begins by evaluating the likelihood of success of each of the Willey's

claims on the merits.

### 1.      Standing

The Court must first address standing, which presents "the threshold jurisdictional

question of whether a court may consider the merits of a dispute." *Miller v. Austin*, ---

F.Supp.3d ---, 2022 WL 3584666, at *3 (D. Wyo. 2022) (quoting *S. Utah Wilderness All.

v. Palma*, 707 F.3d 1143, 1152 (10th Cir. 2013)). Standing presents a jurisdictional issue

that may be raised by the court at any time. *See 303 Creative LLC v. Elenis*, 6 F.4th 1160,

1171 (10th Cir. 2021), *rev'd on other grounds*, 600 U.S. —, No. 21-476, slip op. (2023).

A plaintiff has the burden of establishing standing, which must exist at the time the action

is brought. *Rocky Mountain Peace & Justice Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th

1133, 1151 (10th Cir. 2022) (citing with approval *Mink v. Suthers*, 482 F.3d 1244, 1254-

55 (10th Cir. 2007)).

In order to demonstrate constitutional standing under Article III, a plaintiff must

establish: (1) they suffered an injury in fact; (2) there is a causal connection between the

injury suffered and the conduct and question; and (3) that it is likely, not speculative, that

a favorable decision will redress the injury. *Pac. Frontier v. Pleasant Grove City*, 414 F.3d

1221, 1228–29 (10th Cir. 2005) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiffs suffer an "injury in fact" where they have endured "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Id.* (quoting *Lujan*, 504 U.S. at 560–61) (cleaned up). The requisite causal connection between the injury and the conduct complained of requires the injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up). The party invoking the court's jurisdiction bears the burden of establishing these elements by the manner and degree of evidence required at each stage of the litigation. *Id.* at 561.

Here, as to the Joint Claims, the Court finds it unlikely Mr. Willey has standing to pursue his claims because he has not suffered an injury in fact. Article III standing requires an invasion of a *legally protected interest* which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *See Lujan*, 504 U.S. at 560–61. Here, Mr. Willey has not identified a legally protected interest. The Complaint makes clear he is not a biological parent of the Student, and, while disputed by the District, Mrs. Willey claims to be the Student's sole legal guardian. The evidence before this Court fails to show any *legal* relationship between Mr. Willey and the Student. Thus, Mr. Willey lacks any Article III standing as to claims regarding the Student. However, because Mrs. Willey has standing to pursue both the Joint Claims and her Individual Claims, the Court will proceed to further analyze the instant motion on the merits.

## 2.   Mootness

A corollary to Article III standing, mootness requires a live controversy and that plaintiff possess a personal interest in the outcome of the case throughout all stages of the proceedings. *Lucero v. Bureau of Collection Recovery, Inc.*, 639 F.3d 1239, 1242 (10th Cir. 2011); *see also Kan. Jud. Rev. Bd. v. Stout*, 562 F.3d 1240, 1245 (10th Cir. 2009). "If, during the pendency of the case, circumstances change such that the plaintiff's legally cognizable interest in a case is extinguished, the case is moot and dismissal may be required." *Id.* A party claiming that there is no longer a live case or controversy bears the burden of demonstrating mootness. *Chihuahuan Grasslands All. v. Kempthorne*, 545 F.3d 884, 891 (10th Cir. 2008).

In deciding whether a case is moot, the crucial question is whether granting a present determination of the issues offered will have some effect in the real world. *Id.* at 1246 (quotations omitted). When it becomes impossible for a court to grant effective relief, a live controversy ceases to exist, and the case becomes moot. *United States v. Hahn*, 359 F.3d 1315, 1323 (10th Cir.2004) (en banc). "Generally, repeal of a challenged statute causes a case to become moot because it extinguishes the plaintiff's legally cognizable interest in the outcome, rendering any remedial action by the court ineffectual." *Stout*, 562 F.3d at 1246.

However, voluntary cessation of a defendant's conduct does not moot a case unless it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *West Virginia v. Env't Prot. Agency*, 142 S.Ct. 2587, 2607 (2022). Thus, the defendant bears a particularly heavy burden in demonstrating a case is moot where the

"only conceivable basis for a finding of mootness" is the defendant's voluntary conduct. *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs (TOC), Inc.*, 528 U.S. 167, 189 (2000)). This is where Defendants' mootness argument fails.

Defendants argue the Willey's Joint Claims are moot in their entirety because the Student—upon the Student's request—is being referred to by birth name and corresponding pronouns. (*See* ECF No. 1 ¶ 39, ECF No. 16-3 ¶¶ 5–6.) Because there is no longer any ongoing harm, Defendants argue there is no longer an active case or controversy. The parties also do not dispute that *at one point*, the Student asked to be referred to by a male name and pronoun, and the District honored that request without informing the Willeys. (*See* ECF No. 16-3 ¶¶ 3–4.)

Based on the record currently before the Court, Defendants' argument the case is moot is without merit. Defendants have not withdrawn or eliminated the Policy. The Policy's inapplicability is the result of a third party's request, which could change at any time, triggering the Policy.[7] The Policy therefore remains applicable. In addition, Defendants' arguments ignore the Policy's continued application to Mrs. Willey, as a teacher. Again, the fact Mrs. Willey has not been required to apply it and may never have to apply it is not because Defendants have withdrawn or suspended the Policy.

To this end, there is nothing in the record to suggest the Policy has been repealed or otherwise changed. *See Stout*, 562 F.3d at 1246. Further, the District does not allege they

---

[7] Mrs. Willey also attests at least three teachers are still addressing the Student by a male name and pronouns. (ECF No. 21-1 ¶¶ 10–11.) Although this creates a factual dispute, it is not material to the Court's mootness analysis.

will not seek to enforce the Policy or have amended or suspended the Policy. With the Policy still in place, there is no reason to think Defendants would not pivot back to their original position regarding the Student should the Student change the Student's mind. Neither is there any indication that Defendants would not expect Mrs. Willey to abide by the Policy if she were asked to by a student. Considering the evidence before the Court, it is not "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *West Virginia*, 142 S.Ct. at 2607. Thus, the Defendants are unlikely to carry their particularly heavy burden to show this case is moot. *Friends of the Earth, Inc.*, 528 U.S. at 189.

### 3.    Fourteenth Amendment Right to Direct the Upbringing of Children[8]

#### a.    The General Fundamental Right

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1; *see Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court has long recognized the Due Process Clause guarantees more than fair process and includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel*, 530 U.S. at 65 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). One such protected liberty interest—among the

---

[8] The Court reiterates Mr. Willey does not have standing to pursue any of the Joint Claims as they pertain to the Student, and such claims belong to Mrs. Willey alone. However, for simplicity and consistency the Court will still refer to the Joint Claims being pursued by the plural "Willeys."

longest recognized by the Supreme Court—is the interest of parents in the care, custody, and control of their children. *Id.*

In *Meyer v. Nebraska*, the Supreme Court first recognized the Due Process Clause protected the right to "establish a home and bring up children," and to "control the education of their own." 262 U.S. 390, 399, 401 (1923). While the Court struck down a Nebraska statute that prohibited the teaching of subjects except in English, it still recognized:

> The power of the state to compel attendance at some school and to make reasonable regulations for all schools, including a requirement that they shall give instructions in English, is not questioned. Nor has challenge been made of the state's power to prescribe a curriculum for institutions which it supports.

*Id.* at 402.

The Court further expounded on parents' liberty interest in *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary*, noting "[t]he child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." 268 U.S. 510, 535. *Pierce* struck down a portion of Oregon's Compulsory Education Act that required parents send their child "to a public school for a period of time a public school shall be held during the current year[,]" finding it interfered with a parent's right to direct the upbringing and education of children under their control. *Id.* at 530, 534–35. In affirming the right of parents to send their children to private schools, the Court stated:

> No question is raised concerning the power of the state reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers

> shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare

*Id.* at 534. Supreme Court case law has since affirmed that "parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society." *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972). While the basic fundamental right of parents in the care, custody, and control of their children is well established, it is the *scope and contours* of that right in dispute in this case.

In substantive due process cases, the Supreme Court has required a "careful description" of the asserted fundamental liberty interest, with "[o]ur Nation's history, legal traditions, and practices [providing] the crucial guideposts for responsible decision making." *Glucksberg*, 521 U.S. at 721. The Due Process Clause therefore protects only those fundamental rights and liberties "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty" such that "neither liberty nor justice would exist if they were sacrificed." *Id.* (citing *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 503 (1977) (plurality opinion)).

The Supreme Court has been reluctant to expand the concept of substantive due process because "the guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Id.* at 720 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)). Courts must exercise the upmost care in breaking new ground in this field, mindful that the liberty protected by the Due Process Clause may not be transformed into the policy preferences of the judiciary. *Id.* (citing *Collins*, 503 U.S. at 125; *Moore* 431 U.S. at 502). As the Supreme Court recently observed:

"substantive due process has at times been a treacherous field for this Court," and it has sometimes led the Court to usurp authority that the Constitution entrusts to the people's elected representatives. As the Court cautioned in *Glucksberg*, "[w]e must ... exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court."

*Dobbs v. Jackson Women's Health Organization*, — U.S. —, 124 S.Ct. 2228, 2247–48 (2022) (internal citations omitted).

Here, the Willeys argue that the Policy violates their Fourteenth Amendment substantive due process rights by: (1) concealing information regarding social transitioning which violates their fundamental parental right to make medical and mental health care decisions for their children; (2) interfering with their fundamental right to direct the upbringing and education of their children; and (3) concealing information regarding social transitioning which violates their right to familial association.[9] (ECF No. 7 at 10, 16 and 17).

### b. The Right to Direct Medical Care

Both the Supreme Court and Tenth Circuit have recognized the Due Process Clause provides some level of protection for parents' decisions regarding their children's medical care. *See Parham v. J.R.*, 442 U.S. 584, 603 (1979); *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010). While the exact scope and contours of this right have not been well defined, "a parent's general right to make decisions concerning the care of her child includes, to some extent, a more specific right to make decisions about the child's medical

---

[9] The Willeys also raise a Free Exercise claim, which will be discussed later in this Order.

care." *Wagner*, 603 F.3d at 1197 (citing *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203 (10th Cir. 2003)). However, nothing provided to this Court would support that the enactment or application of the Policy constitutes medical or health care for which parental consent would be required.

The Supreme Court has long cautioned parental rights—including the right to direct a child's medical care—are not absolute or unlimited. *Id.* at 1197–98 (citing *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)); *see also Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019) ("The right to direct a child's medical care is not absolute."). States also have a compelling interest in protecting the lives and health of the children within their borders. *See Globe Newspaper Co. v. Superior Ct. of Norfolk Cnty.*, 457 U.S. 596, 607 (1982). Thus, when a child's health is endangered by parents' decisions, in some circumstances, the State may intervene without violating the parents' constitutional rights. *See Parham*, 442 U.S. at 603.

Turning to the claim at issue here, the Willeys specifically argue the Defendants concealing information regarding the Student's assertion of a different gender identity and request to socially transition—a recognized mental health intervention—violate their fundamental parental rights to make medical and mental health care decisions. (*See* ECF No. 7 at 14.) Based upon the facts as currently presented, the Court finds the Willeys are unlikely to succeed on the merits of their Fourteenth Amendment parental rights claim in this regard.

First, assuming *arguendo* that the Willey's asserted fundamental right conveys an absolute right to direct their child's medical and mental health care, the Willeys have failed

to establish how the Policy infringes upon that right. Numerous courts have recognized being transgender is not a psychiatric condition, and "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594 (4th Cir. 2020); *see Foote v. Town of Ludlow*, No. 22-30041-MGM, 2022 WL 18356421, at *5 (D. Mass. Dec. 14, 2022) (citing *Grimm* and dismissing claim school usurped parent's right to make medical and mental health treatment decisions); *Doe by and through Doe v. Boyertown Area Sch. Dist.*, 276 F.Supp.3d 324, 367 (E.D. Penn. 2017) (finding being transgender is not a medical or psychiatric condition).

However, many of those same courts have recognized some transgender individuals are diagnosed with gender dysphoria, which is recognized by the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("DSM") as "clinically significant distress or impairment related to gender incongruence." (*See* ECF No. 6-1 ¶ 9); *see also Grimm*, 972 F.3d at 594–95. At the same time, the DSM recognizes (and the Willey's expert concedes), "not everyone who is gender variant experiences gender dysphoria." (ECF No. 6-1 ¶ 9.)

Here, the Willeys have not alleged the Student has ever been diagnosed with gender dysphoria, nor that any of the Defendants erroneously believed the Student had been. Instead, the Willeys allege the Student had been diagnosed with AHDH and PTSD and was an individual for "whom affirming a discordant gender identity is antithetical to [the child's] health and well-being." (ECF No. 1 ¶¶ 4, 69) Beyond this conclusory statement, there are no allegations in the Complaint or facts in the record before this Court that the

Student had or has a diagnosed mental health condition related to gender identity. *See*

*Foote*, 2022 WL 18356421 at *4. Although the Willeys rely on the expert affidavit of Dr.

Erica Anderson ("Dr. Anderson") (ECF No. 6-1), there is no indication Dr. Anderson has

ever spoken to—let alone examined—the Student. Absent evidence the Student was

suffering or diagnosed with a mental health condition related to gender identity, the Court

finds it unlikely the Willeys will succeed on the merits of their Fourteenth Amendment

parental right to direct medical care claim.

Further, the Willeys have failed to make a showing the Preferred Name Policy was

used as a means of treatment for any relevant diagnosed medical or mental health condition.

As the *Foote* court explained:

> Plaintiffs have not alleged Defendant's actions were undertaken as a part of
> a treatment plan for gender dysphoria or explained how referring to a person
> by their preferred name and pronoun, which requires no special training or
> skill, has clinical significance when there is no treatment plan in place.
> Similarly, there are no non-conclusory allegations that social transitioning
> was actually occurring or includes supportive actions taken by third parties,
> as opposed to actions a person takes to understand or align their external
> gender presentation with their gender identity. Addressing a person using
> their preferred name and pronouns simply accords the person the basic level
> of respect expected in a civilized society generally . . .
>
> . . .
>
> In the absence of supporting factual allegations, such as a relevant medically-
> recognized diagnoses and treatment plan, the court disregards Plaintiff's
> conclusory statements describing the use of preferred names and pronouns
> as mental health treatment.

*Id.* at *5. The Court finds *Foote* to be both instructive and persuasive in this case.

Even assuming, for sake of argument only, that the Student had a diagnosed mental

health condition related to gender identity the Willeys fail to explain how the Policy

constitutes "treatment" for a relevant mental health condition. There are no allegations

anyone at the school actively approached the Student regarding the Student's preferred name, nor that anyone at the school suggested the Student be referred to by any particular name or pronoun. Rather, the school merely addressed the Student by the Student's requested preferred name and pronoun. Based on the allegations, it was the Student initiating and requesting the use of a different name, not the District.

The Complaint is also void of allegations the Student met with any kind of counselor or other mental health professional within the District regarding the Student's preferred name or pronouns. In fact, the Complaint and materials before this Court provide little information, outside of the Student's name request and the School's compliance therewith. Rather, the evidence focuses primarily on Mrs. Willey's *ex post facto* interactions with administrators. There is no indication that by adhering to the Student's request the District effectuated or intended to "treat" any physical or mental health condition.

Dr. Anderson's conclusions are not inconsistent with this position. Dr. Anderson's affidavit states "social transition (and variations) [refers] *primarily* to adopting a new name and/or pronouns that differ from one's natal sex [,] a social transition can include more than just name and pronoun changes, [including changing one's] hairstyle, clothing, or their appearance in other ways, [using] opposite sex facilities, and/or [making] other changes." (ECF No. 6-1 ¶ 8) (emphasis added). There is nothing in the record to indicate the *school* "adopted" a new name or pronoun. Rather, it was the Student adopting a new name, and the school passively recognizing the Student's wishes. Further, there are no allegations the Student ever changed the Student's hairstyle, clothing, appearance or sought to use opposite sex facilities. Nor is there any evidence the school suggested, facilitated, or

encouraged the Student to engage in such behaviors as part of a "treatment" plan. In sum, there is insufficient evidence to suggest the Policy amounted to active social transitioning or any other kind of "treatment" for a mental health condition. Thus, the Court finds it unlikely the Willeys would succeed on the merits of their claim.

### c.   Parental Right to Direct Care, Upbringing, and/or Education

The Willeys further assert that by "[d]riving a wedge between the parent and child, as Defendants are doing through implementing the [Preferred Names Policy] with [the Student, it] infringes on the parents' right to control the upbringing of a child, a right which falls within the sphere of protected liberty that is 'objectively, deeply rooted in this Nation's history and tradition.' *Dubbs* 336 F.3d at 1202." (ECF No. 7 at 19.) The Willeys further contend that the Student Privacy Policy infringes on their fundamental parental rights by "actively and intentionally deceiving them through the use of children's 'preferred' names and pronouns at school, but legal name and pronouns in the parents' presence." (*Id.*)

While the Supreme Court has never been called upon to define the "precise boundaries" of a parent's right to control a child's upbringing and education, it is clear such a right is neither absolute nor unqualified. *See John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, No. 8:20-3552-PWG, — F.Supp.3d —, 2022 WL 3544256 (D. Md. Aug. 18, 2022) (citing *Bailey v. Va. High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005)). The Supreme Court has stressed *Meyer* and *Pierce* are limited in scope, affirming the right of private schools to exist and operate, and lend "no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what

knowledge a child needs to be a productive and happy member of society." *Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (quoting *Yoder*, 406 U.S. at 239 (White, J., concurring)).

The Tenth Circuit has likewise acknowledged a parent's right to direct a child's education exists but is limited in scope. *Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998). In *Swanson* the court noted, "[t]he case law in this area establishes that parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Id.* (noting other courts had held "that parents have no right to exempt their children from certain reading programs the parents found objectionable, or from a school's community-service requirement, or from an assembly program that included sexually explicit topics."); *see Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 136 (5th Cir. 2009) (citing *Swanson* and finding "[t]he parents' right protects their prerogative to make choices regarding the type of education—e.g., public, private, or home-schooling—that their child receives but not particular components of that education, such as participation in interscholastic athletics or enrollment in particular courses.")

In regard to the Preferred Names Policy, to support an intrusion of the Willeys' fundamental parental rights, this Court would have to significantly expand the contours of the parental rights articulated in *Meyer* and *Pierce.* Such expansion would be at odds with *Dobbs'* and *Glucksberg's* warning that courts must proceed with the upmost care in breaking new ground in the field of substantive due process rights. Moreover, given *Runyon* and *Swanson's* affirmation that both *Meyer* and *Pierce* are limited in scope, this

Court does not believe such a dramatic expansion is likely at this juncture or supported by existing precedent.[10] Considering the lack of supporting caselaw for these propositions and the high bar for expanding existing fundamental rights, the Court finds it unlikely the Willeys would succeed on the merits of such a theory.

As to the Student Privacy Policy, the Willey's assertion that they, as parents, have a fundamental right to *know* at all times what the Student is being called likewise faces significant legal and factual hurdles that lead the Court to conclude it is unlikely the Willeys will succeed on the merits at this juncture. However, as discussed below, there is a component of the Student Privacy Policy that this Court finds constitutionally problematic.

The Willey's Complaint fails to allege and there is no evidence that the District ever actively withheld information or deceived the Willey's regarding the Student's request to be called by the Student's preferred name or pronoun. (*See* ECF No. 1 ¶¶ 27–32.) The Complaint alleges the Student requested and the School complied with the Student's request to be called by a male name and pronoun at the beginning of the 2021–22 school year, and that the Willeys were neither "informed nor advised" regarding the Student's request. (*Id.* ¶¶ 25–26.) The absence of such evidence also impairs the Willey's ability to connect the Policy to their alleged injury as it is not "fairly traceable" to the Policy and is

---

[10] In addition to those already mentioned, numerous other courts have specifically rejected the position that parents have an absolute right to impose their demands and preferences on public schools or their activities. *See Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197 (9th Cir. 2005) *amended on denial of rehearing*, 447 F.3d 1187 (9th Cir. 2006) (finding parents do not have a fundamental right to generally to direct how a public school teaches their child); *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008); *Crowley v. McKinney*, 400 F.3d 965, 968 (7th Cir. 2005) (finding *Meyer* and *Pierce* are about a state's denial of a private education, and do not convey a right for parental management); *Leebaert v. Harrington*, 332 F.3d 134, 140–42 (2d Cir. 2005); *but see Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000). At a minimum, given the apparent circuit split, the Court cannot say the Willeys would likely be successful on the merits under this theory.

instead "the result of the independent action of some third party not before the court." *See Lujan*, 505 U.S. at 560. To establish a constitutional injury and nexus the Willeys would have to demonstrate the Constitution imposes an affirmative obligation on the District to actively disclose information regarding a student—even in the *absence* of a parent's inquiry or request. Based upon current caselaw it does not appear there is a strong likelihood of success on the merits of this argument.

However, a parent's established fundamental right to direct the upbringing and education of their children would appear to be burdened if a parent was misinformed or the District or a teacher refused to respond to a parent's inquiry regarding their minor child's request to be called by a different name, absent a showing of some danger to the health or wellbeing of the student.

To the extent the Student Privacy Policy would preclude a teacher or school district personnel, absent a minor student's consent, from answering or responding to a parent's or guardian's inquiry as to whether their child is being called by other than their legally given name or required to lie to a parent or guardian as to the name the minor student is being called by, it creates a likely constitutional problem.[11]

---

[11] As noted *supra* the Preferred/Chosen Names Procedure requires staff to respect the privacy of all students regarding such choice. (ECF No. 1 at 68-69.) Ms. Bolton's September 9, 2022 email (ECF No. 1 at 75-76) clarified that "[w]hen a student indicates that their family is not supportive of their gender identity and/or the District is concerned for the student's safety, the District will honor a student's request for confidentiality until the student consents to the disclosure and/or the District completes an individualized assessment and rules out any particular and substantiated concern of real harm to the student." The use of the disjunctive and conjunctive make the Policy ambiguous. There is no evidence that any individualized assessment was ever conducted on the Student in this case. It should be noted that under Wyo. Stat. § 14-3-205, school teachers are required to report any believed or suspected child abuse or neglect.

Parents and legal guardians of minor children have a fundamental right to make decisions concerning the care, custody and control of their children. *Troxel*, 530 U.S. at 65–66 (2000) (citing with approval *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). Parents and guardians also enjoy the liberty of directing the upbringing and education of minor children under their control. *Id.* at 65 (citing with approval *Pierce*, 268 U.S. at 534-35). To the extent the Student Privacy Policy prohibits a teacher or school employee, *upon inquiry* by a parent or legal guardian, from responding or providing accurate and complete information concerning their minor child (and absent a threat to the wellbeing of the student), it burdens a parent's fundament right to make decisions concerning the care, custody and education of their child. *See Ricard v. USD 475 Geary Cnty., Kan. Sch. Bd.*, No. 5:22-cv-05015-HLT-GEB, 2022 WL 1471372, at *8, n.12 (D. Kan. May 9, 2022) (noting it is "difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children information fundamental to their identity, personhood, and mental and emotion wellbeing such as their preferred name and pronouns;" further finding "it is illegitimate to conceal information from parents for the purpose of frustrating their ability to exercise a fundamental right.")

While parents do not have the right to manage the operations of a school or even the courses and curriculum (*see Swanson*, 135 F.3d at 699), they do have a right to direct their minor child's education which cannot be accomplished unless they are accurately informed in response to their inquiries. Similarly, parents could not make a reasonable choice regarding the type of education—public, private, or home schooling, *see Cornerstone*

*Christian*, 563 F.3d at 136—if they are unaware of circumstances that have a significant bearing on that decision because of the school's withholding of information or active deception, despite their inquiry.

Based upon the law and facts presented at this point the Willeys are unlikely to succeed on the merits of their Fourteenth Amendment parental rights claims challenging the Preferred Names Policy. However, as set forth above, to the extent the Student Privacy Policy were interpreted, absent student consent allowing disclosure, to require a teacher or school district employee to: (1) refuse to disclose said information; or (2) provide materially misleading or false information; it presents issues that potentially implicate both constitutional and statutory rights.[12] The Court therefore finds the Willeys have a strong likelihood of success on the merits challenging the Student Privacy Policy to these ends.

Certainly, if there was a reasonable basis to fear the minor child would be in danger or potentially abused, that could provide an exception to the disclosure and corresponding duty to report under Wyoming law. However, there is no suggestion that such a situation existed in this case. Nevertheless, the Policy is not so limited.

### d.    Applicable Tests: Substantive Due Process Claims

Finally, both the Supreme Court and Tenth Circuit have prescribed several tests when evaluating substantive due process claims. *See Halley v. Huckaby*, 902 F.3d 1136,

---

[12] The refusal to disclose such information likely runs afoul of the District's obligations under the Federal Educational Rights and Privacy Act of 1974 ("FERPA"). While the Supreme Court has made clear FERPA does not confer a private right of action under § 1983 or any other theory—and thus is of no help to the Willey's chances of success on the merits—it could certainly lead to other consequences for the District. *See Gonzaga Univ. v. Doe*, 526 U.S. 273, 287 (2002).

1153 (10th Cir. 2018). In some instances, substantive due process cases turn on whether the government has infringed on a "fundamental right." *See e.g.*, *Glucksberg*, 521 U.S. at 721–22. Other times, the legal test asks whether the government action deprives a person of life, liberty, or property in a manner that shocks the judicial conscience. *See e.g., Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The Tenth Circuit has concluded that courts should apply the fundamental-rights approach when the plaintiff challenges *legislative action*, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious *executive action. Halley*, 902 F.3d at 1153; *see Browder v. City of Albuquerque*, 787 F.3d 1076, 1079 (10th Cir. 2015); *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009).

Using the fundamental rights approach, the Supreme Court has noted the Fourteenth Amendment's Due Process Clause "forbids the government to infringe fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)). However, if the plaintiff fails to establish the threshold requirement that the challenged state action implicates a "fundamental right," then only "a reasonable relation to a legitimate state interest to justify the action" is required to pass constitutional muster. *Id.* at 722.

Conversely, plaintiffs face a much higher bar under the shocks the conscience approach. "The ultimate standard for determining whether there has been a substantive due process violation is whether the challenged action shocks the conscience of federal judges." *Moore v. Guthrie*, 438 F.3d 1036, 1040 (10th Cir. 2006) (cleaned up). It is well settled

negligence is not sufficient to shock the conscience, and a plaintiff must do more than show the government actor intentionally or recklessly caused injury by abusing or misusing government power. *Id.* Due process protection has "[h]istorically been applied to deliberate decisions of government officials to deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). Put another way, "[t]o be conscience-shocking, [the action must be] so arbitrary to be as an instrument of oppression, egregious, outrageous, and so brutal and offensive that it runs afoul of traditional ideas of fair play and decency." *Woodard*, 912 F.3d at 1301 (cleaned up).

Relying primarily on *Dubbs*, the Willeys urge the Court to apply the former test because a fundamental right has been implicated. *See* 336 F.3d at 1203. However, this ignores the more recent guidance from *Halley*, under which the test is determined by the nature of the state action, not the nature of the fundamental right alleged to be implicated. In this particular case, whether the Policy itself and the accompanying actions by the individual defendants amount to legislative or executive action is an unsettled matter, and one the Court need not resolve today. Applying either approach, the Court finds the Willeys are unlikely to succeed on the merits of their claim as applied to the Preferred Names Policy. Conversely, as set forth above and under either approach, to the extent the Policy would preclude a school district employee from responding to a minor parent's inquiry or require providing false information, absent a reasonable concern of abuse, it would be arbitrary and conscience-shocking.

As to the Preferred Names Policy, the Willeys have failed to either establish a fundamental right, or where they have sufficiently identified a fundamental right, that the

Preferred Names Policy implicates that right. Having failed to do so, only "a reasonable relation to a legitimate state interest to justify the action" is required. *Glucksberg*, 521 U.S. at 722. The Willeys have failed to make any showing that the Preferred Name Policy lacks a reasonable relation to several legitimate interests, such as potential compliance with Title IX and generally avoiding discrimination. As such, they have not shown a likelihood of success on the merits.

The Willeys arguments fair no better under the "shocks the conscience standard." Given the record at this stage, the Court cannot say the Preferred Names Policy or the actions of any of the defendants were so "egregious, outrageous, and so brutal and offensive" that they run afoul of "traditional ideas of fair play and decency." *Woodard*, 912 F.3d at 1301. Calling a student by their preferred and requested name and pronoun is not conscience shocking.

However, the same cannot be said for the Student Privacy Policy to the extent it precludes disclosure in response to a parent's inquiry absent the minor student's consent and in the absence of a reasonable safety concern.

Fundamentally, such an approach makes no sense. Simply by refusing or being unable to respond to the minor parent's inquiry, a school district employee effectively answers the parent's question, unless they blatantly lie to the parent. Where there is no reasonable concern for the minor child's safety there is no rational—let alone compelling reason—to prevent a school district employee from honestly responding to a parent's inquiry.

Moreover, as discussed above, by failing to provide complete and accurate information it would interfere with parent's liberty of directing the upbringing and education of minor children under their control. To the extent the Student Privacy Policy is applied in this fashion, it shocks the judicial conscience.[13] *Moore*, 438 F.3d at 1040. To these ends, the Willeys have shown a strong likelihood of success on the merits of their challenge to the Student Privacy Policy.

### e.      Fourteenth Amendment Right to Familial Association

The Due Process Clause also protects the freedom of personal choice in matters of marriage and family life. *See Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639–40 (1974) (collecting cases). The Tenth Circuit has recognized the right to familial association as a substantive due process right under this umbrella, specifically applying the shocks the conscience legal standard. *See Halley*, 902 F.3d at 1153, 1155. A constitutional claim of interference with the right to familial association requires two showings:

> (1) that the defendants intended to deprive the plaintiffs of their protected relationship with a family member, and (2) that balancing the plaintiffs' interest in their protected relationship against the state's interest in the family member's health and safety, defendants either unduly burdened plaintiffs' protected relationship or effected an unwarranted intrusion into that relationship.

*Id.* (quoting *Thomas v. Kaven*, 765 F.3d 1183, 1196 (10th Cir. 2014)) (cleaned up). "In conducting this balancing, the court will consider, among other things, the severity of the

---

[13] Because the Willeys have satisfied the more demanding "shocks the conscience standard," the Court is satisfied they would also satisfy the less stringent fundamental rights approach.

infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action." *Thomas*, 765 F.3d at 1196.

However, the Supreme Court has also recognized "the family itself is not beyond regulation in the public interest, and "neither rights of religion nor rights of parenthood are beyond limitation." *See Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). As the *Prince* Court cautioned:

> Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience.

*Id.*

Here, the Willeys attempt to broaden the right of familial association to encompass the protection of "the private realm of the family from the interference by the state." (ECF No. 7 at 20.) They claim the school intentionally interfered with the sanctity of their family relationship by concealing "critical mental health information," and burdened their family relationship by excluding them entirely from the "parental decision-making process" regarding their child because the Willeys do not agree with the school's viewpoint regarding gender identity. (*Id.* at 20–21.) Based upon the facts and case law this Court is not persuaded the Willeys are likely to succeed on the merits of such a claim.

First, while the Willeys attempt to retrofit a familial association claim into a "familial privacy" action, their proffered caselaw does not support such an interpretation. Cases such as *Halley* and *Thomas* illustrate that the type of "deprivation" typically at issue involves the state removing a child from the parent's home—not a state policy or a

procedure that purportedly takes a "decision" away from the parents. There is nothing to suggest the Policy deprives the Willeys of their familial association with the child in this sense. Assuming *arguendo* the Willey's interpretation is correct, any state policy that caused tension or disagreement between the parents and the child would potentially implicate a fundamental constitutional right. Given the absence of authority to this effect and the obvious far-reaching implications, the Court highly doubts the Willeys will be successful on the merits.

Second, the Willey's position implies it is within the protected sphere of familial privacy and association to determine what name and pronoun a child should use and be referred to by others. Such a proposition would *dramatically* expand a fundamental substantive due process right, which this Court must utilize the upmost care in doing. *See Glucksberg*, 521 U.S. at 721. This also fails to consider the impact on a variety of the *child's* potential fundamental rights. Given the potential implications and high bar, the Court finds it unlikely the Willeys would be successful on the merits under such a theory.

### 4. First Amendment Right to Free Exercise of Religion

#### a. Free Exercise Law Generally

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" or religion. U.S. Const. amend. I. The Free Exercise Clause is applicable to the states through the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). A plaintiff bears the initial burden to demonstrate an infringement of his or her rights under the Free Exercise Clause, and if the plaintiff carries that burden the focus then shifts to the defendant to show that its actions were nonetheless justified and

appropriately tailored. *See e.g., Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1876–77 (2021).

A plaintiff may show a violation of the Free Exercise Clause in numerous ways, including by showing a government entity has burdened his or her sincerely held religious beliefs or practices pursuant to a policy that is not "neutral" or "generally applicable."[14] *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2422 (2022) (citing *Emp. Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877 (1990)). Should a plaintiff make such a showing, a court will find a First Amendment violation unless the government can satisfy "strict scrutiny" by "demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* (quoting *Church of Lukumi Babalu Aye, Inc. v. Hiyaleah*, 508 U.S. 520, 546 (1993)). However, a law that is both neutral and generally applicable need only be rationally related to legitimate government interest to survive a constitutional challenge. *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006).

---

[14] A plaintiff may also prove a Free Exercise violation by showing "official expressions of hostility" to religion or religious viewpoints that accompany laws or policies burdening religious exercise. *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*, 138 S.Ct. 1719, 1732 (2018) (further noting the government "cannot act in a manner that passes judgment on or presupposes the illegitimacy of religious beliefs and practices."). As such, the government is obliged to proceed in a manner neutral toward and tolerant of a claimant's religious beliefs. *Id.* at 1731. Factors relevant to the assessment of governmental neutrality include: (1) the historical background of the decision under challenge; (2) the specific series of events leading to the enactment or official policy in question; (3) and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body. *Id.* (quoting *Lukumi*, 508 U.S. at 540). At this point, the Willeys have not alleged any official expressions of hostility towards religion to give rise to a claim under this approach.

### b.    Sincerely Held Religious Beliefs and Burden

The first questions in any free exercise claim are whether the plaintiff's beliefs are religious in nature, and whether those religious beliefs are sincerely held. *United States v. Seeger*, 380 U.S. 163, 185 (1965). However, such religious beliefs need not be "acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Lukumi*, 508 U.S. at 531. The beliefs must be "rooted in religion" because "personal preferences and secular beliefs do not warrant the protection of the Free Exercise Clause." *See Frazee v. Ill. Dept. of Emp. Sec.*, 489 U.S. 829, 833 (1989). It is also "not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989).

Here, the Willeys have pleaded five particular religious beliefs: (1) that human beings are created male and female and that the natural created order regarding human sexuality cannot be changed regardless of individual feelings, beliefs, or discomfort with one's identity, and biological reality, as either male or female; (2) that parents have a non-delegable duty to direct the upbringing and religious training of the their children, including concerning human sexuality and identity; (3) that all people are to be treated with respect and compassion, which includes refraining from misrepresenting an individual's natural biological and created identity as either male or female; (4) that individuals are to speak the truth regarding matters of sexual identity and biological reality as a male or female; and (5) that children are to honor their father and mother, which means they are not to lie to their parents or act in contravention to their parent's direction and instruction. (ECF No. 1

¶¶ 180–84.) The Court will assume, for purposes of this proceeding only, that these beliefs are "rooted in religion," and therefore assume (without deciding) the Willey's asserted beliefs are religious in nature.

Religious beliefs are burdened in situations where the state (1) requires participation in an activity prohibited by a sincerely held religious belief; (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent to engage in conduct contrary to a sincerely held religious belief. *Hobby Lobby*, 723 F.3d at 1138 (discussing application of test to Religious Freedom Restoration Act case). The substantial pressure prong rests on established Supreme Court precedent, finding "the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs . . ." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717–18 (1981).

The Tenth Circuit has further explained the requisite "burden" requires more than "offending [a plaintiff's] personal religious beliefs," and the challenged action must in some way be coercive or compulsory in nature. *Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 557 (10th Cir. 1997). It is at this juncture the Willey's Joint Claims begin to face significant legal hurdles.

While it is apparent the Policy conflicts with at least some of their asserted beliefs, they have not shown it does more than "offend [their] personal religious beliefs." *See Bauchman*, 132 F.3d at 557. What is notably absent is any allegation of coercion or compulsion. As parents, they are not being coerced or compelled into recognizing any

individual in any particular way inconsistent with their religious beliefs. Nor are they being compelled or coerced to lie to anyone, or to "speak" any particular truth. Rather, the District is recognizing a third-party—in this case, the Student—by the Student's requested preferred name and allegedly not sharing that information with them. Under the case law such a causal relationship is likely to attenuated to create the requisite "burden" on religious beliefs. At this juncture, the Court cannot say the Willey's Joint Claims are likely to succeed on the merits.

Mrs. Willey's Individual Claims present a different story. Undoubtably, the Preferred Names Policy conflicts with her belief that human beings are created either male or female and cannot change regardless of an individual's feelings or beliefs. (ECF No. 1 ¶ 179.) Being compelled to call someone by a name or pronoun not in conformance with this belief is the exact type of "coercion or compulsion" prohibited by the Free Exercise Clause. However, for reasons discussed *infra*, Mrs. Willey's objection to the Preferred Names Policy is unlikely to succeed on the merits.

As discussed above, the Student Privacy Policy is problematic as it relates to Mrs. Willey's role as a teacher and to the extent it restricts her from responding to a minor parent's inquiry or having to lie in response to an inquiry, absent reasonable concern for the student's safety. However, having already determined the Willeys have a strong likelihood of success on the merits for other reasons, the Court need not evaluate the Student Privacy Policy as applied to Mrs. Willey as a teacher from a free exercise perspective at this stage of the proceedings.

### c.    Neutrality and General Applicability

Turning to neutrality and general applicability, a government policy does not qualify as "neutral" if it is "specifically directed at religious practice." *Kennedy*, 142 S.Ct. at 2422. A policy can fail this test if it "discriminates on its face," or if "a religious exercise is otherwise its object." *Id.* (quoting *Lukumi*, 508 U.S. at 533).

A government policy is not "generally applicable" if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way" or "if it provides a mechanism for individualized exceptions." *Id.* (quoting *Fulton*, 141 S.Ct. at 1877). Where the state has a mechanism to provide exceptions, it may not refuse to extend that system to cases of religious hardship without a compelling reason. *303 Creative*, 6 F.4th at 1184. Failing either the neutrality or general applicability test will trigger strict scrutiny. *Kennedy*, 142 S.Ct. at 2422.

Here, as to the neutrality prong, there is nothing to suggest the Preferred Names Policy is specifically aimed at religious practice. Rather, the consistent position of the District has been the purpose of the Policy is to safeguard the physical and psychological well-being of the students, to avoid discrimination, to conform with current statutory and case law, and to maintain student privacy. (*See e.g.*, ECF No. 1 ¶ 66.) The statement by Ms. Arnoldi that "[the school] does not get to base [it's] decisions on personal and religious beliefs" buttresses the notion the Policy was not aimed at religion. Although the Willeys may contest the legitimacy of the District's reasoning for the Policy, there is nothing in the record to suggest it was specifically aimed at any religious practice or belief. At this stage, the Court finds the Policy is likely neutral and is therefore unlikely to trigger strict scrutiny.

There is also no evidence to suggest the Preferred Names Policy is not generally applicable. At the outset, the Willeys verified Complaint alleges they "are informed and believe" the District adheres to the Policy under a rigid "one size fits all protocol," and therefore do not grant exceptions for any purpose. (ECF No. 1 ¶ 89.) To this end, the Willeys continually allege the Policy does not permit accommodations for religious beliefs (*Id.* ¶ 62), and admit they have no way of knowing for sure how the Policy is being implemented as to other children in the District. (*Id.* ¶ 88.)

The Willey's verified Complaint contains no allegations—nor suggestion—that the District ever actually granted exceptions to the Preferred Names Policy, either for teachers or families upon their request. In fact, Mrs. Willey alleges that any time a student requested to be called by a different name or pronoun, a notification came up in the teacher portal, and building principals ensured adherence. (*Id.* ¶ 90.) Furthermore, the Preferred Names Policy contains no mechanism for exceptions or exemptions on its face, and uses mandatory, as opposed to permissive, language: "Accordingly, staff *must* use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications." (ECF No. 16-2; ECF No. 1 at 68) (emphasis added). The Court finds it likely the Preferred Names Policy is both neutral and generally applicable, and therefore unlikely to be subjected to strict scrutiny. As such, the Court finds Mrs. Willey is unlikely to succeed on the merits of her individual free exercise claim.

### d. *Kennedy v. Bremerton School District*

Even if the Court were to find the Preferred Names Policy (as it relates to Mrs. Willey's Individual Claims) is *not* neutral and generally applicable, her free exercise claim

faces another substantial legal hurdle that make it unlikely to succeed on the merits absent further legal and factual development.

In *Kennedy* (as noted by Justice Thomas in his concurrence) the Court left unresolved two issues related to the Free Exercise Clause: (1) How public employees' rights under the Free Exercise Clause may or may not be different from those enjoyed by the general public; and (2) what burden a government employer must shoulder to justify restricting an employee's religious expression. *See Kennedy*, 142 S.Ct. at 2433 (Thomas, J., concurring). It did so because the school district's justification for prohibiting a football coach's individual postgame prayer—that it ran afoul of the district's Establishment Clause duties—was no justification at all, as it was based on the district's "misconstruction" of Establishment Clause.[15] *Id.* at 2432 (majority opinion). Because the Court concluded the district's policy could not be sustained under *any* level of scrutiny, it did not address the question of what burden the district must carry.[16] *Id.* at 2426.

This case presents no such Establishment Clause concerns, and undoubtably Mrs. Willey is a public employee who's sincerely held religious beliefs are potentially being burdened by a workplace policy. Indeed, this case potentially brings into the crosshairs the exact scenario left unaddressed by the Supreme Court just last term—especially if the Preferred Names Policy is *not* generally applicable.

---

[15] In so doing, the Supreme Court swept away what was left of *Lemon v. Kurtzman*, 403 U.S. 602 (1971).
[16] Of note, the Court also found Mr. Kennedy had a colorable Free Speech claim under the first step of the *Pickering-Garcetti* framework, as his prayer was "private speech" as opposed to government speech. *Id.* at 2425.

Given the Supreme Court's admonition that one clause of the First Amendment should not "trump the other two" and there is no sound reason to prefer one constitutional guarantee over another, *Kennedy*, 142 S.Ct. at 2432, it is hard to imagine why a public employee's free exercise rights would warrant *more* protection than their Free Speech rights. As will be discussed below, Mrs. Willey's Free Speech rights are likely subject to her employer's control. Although it need not expound on or decide the issue at this time, Mrs. Willey would likely face significant legal hurdles to demonstrate why her free exercise rights are not similarly restricted.

### 5.     First Amendment Right to Free Speech

The First Amendment's free speech protections extend to teachers and students, neither of whom "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Kennedy*, 142 S.Ct. at 2423 (quoting *Tinker* 393 U.S. at 506). Of course, this does not mean the speech rights of public-school teachers are boundless—in addition to being private citizens, they are employees paid in part to speak on the government's behalf and convey its intended messages. *Id.*

In cases implicating the free speech rights of government employees, the Supreme Court has directed courts to proceed in two steps.[17] *Id.*; *see Garcetti v. Cellabos*, 547 U.S. 410, 418 (2006); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563 (1968). The first step involves a threshold inquiry into the nature of the speech at issue. *Kennedy*, 142 S.Ct. at 2423. If a public employee speaks "pursuant to [his or her]

---

[17] Using the same precedents, the Tenth Circuit has instead framed this inquiry as a four-part balancing test. *See e.g.*, *Montgomery v. City of Ardmore*, 365 F.3d 926, 938–39 (10th Cir. 2004).

official duties," the Supreme Court has found the Free Speech Clause will generally not shield the individual from the governmental employer's control and discipline. *Garcetti*, 547 U.S. at 421.

The critical question is whether the speech at issue is normally within the scope of an employee's duties, an inquiry that should be undertaken practically rather than with a "blinkered focus on the terms of some formal and capacious written job description." *Lane v. Franks*, 573 U.S. 229, 233 (2014); *Garcetti*, 547 U.S. at 424. At the other end of the spectrum, when an employee speaks "as a citizen addressing a matter of public concern," the First Amendment's free speech protections may be implicated, and courts should proceed to a second step. *Garcetti*, 547 U.S. at 423. Speech on "a matter of public concern" is that which may be "fairly considered as relating to any matter of political, social, or other concern to the community." *See Connick v. Meyers*, 461 U.S. 138, 146 (1983). To determine whether the speech involves a matter of public concern, a court should look to the "content, form, and context of a given statement, as revealed by the whole record." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (quoting *Connick*, 461 U.S. at 147–48).

At the second step, courts should engage in "a delicate balancing of the competing interests surrounding the speech and its consequences." *Kennedy*, 142 S.Ct. at 2423. "Among other things, courts at this second step have sometimes considered whether an employee's speech interests are outweighed by the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Garcetti*, 547 U.S. at 417). It is well established that public school teachers are

public employees whose speech pursuant to their official duties is subject to the *Pickering* analysis. *See Westbrook v. Teton Cnty. Sch. Dist. No. 1*, 918 F.Supp 1475, 1492 (D. Wyo. 1996).

Here, it is important to note the impact the Policy has on Mrs. Willey's speech. In addition to potentially penalizing her for not complying with the Preferred Names Policy or Student Privacy Policy, the Policy also tries to *compel* her to speak something not on her mind—i.e., calling a student by pronoun or name she believes to be inaccurate either in the classroom or when communicating with parents. In that sense, the Policy also operates to compel her speech.

It is a "fundamental rule of protection under the First Amendment that a speaker has the autonomy to choose the content of his own message." *See Hurley v. Irish-Am. Gay Lesbian & Bisexual Grp. Of Bos.*, 515 U.S. 557, 573 (1995); *303 Creative v. Elenis*, 600 U.S. — (2023); *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 61 (2006) (recognizing "freedom of speech prohibits the government from telling people what they must say"); *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015). The Supreme Court recently found that while the *Pickering* framework fits much less well where the government compels speech, "if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S.Ct. 2448, 2473 (2018) (citing

*Garcetti*, 547 U.S. at 421–22, 425–26).[18]  While *Janus* certainly left open the possibility that *Pickering* may not apply to cases where the government compelled the speech of its employees, the clear majority of courts to address the issue have concluded *Pickering* still applies to such claims. *See e.g., Meriwether*, 992 F.3d at 509; *Hiers v. Bd. of Regents of Univ. of N. Tex. Sys.*, No. 4:20-CV-321-SDJ, 2022 WL 748502, at *14–15 (E.D. Tex. Mar. 11, 2022) (noting *Janus* left the question open and applying *Pickering* to compelled speech claim); *Gwinnett v. S.W. Fla. Reg'l Plan. Council*, 407 F.Supp.3d 1273, 1281 (M.D. Fla. 2019).[19]  Absent clear directive from either the Supreme Court or Tenth Circuit to the contrary, the Court applies the standard *Pickering* framework to Mrs. Willey's compelled speech claim.

At the first step, the Court has little trouble concluding that Mrs. Willey was being asked—indeed compelled—to speak pursuant to her official duties as a teacher, and not as a citizen on a matter of public concern. The Policy only implicates Mrs. Willey's interactions with students inside her classroom, and the communications she has pursuant

---

[18]  The Supreme Court found, "[i]f *Pickering* applies at all to compelled speech—a question we do not decide—it would certainly require an adjustment in that context." *Janus*, 138 S.Ct. at 2473. The Court noted *Pickering* was based on the insight that "the speech of a public-sector employee may interfere with the effective operation of a government office." *Id.* It posed the following hypothetical:

> Now, suppose that the assistant had not made any critical comments about the supervisors but that the district attorney, out of the blue, demanded that she circulate a memo praising the supervisors. Would her refusal to go along still be a matter of purely private concern? And if not, would the order be justified on the ground that the effective operation of the office demanded that the assistant voice complimentary sentiments with which she disagreed?

*Id.* The Court did not arrive at a firm conclusion.

[19]  In addition, the Supreme Court has imposed a heightened burden on the government where the speech: (1) does not involve a matter of government employment; and (2) takes place outside the workplace. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 470, 475 (1995). However, there is no indication the speech involved in this case would take place outside the workplace, so *NTEU* does not apply.

to those duties with parents. While it could fairly be said issues surrounding transgenderism are of "political, social, or other concern to the community," the "content, form, and context" of the potential speech at issue in this case do not give rise to matters of public concern.

For example, Mrs. Willey is only be asked to refer to *individual* students by their preferred name and pronoun. She has not alleged she will be speaking generally regarding transgender individuals or being asked to convey any large-scale messages to her students regarding transgender rights. She is also only being asked to speak to a small group of individuals—in some cases to a single set of parents. Considering the form and context of such interactions, it takes her potential speech out of the public arena and into a purely private sphere.

Had Mrs. Willey been disciplined (or even faced with the threat of discipline) for speaking out against the Policy or its justifications in a *public setting*—such as speaking at a school board meeting or a rally as a concerned citizen—it would present an entirely different set of circumstances. However, that is not the case here. Mrs. Willey is being compelled to speak only in her capacity as a teacher in the private sphere.

The Court therefore finds the Policy only seeks to compel Mrs. Willey's speech pursuant to her official duties, and not restrict or compel her to speak as a citizen on matters of public concern. As such, the Free Speech Clause will likely not shield her from the District's control. *Garcetti*, 547 U.S. at 421. The Court therefore need not address the second *Pickering* step at this juncture.

This outcome is not inconsistent with the Sixth Circuit's recent decision in *Meriwether*. There, the court declined to apply *Garcetti's* general rule to a case "involving speech related to scholarship or teaching," instead finding a college professor's refusal to use preferred pronouns in class was protected speech under the First Amendment. 992 F.3d at 511–12. After finding "the academic-freedom exception to *Garcetti* covers all classroom speech related to matters of public concern, whether that speech is germane to the contents of the lecture or not," the court went on to apply *Pickering* and conclude the professor's refusal to use preferred pronouns *was in fact* a matter of public concern, and the balancing weighed in favor of the professor's free speech rights. *Id.*

However, crucial to the *Meriwether* court's analysis was the teacher at issue was a public university professor lecturing in class. The court specially recognized "the expansive freedoms of speech and thought associated with the university environment, [and] universities occupy a special niche in our constitutional tradition." *Id.* at 504 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003)). It repeatedly emphasized *Garcetti* does not apply to "public university *professors*" in the "academic context of a *public university*." *Id* at 505 (emphasis added). The Willeys do not identify—nor can the Court locate—any decision extending *Meriwether's* reasoning to a public K–12 setting.[20] Given *Meriwether's* justifications and lack of caselaw extending its reasoning to the K–12 setting, the Court likewise declines to do so today.

---

[20] One court recently refused to extend *Meriwether* to a Title VII case involving a public school teacher, noting that "courts have continually emphasized the distinction between public K-12 schools and universities in addressing speech and other constitutional issues." *Kluge v. Brownsburg Cmty. Sch. Corp.*, 548 F.Supp.3d 814, 842 (S.D. Ind. 2021).

In sum, because Mrs. Willey's free speech claim hinges on her speaking on a matter pursuant to her official duties and not as a citizen on a matter of public concern, the Court finds she is not likely to be successful on the merits.

**D.      Second Prong: Irreparable Harm**

"To obtain a preliminary injunction, a movant must establish that he is likely to suffer irreparable harm in the absence of preliminary relief." *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1249–50 (10th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)) (internal quotation marks omitted). Although irreparable harm "does not readily lend itself to definition," "a plaintiff must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *Fish v. Kobach*, 840 F.3d 710, 751–52 (10th Cir. 2016) (internal quotations marks omitted). That harm "must be both certain and great," and not "merely serious or substantial." *N.M. Game & Fish*, 854 F.3d at 1250. Moreover, the injury must be likely to occur before the court can rule on the merits of the case. *Id.* (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1260 (10th Cir. 2003)). As previously noted, the loss of constitutional rights, even for a brief period of time, constitutes irreparable harm. *See Heideman*, 348 F.3d at 1190.

As discussed *supra*, to the extent the Student Privacy Policy were interpreted, absent student consent allowing disclosure and following parental inquiry to require a teacher or school district employee to: (1) refuse to disclose said information; or (2) provide materially misleading or false information; it presents issues that potentially tread on both the Willey's constitutional and statutory rights. Because there is a constitutional dimension

to this problem, to the extent the Student Privacy Policy is interpreted in this manner it likely causes irreparable harm.

The same cannot be said for the remainder of the Willey's claims. In her affidavit Mrs. Willey attests on or around May 1, 2023, she discovered the Student had a "secret cell phone" that had been given to the Student by "others" without her knowledge. (ECF No. 21-1 ¶ 10.) Upon "examining the content of the phone and speaking with [the Student]," she discovered three teachers were still referring to the Student by a male name and pronoun. (*Id.* ¶ 11.) Through Ms. Bolton's affidavit, the District maintains that upon the Student's request, the Student is now being referred to by a female name and pronoun. (ECF No. 16-3 ¶ 5–6.)

Mrs. Willey's affidavit does not detail any of the messages or specifics as to how and why she believes three teachers are continuing to refer to the Student by male pronouns. (ECF No. 21-1 at ¶ 11.) Regardless, Mrs. Willey does not claim anyone has ever lied to her or deceived her as to what the Student is being called while at school. While her affidavit names three teachers that she claims are calling the Student by a male name and pronoun, she does not claim to have ever actually communicated with *any* of them. There is no evidence demonstrating that the Defendants failed to respond or falsely responded to Plaintiffs.

In addition, the Court finds the statements in Mrs. Willey's affidavit do not provide sufficient detail to allow this Court to even evaluate the reliability or source of any secret cell phone to sufficiently show irreparable harm. There is no indication this "secret cell phone" originated or was provided by any of the Defendants. Nor is there any indication

how or where Mrs. Willey came across the information upon the phone's inspection. In sum, Mrs. Willey's statements regarding the cell phone do not bear the sufficient indicia of reliability for the Court to give them substantial weight when analyzing any ongoing harm. Even should the situation change at the Student's request, school is not in session over the summer and the Court will have additional time to fully consider the case on the merits.

Consistent with the foregoing, the Willeys have shown they are likely to suffer irreparable harm as to application of the Student Privacy Policy as discussed; however not with regards to the Preferred Names Policy.

**E.     Third Prong: Balance of Harms**

The third factor concerns the balance of harms. *See Awad*, 670 F.3d at 1131. Under the heightened standard of review applicable to injunctions that change the status quo, the plaintiff must make a "strong showing" that the threatened injury outweighs any injury to the defendants caused by granting an injunction. *Id.* Here, the Willeys have made a sufficiently strong showing that any threatened injury to them as a result of the Student Privacy Policy (as applied) outweighs any threatened injury to the District.

As the District points out, the Policy is in place—at least in part—to comply with Title IX and avoid discrimination on the basis of sex. (ECF No. 16-2 at 2); *see* "Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*," 85 Fed. Reg. 32637, 2021 WL 2531043 (June 22, 2021); *see Bostock v. Clayton Cnty. Ga.*, 140 S.Ct. 1731 (2020). Under the interpretation by the United States

Department of Education, *Bostock's* pronouncement that Title VII's prohibition of discrimination on "the basis of sex" encompasses discrimination based on sexual orientation and gender identity *also* applies to Title IX's parallel prohibition on sex discrimination in federally funded education programs and activities. *See* 86 Fed. Reg. at 32638–39. While a federal district court in Tennessee recently enjoined enforcement of the Department of Education's interpretation in twenty states, Wyoming is not among them. *See Tennessee v. U.S. Dep't of Educ.*, 615 F.Supp.3d 807 (W.D. Tenn. 2022).

The Willeys hotly contest the District's assertion it would run afoul of Title IX absent the Policy. (ECF No. 21 at 5–6.) They argue *Bostock* is limited to Title VII discrimination cases, and the executive orders signed by President Joseph R. Biden Jr. cited by the District (ECF Nos. 16-5, 16-6) are of no consequence and only seek to "mislead and misinform the court." (ECF No. 21 at 5.)

The Willey's argument completely ignores the Department of Education's regulations—which, like it or not, the District is bound to follow should it wish to continue to receive federal funds. The Willeys also seem to discount that at least one circuit court of appeals has already explicitly held *Bostock's* holding applies equally to Title IX. *See Grimm*, 972 F.3d at 616, 619. Even apart from *Bostock*, several courts have independently concluded Title IX prohibits discrimination based on gender identity or significantly adopted *Bostock's* reasoning without explicitly reaching a conclusion. *See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049–50 (7th Cir. 2017), *abrogated on other grounds*, *Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020); *Dimas v. Pecos Indep. Sch. Dist. Bd. of Educ.*, No. 1:21-CV-978-KWR-

JFR, 2022 WL 816501, at *4 (D.N.M. March 17, 2022) (concluding based on *Bostock* that allegations of discrimination due to sexual orientation fall within Title IX's broader prohibitions against discrimination on the basis of sex); *Whitman-Walker Clinic, Inc. v. U.S. Dept. of Health & Humans Servs.*, 485 F.Supp.3d 1, 42 (D.D.C. 2020) (agency action arbitrary and capricious for failing to consider *Bostock* in rulemaking involving Title IX). Given these considerations, the Court refuses to ignore the *possibility* that enjoining the Policy could subject the District to Title IX sanctions.

When balancing the harms, as previously discussed the Court does not find the Willeys are likely to be successful on the merits of any of their claims with regards to the Preferred Names Policy. Although there exists a theoretical prospect of injury, such a prospect is certainly neither likely nor imminent. Conversely, the Court considers the potential Title IX implications to weigh heavily against issuing an injunction at this time. A program found to be in violation of Title IX's requirements faces a potential loss of funding. *See* 20 U.S.C § 1682. Should the District theoretically run afoul of Title IX's anti-discrimination provisions, it would face the threat of substantial financial injury, much to the detriment of all its students. The balance of harms therefore does not tip in favor of issuing an injunction relating to the Preferred Names Policy.

However, the Student Privacy Policy—when applied as previously discussed—does not raise the same Title IX concerns. Instead, refusing to disclose information to parents (or lying to them) raises substantial constitutional and statutory concerns. Considering the circumstances, the Willeys have made a strong showing that the threatened injury outweighs any injury to the defendants caused by granting an injunction. As such, the Court

finds the third factor favors issuing an injunction as to the Student Privacy Policy (as applied), but not to the Preferred Names Policy.

## F.    Fourth Prong: Public Interest

The final prong requires the injunction not be against the public interest. *Free the Nipple-Fort Collins,* 916 F.3d at 807. It is always in the public interest to prevent the violation of a party's constitutional rights. *Id.*

As explained above, the Student Privacy Policy may well violate the Willey's fundamental constitutional right to make decisions concerning the care, custody and control of their children. *See Troxel*, 530 U.S. at 65-66. Because it is always in the public interest to prevent a violation of a party's constitutional rights, the Court finds the fourth factor weighs in favor of an injunction in this regard.

The same cannot be said for the Preferred Names Policy. Absent a constitutional concern, considering the potential financial impact on the public should the District run afoul of Title IX and the basic human rights interests in avoiding discrimination of all kinds, the Court finds the public interest factor weights against issuing an injunction.

## CONCLUSION AND ORDER

As set forth above, absent a reasonable concern of physical harm or abuse, to the extent the Student Privacy Policy would prevent a school district employee from responding to a minor student's parent inquiry or require the school district employee to lie about the student's request to be called by a different name or pronoun, this Court finds that the factors weigh in support of a preliminary junction as to this aspect of the Policy

only. The Court finds as to the Preferred Names Policy, a consideration of the factors does not support the granting of a preliminary injunction and it will be denied.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction (ECF No. 6) is hereby GRANTED IN PART. As to the Student Privacy Policy, absent a reasonable concern of physical abuse or harm, the District is hereby enjoined from precluding a school district employee from responding to any minor student's parent's inquiry regarding their requested name or pronoun or from requiring a school district employee to lie about a student's request to be called by a different name or pronoun.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction (ECF No. 6) is hereby DENIED as to all other aspects of the Policy.

Dated this 30th day of June, 2023.

Scott W. Skavdahl
United States District Judge