Henry F. Bailey Jr. WY Bar #5-1681
Bailey Stock Harmon Cottam Lopez LLP
6234 Yellowstone Road
Cheyenne, WY 82009
307.638.7745
hank@performance-law.com
Counsel for Plaintiffs

Ernest G. Trakas*
MO Bar No. 33813
Mary E. McAlister*
VA Bar No. 76057
Vernadette R. Broyles*
GA Bar No. 593026
CHILD & PARENTAL RIGHTS CAMPAIGN
5805 State Bridge Road, Suite 310
Johns Creek, GA 30097
Telephone (770) 448-4525
etrakas@childparentrights.org
mmcalister@childparentrights.org
vbroyles@childparentrights.org
* Admitted *Pro Hac Vice*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| Ashley Willey, Sean Willey, | ) | |
| Plaintiffs | ) | Civil Case # 23-cv-069-SWS |
| v. | ) | |
| Sweetwater County School District #1 Board of | ) | First Amended Complaint |
| Trustees; Kelly McGovern, Superintendent of | ) | for Declaratory Relief, |
| Sweetwater County School District #1, individually;) | Injunctive Relief and |
| Nicole Bolton, Assistant Superintendent & Human | ) | Damages |
| Resources Director of Sweetwater County School | ) | |
| District #1, individually; Kayci Arnoldi, Director of ) | |
| Student Services of Sweetwater County School | ) | |
| District #1 individually; Bryant Blake, Principal of | ) | |
| Black Butte High School, individually, | ) | |
| Defendants | ) | |

## <u>INTRODUCTION</u>

1.     Plaintiffs file this action to vindicate and secure their fundamental parental rights to direct the upbringing of, and mental health decision-making for, their children and their fundamental right to free exercise of religion under the United States and Wyoming constitutions.

1

2.     Defendants have been and are violating Plaintiffs' fundamental rights by establishing and implementing a procedure (generally, the "Policy") that deliberately conceals from Plaintiffs critical information regarding their children's mental health and well-being, *i.e.,* their assertion of a discordant gender identity and request to be affirmed in that identity through the use of alternate names, pronouns and other measures, without the knowledge and consent— and even over the objection of—their parents. Implementation of the Policy includes engaging in "social transitioning" in the form of acceding to the requests of minor children that they be treated as the opposite sex and referred to by alternate names and pronouns without notice to or consent of the parents.  The Policy also directs that parents are not to be told about the social transitioning unless the minor children agree to disclosure.

3.     Defendant Sweetwater County School District #1 ("District") administration also mandates that school staff, including Mrs. Willey, purposefully and intentionally mislead and deceive parents by referring to their child by his or her legal name and biologically accurate pronouns when communicating with parents but using the child's assumed name and pronouns at all other times, unless the child has consented to informing his or her parents. In so doing, Defendants have violated and continue to violate Mrs. Willey's free speech and free exercise rights under the United States and Wyoming constitutions.

4.     Defendants' actions are particularly egregious with regard to Mrs. Willey's daughter, A.S., whom Defendants know is a childhood trauma survivor diagnosed with ADHD, PTSD, and symptoms of Gender Dysphoria for whom affirming a discordant gender identity is antithetical to her health and well-being. Yet, despite this knowledge, Defendants purposefully and recklessly disregard the known harm to A.S. and continue to implement the Policy as to

A.S., even, in Defendant. Blake's case, stating that he will lie to Plaintiffs about A.S.'s identity if A.S. asks him to.

5.      So long as the Policy remains in effect, Plaintiffs' fundamental rights continue to be in jeopardy as any requests by their other minor children attending District schools to be treated as other than their sex and use alternate names and pronouns will be acceded to without notice to or consent of Plaintiffs. Furthermore, District staff will be required to deliberately withhold information regarding those children's requests from Plaintiffs unless the children consent in violation of Plaintiffs' fundamental rights.

6.      Plaintiffs are asking this Court to remedy the violations of their fundamental rights and the resulting harm to them and their children by granting injunctive and declaratory relief and awarding damages, including attorneys' fees and costs, to Plaintiffs.

## JURISDICTION AND VENUE

7.      This action is filed pursuant to 42 U.S.C. § 1983 seeking redress of injuries suffered by Plaintiffs from deprivation, under color of state law, of rights secured by the Fourteenth Amendment to the United States Constitution, and the laws of the United States. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a).

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and other applicable law because the events and omissions giving rise to the claims in this action arose in the District of Wyoming. Venue is also proper in this Court because the Defendants reside or have their principal place of business in this District.

9.      This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, implemented through Federal Rule of Civil Procedure 57.

10.     An actual controversy exists between the parties involving substantial constitutional issues, in that Plaintiffs allege that Defendants' policies, procedures, directives and actions taken in accordance with them, on their face and as applied, violate the United States Constitution and have infringed Plaintiffs' rights, while Defendants allege that their policies, procedures, directives, and actions comport with the Constitution and even required under current federal administrative guidance.

11.     This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, under 42 U.S.C. § 1988.

## PARTIES

12.     Plaintiff Ashley Willey is the mother of A.S., who at all times relevant to this Complaint was a student at Black Butte High School, which is part of the District.

13.     Plaintiffs Ashley and Sean Willey are the parents of four other children who attend District schools and therefore are subject to the District's protocols, policies, procedures, and guidance, including the Policy.

14.     Plaintiff Ashley Willey is, and at all relevant periods alleged herein was, employed by the District as a general education math teacher assigned to a special education class.

15.     Sweetwater County School District # 1 is a unified school district organized and existing as "a body corporate" under Wyo. Stat. § 21-3-101. Defendant Board of Trustees is the governing body of the District under Wyo. Stat. § 21-3-105, capable of suing and being sued under Wyo. Stat. § 21-3-111 (collectively the "District")

16.     Defendant Kelly McGovern ("Ms. McGovern") is the Superintendent of the District, operating as the chief administrative officer of the District under Wyo. Stat. § 21-3-111. She is sued in her individual capacity.

17.     Defendant Nicole Bolton ("Ms. Bolton") is the Assistant Superintendent and Human Resources Director for the District. She is sued in her individual capacity.

18.     Defendant Kayci Arnoldi ("Ms. Arnoldi") is the Director of Student Services for the District. She is sued in her individual capacity.

19.     Defendant Bryant Blake ("Mr. Blake") is the Principal of Black Butte High School, which is part of the District. He is sued in his individual capacity.

## STATEMENT OF FACTS

20.     Mrs. Willey's daughter, A.S., is 16 years old. She experienced childhood trauma and has been under the care of physicians and mental health professionals since that time.

21.     A.S. is receiving therapy from a private counselor chosen by Plaintiffs for ADHD, PTSD and symptoms of gender dysphoria. A true and correct copy of the treatment letter from A.S.'s therapist is attached to this Complaint, marked as Exhibit A and incorporated herein by reference.

22.     A.S. has in place an Accommodation Plan under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et. seq. ("504 Plan") as a result of her ADHD diagnosis.

23.     In 2021, during her freshman year of high school, A.S. was having flashback nightmares related to her childhood trauma.

24.     When A.S. began experiencing the nightmares, Mr. and Mrs. Willey increased the frequency of the therapy sessions with the private counselor.

5

25.     A.S. was also experiencing discomfort with the pubertal changes in her body and disliked her body. At school she was discussing her discomfort with some peers who told her that the discomfort and A.S.'s interests in sports and stereotypical "male interests" was because she was "trans."

26.     A.S. told her private counselor that she thought she might be "trans." The counselor and Mr. and Mrs. Willey began addressing those issues with A.S. and in conjunction with the counselor developed a treatment plan for working through the symptoms of gender dysphoria and A.S.'s other underlying trauma and mental health issues.

27.     Unbeknownst to Mr. and Mrs. Willey, at the beginning of the 2021-2022 school year, A.S. told teachers and staff at Black Butte High School that she wanted to be treated as a boy, use the male name "C" and be referred to by male pronouns. She also requested that District personnel conceal the information from Mr. and Mrs. Willey, which District personnel agreed and, pursuant to the Policy, were required to do.

28.     Throughout the school year, District personnel purposely and intentionally concealed from Mr. and Mrs. Willey that A.S., a female, was being treated as a boy with the male name "C" and male pronouns and deceived Mr. and Mrs. Willey by referring to A.S. by her legal name and biologically accurate pronouns in their presence. The concealment and deception occurred even during the 504 meetings which are intended to address issues related to A.S.'s mental health.

29.     Consequently, Defendants intentionally kept Mr. and Mrs. Willey in the dark about a significant issue related to A.S.'s mental health, *i.e.*, her assertion and in-school affirmation of a male identity, an issue for which A.S. was already subject to a treatment plan by a private counselor chosen by Plaintiffs.

30.    More than six months passed when, on March 29, 2022, Mrs. Willey inadvertently discovered that Defendants had been intentionally concealing from her that her daughter was being treated as a boy with a male name and pronouns at school but being referred to by her legal name during conversations with her parents.

31.    During district-wide training on March 29, 2022, Mrs. Willey met some teachers from Black Butte High School where A.S. was enrolled.

32.    Mrs. Willey asked one of the teachers from Black Butte if she knew her daughter, "A." The teacher replied, "yes, I know A. She's a sweet girl."

33.    Mrs. Willey asked the other Black Butte teacher whether he knew her daughter, and he asked Mrs. Willey whether her daughter had a last name starting with "B."

34.    Mrs. Willey responded no and showed the teacher a picture of A.S. The first teacher then said to the second teacher, "It goes by 'C'," thereby revealing that she was, in keeping with the Policy, deceptively calling A.S. by her legal name in front of her parent but using a male name and pronouns in school.

35.    Mrs. Willey responded, "No, she goes by A." She then asked how long A.S. had been referred to as "C," and both teachers stated that they had done so for the entire school year.

36.    Had it not been for Mrs. Willey meeting those teachers and having that conversation, she might never have learned that her vulnerable daughter was being secretly and deliberately affirmed as a boy while at school and that District staff was intentionally concealing the information from her.

37.    Mrs. Willey is informed and believes and based thereon alleges that District counseling staff were meeting with A.S. during the 2021-2022 school year, without her consent, and were discussing and supporting A.S.'s assertion of a discordant gender identity and being

treated as a boy with a male name and pronouns, which had been concealed from Mr. and Mrs. Willey. Mrs. Willey is unable to elaborate on these conversations due to Defendants' refusal of Mrs. Willey's request for copies of her daughter's records, as discussed *infra.*

38.     Mrs. Willey is informed and believes and based thereon alleges that A.S. was engaging in conversations with other District staff about gender identity issues, without the consent of Mrs. Willey, prior to Mrs. Willey's inadvertent discovery of Defendants' concealment of her daughter's alternate identity. Mrs. Willey is unable to elaborate on these conversations due to Defendants' refusal of Mrs. Willey's request for copies of her daughter's records, as discussed *infra.*

39.     Mrs. Willey spoke with A.S. about the gender identity issue and confirmed that District staff had been treating A.S. as a boy and using a male name and pronouns since the beginning of the school year. Mrs. Willey told A.S. that being treated as the opposite sex and the use of the alternate name at school had to stop.

40.     A.S. told her mother multiple times that A.S. felt pressured by District staff to call herself a boy and that A.S. was uncomfortable doing so. A.S. said she was concerned that District personnel would be angry if she did not continue with being treated as a boy.

41.     On March 29, 2022, Mrs. Willey sent a direct message to teachers and staff at Black Butte:

> It has come to my attention that the teachers and staff that interact with my daughter have been referring to her as "C" and have treated her like she is a male. AND that this was knowingly something that she was hiding from her parents. "A" is in fact an "A" and she is female. You will refer to her as "A" and only "A." If this continues, then I will take this further and go to the CAB. [Central Administration Building]. She is a CHILD who is not old enough to make life changing decisions such as these. And even though this is absolutely none of anyone's business besides that of the people in our family and her counselor, **she has stated multiple times that she felt pressured into calling herself a boy, and that this makes her uncomfortable.** With working through this, and having

people encouraging things BEHIND her parents backs instead of coming to us, has made the situation worse. Thank you for your time in this matter. I would be more than happy to come to speak with any of you in person if you have questions.

You may disagree, and that is certainly your right, but the fact remains that I am her parent and she is a child. (emphasis added).

A true and correct copy of Mrs. Willey's direct message is attached hereto, marked as Exhibit B and incorporated herein by reference.

42.      On the same day, Mrs. Willey send an email to Principal Blake:

It has come to my attention tonight that the entire staff that interacts with my daughter at your school, including yourself, have been referring to her as "C" and referring to her as a male. It has also come to my attention that my 15 year old CHILD has instructed you guys to hide this from us. This is written instructions, that you and your staff will no longer refer to my child as a male or "C." Her name is "A" she is a female and she is not old enough to make any decision thinking that she is anything other than what she is. I am appalled and furious that you and your staff are participating in hiding this from her PARENTS!!!! She is currently in counseling and has been working very hard to understand that she is in fact a TOMBOY which has disappeared since we were in school.  If this is going to be an issue or I find out that this is continuing, I will take this to the CAB.

If you have questions, I am willing to come talk to you in person. Please respond that you understand.

A true and correct copy of Mrs. Willey's email is attached hereto, marked as Exhibit C and incorporated herein by reference.

43.      Principal Blake responded that he had reached out to Human Resources regarding the issue, that human resources would be reaching out to the District legal team to get further clarification, and that he would reach out to Mrs. Willey when he received that clarification. A true and correct copy of Principal Blake's email is attached to this Complaint, marked as Exhibit D and incorporated by reference.

44.     Mrs. Willey responded that there was no clarification needed except from her as A.S.'s parent and that she was interpreting Principal Blake's email as a refusal to follow written parent instructions. A true and correct copy of Mrs. Willey's email is attached to this Complaint, marked as Exhibit E and incorporated by reference.

45.     Mrs. Willey requested that A.S. tell her teachers to call her "A" instead of "C." A.S. said she did so.

46.     At a meeting in April 2022 Ms. Bolton told Mrs. Willey that A.S. had asked teachers and staff to call her "A" because "her parents said so." Ms. Bolton emphasized to Mrs. Willey that District staff was calling A.S. by her legal name at that time only because A.S. requested it. Ms. Bolton said that, regardless of Mrs. Willey's instructions, if A.S. asked to be called by a male name and pronouns then District staff would honor that request and would not inform Mrs. Willey of the change.

47.     Ms. Bolton said that the teachers at Black Butte, and Mrs. Willey as a teacher in the District, were required to accede to the wishes of a minor student who said he or she was trans, wanted to be treated as the opposite sex with an alternate name and pronouns, and did not want his or her parents told, regardless of the parents' direction or even over their objection.

48.     Ms. Bolton told Mrs. Willey that acceding to the wishes of the student without informing parents was required to "protect the child's safety." There were no allegations that A.S. was "unsafe" living with Mr. and Mrs. Willey or being treated as a female at home.

49.     Ms. Bolton's interaction with Mrs. Willey revealed that the District had in place a custom, practice or procedure, the "Policy," that 1) required that District staff abide by children's requests to be treated and affirmed as the opposite sex and addressed by opposite sex names and pronouns ("Preferred Names Policy") and 2) that District staff must conceal

information from parents regarding their child being affirmed and treated as the opposite sex unless the child consented to the parents being told ("Parent Concealment Policy").

50.     Mr. Blake later told Mrs. Willey that he would in fact lie to her if A.S. requested to be treated as a male, that an alternate name and male pronouns be used, and her parents not told.

51.     Mr. and Mrs. Willey met with Ms. McGovern on April 22, 2022. Mr. and Mrs. Willey informed Ms. McGovern that A.S. had suffered trauma and that suppressed memories of the abuse had surfaced in 2021, causing nightmares and distress about her developing female body. They also told Ms. McGovern that there was a treatment plan in place with a private counselor chosen by Mr. and Mrs. Willey to help A.S. deal with the effects of the trauma and the symptoms of gender dysphoria.

52.     Mr. and Mrs. Willey expressed their anger that Black Butte staff had deliberately withheld information regarding their treatment of A.S. as a boy, with a male name and pronouns, information that was significant to her ongoing treatment plan and concealment of which interfered with that treatment plan.

53.     Mr. and Mrs. Willey met with Ms. McGovern and Mr. Blake on April 26, 2022. They informed Mr. Blake of A.S.'s history of childhood trauma and its connection to her discomfort with her body, *i.e.,* her symptoms of gender dysphoria that were being addressed by the private counselor.

54.     Mr. Blake said that the parents' direction that A.S. be referred to by her legal name and with female pronouns put Black Butte staff in a "Catch-22," because teachers and staff had been directed, pursuant to the District's Policy, that if a child requested to be called by

another name and alternate pronouns, then the teachers were required to do so and to not inform parents unless the child agreed.

55.     Mr. Blake thus confirmed what Ms. Bolton revealed earlier, *i.e.,* that the District had in place the Policy comprised of the 1) Preferred Names Policy, *i.e.,* that District staff abide by children's request to be treated as the opposite sex and addressed by opposite sex names and pronouns and 2) Parent Concealment Policy, *i.e.,* that District staff must conceal from parents information regarding their child being treated as the opposite sex unless the child consented to the parents being told.

56.     At the conclusion of the April 26, 2022, meeting, Ms. McGovern indicated that school staff would use A.S.'s legal name and female pronouns if **A.S. requested it**, but only because A.S. did not want to upset her parents, not because of the parents' directions.

57.     Ms. McGovern then explicitly confirmed the existence of the District-implemented Policy by directing Mrs. Willey that as an employee of the District, she was expected to abide by children's wishes to be called by alternate names and/or pronouns and that Mrs. Willey was not to inform parents about their children's requests to be called by alternate names and/or pronouns unless the children agreed.

58.     Ms. McGovern stated that when children express issues with their gender at school, the District has decided that the student must be supported regardless of parental consent because the school has to provide a "safe environment."

59.     Neither Ms. McGovern nor Ms. Bolton explained how using a child's legal name and biologically accurate pronouns made a child "unsafe."

60.     Mrs. Willey informed Ms. McGovern that the District's Policy that she, as a teacher, had to agree to change how a child is identified at school. *i.e.,* speak falsely, and conceal

that information from parents violates Mrs. Willey's sincerely held religious beliefs, which include not speaking falsely or being deceitful by concealing information requested by a parent.

61.     At the beginning of the 2022-2023 school year, Mrs. Willey received written confirmation of what Ms. Bolton, Mr. Blake and Ms. McGovern had said regarding the District-sanctioned Policy. Contained within a document entitled "SCSD #1 Special Services Non-Negotiables August 15, 2022," which special education staff were supposed to sign, was the following description of the Policy, denominated as the Preferred/Chosen Names Procedure:

> As you become acquainted with your students, you may encounter students wishing to use a preferred or chosen name. A preferred/chosen name is any name a student chooses to use other than their legal name. For example, a student may wish to shorten their first name (*e.g.* Steven to Steve) or to be referred to by their middle name or a nickname. Sweetwater County School District Number One is committed to promoting an educational environment that is supportive and respectful to all students. Calling a person by their preferred name and pronoun shows respect and contributes to the District's commitment to providing a safe and nondiscriminatory educational environment. Accordingly, **staff must use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications. Staff must respect the privacy of all students regarding such choice.** (emphasis added).

> Violations of this procedure may constitute discrimination based on sex, and may result in discipline. Students who experience problems or discrimination related to their preferred/chosen name or pronoun shall be referred to the Title IX Coordinator for resources and assistance. This procedure does not address changes to educational records to reflect legal name changes. Any requests to amend educational records shall be referred to the Director of Human Resources.

A true and correct copy of the "Non-negotiables" document is attached to this Complaint, marked as Exhibit F and incorporated herein by reference. Mrs. Willey manually crossed out the language regarding "Preferred/Chosen Names" from the SCSD #1 Special Services Non-Negotiables document before she signed it. In doing so, Mrs. Willey put the District on notice that she was requesting a reasonable accommodation so as to not violate her sincerely held religious beliefs.

62.     On August 15, 2022, Mrs. Willey met with Ms. Arnoldi and Ms. Bolton to  advise them of her concerns and objections about the application of the Policy to all of her children, and particularly to A.S. in light of A.S.'s history of childhood trauma and mental health issues for which a treatment plan was in place.

63.     Ms. Arnoldi informed Mrs. Willey that the District would not honor Mrs. Willey's specific instruction that A.S. be addressed by her given name and female pronouns and treated as the female that she is.

64.      Ms. Arnoldi informed Mrs. Willey that, pursuant to the Policy, District staff would be following A.S.'s (and, by extension any of the Willey children's) requests to be treated as the opposite sex over the parents' express objections and would "respect their [the children's] privacy" by not revealing the differential gender affirming treatment unless the children agreed.

65.     Mrs. Willey reminded Ms. Bolton and Ms. Arnoldi of her family's sincerely held religious beliefs against affirming a male identity in their daughter and against Mrs. Willey being compelled to affirm a discordant gender identity in her students.

66.     Mrs. Willey also stated that her sincerely held religious beliefs prevent her from intentionally withholding information from parents or actively deceiving them about their children's identity at school. Again, effectively requesting a religious accommodation exempting her from the Policy.

67.     Following the meeting, Ms. Arnoldi sent Mrs. Willey an email denying her requested accommodation, stating that "[u]nfortunately, we don't get to base our decisions on personal and religious beliefs. We have to follow the policy and procedures that are set forth by law and recent court cases. As an employee of the district, you will have to abide by the policies that are in place for SCSD#1."

68.     In so doing, Ms. Arnoldi confirmed that the District had adopted and was implementing the Policy comprised of the Preferred Names Policy and Parent Concealment Policy.

69.     Ms. Arnoldi also revealed that the District would not permit accommodations for Mrs. Willey's sincerely held religious beliefs.  A true and correct copy of Ms. Arnoldi's email is attached hereto, marked as Exhibit G and incorporated herein by reference.

70.     On September 9, 2022, Ms. Bolton sent a district-wide email regarding staff responses to children's requests to be treated as the opposite sex, use alternate names or pronouns and to conceal that information from their parents. A true and correct copy of Ms. Bolton's email is attached to the Complaint, marked as Exhibit H and incorporated by reference.

71.     Ms. Bolton's email was a response to some social media posts that stated that District staff had been directed not to talk to parents about gender identity issues with their children. Ms. Bolton claimed that District staff were "never directed not to talk to parents or to lie to parents." Ms. Bolton went on to claim that decisions about supporting "transgender and gender nonconforming students **may** involve the student, parents and District administration" (emphasis added) and that teachers were to refer matters to the principal, who would then "involve central administration."  Notably, Ms. Bolton did not state that decisions must involve the parents.

72.     Ms. Bolton further stated that children's requests for confidentiality as to their parents must be honored:

> [T]he District will prioritize safeguarding the physical and psychological well-being of a student. When a student indicates that their family is not supportive of their gender identity and/or the District is concerned for the student's safety, the **District will honor a student's request for confidentiality until the student consents to the disclosure and/or the District completes an individualized assessment and rules out any particularized and substantiated concern of**

**real harm to the student**. The expectation is that parents will eventually be involved: the District will support the student in this process and encourage familial involvement whenever possible. For example, the District will offer the opportunity to speak with a school counselor or social worker to facilitate conversations with parents. (emphasis added).

73.     Therefore, Ms. Bolton confirmed that District staff is required to honor the requests of a minor child to conceal information from his or her parents over the right of his or her parents to be informed. Ms. Bolton also acknowledged that District staff will permit minor children to receive gender affirming mental health counseling from school employees without parental consent.

74.     Consequently, Defendants have given A.S. [and other minor children] who has underlying mental health issues and is receiving care from a parent-chosen counselor the authority to determine whether her parents are being sufficiently "supportive" of her announced discordant gender identity to be informed.

75.     The District has given A.S. the power to override her parent's decisions and to prohibit her parent from being informed that her child is being treated as a boy with a male name and pronouns at school, even when the parent has already instituted a mental health treatment plan and instructed the school not to treat A.S. as a boy with a male name and pronouns.

76.     Defendants have unilaterally determined that A.S. and other minor children who cannot legally consent to medical care, mental health treatment or enter into a contract under Wyoming law can decide that they identify as the other sex and change their names and pronouns without their parents' knowledge or consent. Furthermore, Defendants are directing that these minor students can compel adults to refer to them by discordant names and pronouns and withhold the information from their parents.

77.     Defendants actively enforce the Policy, including by publishing warnings on the District's attendance and grade recording system that District personnel are not to mention a student's decision to adopt a different name and pronouns, particularly to parents, unless the children have consented.

78.     Defendants also enforce compliance with the Policy by directing school principals to attend parent-teacher conferences to ensure that teachers do not share information about children's gender identity with the parents, but instead deceive parents by using the children's legal name and biologically realistic pronouns in the parents' presence.

79.     District staff, like Mrs. Willey, are threatened with professional discipline, including termination, if they do not abide by the children's requests and refuse to conceal information from parents.

80.     At the Board of Trustees' meeting on September 12, 2022, Ms. McGovern responded to a citizen's question about whether teachers are required to keep information regarding students' gender identity from parents by saying that "[t]here are some situations that -- and, again, it is on a case-by-case basis. But if there is a fear from the student, if there are extenuating circumstances that the school is aware of, we will honor the privacy of the student." (Partial Transcript of 9/12/22 Board meeting, attached as Exhibit I and incorporated by reference, at p. 30 lines 11-17).

81.     Board Chairwoman Carol Jelaco confirmed during the meeting that "[i]f the student expresses a fear of telling -- of what might happen if they are -- if their parents are told, the district, from my interpretation, is bound to keep the student's -- shall we say what -- **whatever the student wants is paramount**."  (Exhibit I at p. 29, lines 9-14) (emphasis added).

82.     During the meeting, both Ms. Jelaco and Ms. McGovern repeatedly claimed that the District responds to student issues related to gender identity on "a case-by-case basis." Ms. McGovern claimed that there was no blanket response required by district teachers. (Exhibit I, p. 28, line 24 to p. 31, line 11).

83.     Ms. McGovern's statement contradicts the written directive given to Mrs. Willey and other staff which included language stating "staff **must** use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications. Staff **must** respect the privacy of all students regarding such choice. Violations of this procedure may constitute discrimination based on sex and **may result in discipline**." (emphasis added) (Exhibit F).

84.     Mrs. McGovern's statement also contradicted the statement made by Ms. Bolton to District staff that the "District will honor a student's request for confidentiality until the student consents to the disclosure **and/or** the District completes an individualized assessment and rules out any particularized and substantiated concern of real harm to the student." (Exhibit H) (emphasis added).

85.     The public statement by Mrs. McGovern further contradicted Ms. Arnoldi's message to Mrs. Willey that "unfortunately we don't get to base our decisions on personal and religious beliefs. We have to follow the policy and procedures that are set forth by law and recent court cases. As an employee of the district you will have to abide to the policies that are in place for SCSD#1." (Exhibit G).

86.     Plaintiffs are informed and believe and based thereon allege that the School Board has acquiesced, and thereby accepted, the adoption and implementation of the Policy that grants children decision-making authority regarding their identity at school and requires staff

secrecy and concealment of information regarding gender identity issues and staff facilitation of social "gender transition" actions from parents.

87.     Contrary to Ms. McGovern's and Ms. Jelaco's public statements, Mr. and Mrs. Willey's experience shows that the School Board and administration do not address gender identity issues "on a case-by-case basis," but instead follow a blanket policy that prioritizes the children's requests over the parents' right to be informed of matters critical to their children's well-being, even permitting children's requests to override parents' objections.

88.     Likewise, contrary to Mrs. McGovern's statements at the school board meeting, Mrs. Willey in her role as a teacher was not told to address children's requests on a case-by-case basis but was directed that she must "respect" the child's wishes and not inform parents. Mrs. Willey was also told that she had to disregard her sincerely held religious beliefs regarding lying to others and the biological reality of human beings in order to keep her job as a public-school teacher.

89.     At the September 12, 2022, Board meeting following Ms. McGovern's statements, Mr. Willey informed the School Board about the realities of the Policy: "As a parent that experienced last year teachers withholding information from a parent with my daughter, it caused more issues with her at home than it did anything else. She was trying to live two lives, going to school being referred one way, coming home being referred another way, and it was causing her to have mental breakdowns, lash out at home with her siblings, and causing lots of other issues." (Exhibit I, p. 42, line 17 to 25).

90.     Mr. Willey further said, "Now, I understand case-by-case scenario, …you guys aren't psychologists. You're not licensed counselors. So how can you make the judgment call

whether to notify a parent or not on what is going on with their student?" (Exhibit I, p. 43, lines 1 to 5).

91.      Mr. Willey told the Board:

So I guess my question for the school board and the school is, if you're going to withhold this information from parents, which is -- is law, is your guys' right, are you guys going to provide counseling for these students from a licensed counselor outside of the school that they can talk to to get the help that they need? Because not all students that go through this transgender, that go through these situations, are okay. They're having issues mentally, and it's a constant battle internally for them.

If …you're taking that – that right for a parent to help their -- their child, then is the school going to start providing counseling, outside counseling for these students so they can talk to somebody, so they can get the help they need so it doesn't cause further issues?. (Exhibit H, page 43, line 10 to 44, line1).

92.      Mr. Willey continued:

I was told over a dozen times it was for the health and safety of my child. As teachers, you guys are required to report if you think there's any abuse or any harm that are going to come to a student within the home. No -- nothing was filed. Nothing -- no claims were made. But they flew under the flag that they were doing it for my child's safety and protection. If that's the case, then why was there no claims filed with DFS or the authorities in terms of the protection of my child? I understand they're scared. They don't know how to come out and -- open dialogue with their parents. That was the case of my daughter. But we weren't given the opportunity to. And like I said, if -- you're going to withhold that information from parents and make that judgment call, then those students need to be paired up not with a school counselor, but with a certified counselor outside of the school that's licensed in that field to help them through this issue. Is the district going to be willing to start paying for counseling services for all these students? Because you're taking that away from parents so they can't help their students. They can't help their kids, because they're not informed. They don't know what's going on. (Exhibit I, p. 44, line 25 to p. 45 line 12.).

93.      Mr. Willey informed the Board and Ms. McGovern that it was Defendants' concealment of information, not revelation of A.S.'s gender confusion, that created a rift in the parent-child relationship as well as negatively affecting A.S.'s mental and emotional health,

which was already adversely affected by childhood trauma. (Exhibit I, p. 42, line 16 to p. 46, line 16).

94.     In keeping with the Parent Concealment Policy, Mrs. Willey has not been informed whether A.S. is being treated as the female that she is and being addressed by her legal name and biologically realistic pronouns, or as a boy with a male name and pronouns.

95.     However, again only by happenstance, Mrs. Willey has learned that at least three of A.S.'s teachers at Black Butte were treating her as a boy and referring to her with a male name and pronouns during the 2022-2023 school.

96.     So long as the Parent Concealment Policy stays in effect, Plaintiffs have no way of knowing whether their other children are being treated as something other than their sex and addressed by other than their legal names and biologically realistic pronouns and the information is being intentionally concealed from them.

97.     Defendants are continuing to intentionally withhold from Mrs. Willey information critical to A.S.'s health and well-being, in particular, information regarding mental health counseling sessions at school. As Defendants know, A.S. is being treated for mental health issues, including symptoms of gender dysphoria, by a private counselor (See Exhibit A). Information related to A.S.'s mental health issues, including whether she is being treated as male, is relevant and critical to A.S.'s ongoing treatment plan. Concealing information relevant and critical to the treatment plan instituted by Mrs. Willey and her chosen counselor interferes with her ability to exercise her fundamental parental right to make decisions regarding A.S.'s mental health.

98.     Mrs. Willey requested that in-school counseling sessions be discontinued so as to not interfere with A.S.'s treatment plan. Mrs. Willey requested records related to the in-school

counseling to facilitate her decision-making and discern its effect on A.S.'s treatment plan. However, Defendants have refused to provide Mrs. Willey with the records, further interfering with her exercise of her fundamental parental rights.

99.     By adopting and implementing the Preferred Names Policy requiring that children's assertion of a discordant gender identity and request to "affirm" that identity with opposite-sex names and pronouns, Defendants are engaging in "social transitioning," *i.e.*, "changes that bring the child's outer appearance and lived experience into alignment with the child's core gender. Changes often associated with a social transition include changes in clothing, name, pronouns, and hairstyle."[1]

100.     "Social transitioning" is recognized by experts as part of the "treatment of gender dysphoria" in children, *i.e.* mental health treatment.[2]

101.     Under Wyoming law, children under 18 cannot receive mental health treatment without parental consent unless the child is emancipated, married, in the military, age 12 and seeking smoking cessation, or the parents cannot be located and the matter is urgent, none of which applies here. Wyo. Stat. § 14-1-101.

102.     Defendants' actions in facilitating "social transitioning" for minors and intentionally concealing that information from parents, including Plaintiffs, violates Wyo. Stat. § 14-1-101and Plaintiffs' fundamental constitutional right to direct the upbringing of their children by making decisions about the children's mental health care as described *infra*.

---

[1]     *Adams v. The Sch. Bd. of St. Johns Cty, Fla.,* No. 3:17-cv-00739, (M.D.Fla. June 28, 2017), Diane Ehrensaft Exp. Rep. 10-11 ECF 137-2.

[2]     *Id.*

103.     Plaintiffs have sincerely held religious beliefs that human beings are created male or female and that the natural created order regarding human sexuality cannot be changed regardless of individual feelings, beliefs, or discomfort with one's identity.

104.     Plaintiffs also have sincerely held religious and moral beliefs that parents have the non-delegable duty to direct the upbringing and beliefs and religious training of their children, including concerning human sexuality and identity.

105.     Plaintiffs have informed Defendants about their sincerely held religious beliefs and how Defendants' Policy and staff conduct is infringing those beliefs. Nevertheless, Defendants continue to implement the Policy and refuse to respect Plaintiffs' requests that A.S. be treated and recognized as a girl named "A" in keeping with their religious beliefs.

106.     Defendants are also interfering with Mrs. Willey's right to free exercise in her role as a teacher in refusing to provide reasonable accommodations to permit Mrs. Willey to exercise her religion and perform her duties as a teacher.

107.     Defendants' statements and actions evidence a reckless disregard and disdain for the fundamental religious free exercise rights of Mrs. Willey as an individual employed by the District who, because of the Policy, has to choose between her sincerely held religious beliefs and her job.

108.     Defendants' statements and actions evidence a reckless disregard and disdain for the fundamental free speech rights of Mrs. Willey as an individual employed by the District who, because of the Policy, has to choose between her job and uttering a compelled message with which she disagrees.

109.     Unless and until Defendants, inter alia, a) cease instructing District staff that parents are not to be notified when their children seek to socially transition to a discordant gender

identity through, *inter alia,* treating children as a different sex, including with  alternate names and pronouns; b) publicly establish and adopt a formal policy that parents will be notified when children raise issues related to their mental health, including expression of a discordant gender identity; c) cease deceiving parents by treating and referring to children one way  when communicating with parents and another way at school, and d) abide by parents' instructions concerning their child's mental health treatment and assertion of a discordant gender identity, Plaintiffs' fundamental rights to direct the upbringing of their children, to make decisions regarding their children's medical and mental health, and free exercise rights will continue to be violated.

### FIRST CAUSE OF ACTION
### VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983
### (Violation of Plaintiffs' Substantive Due Process Fundamental Parental Right to Direct the Upbringing of Their Children under the U.S. Constitution)
### (By All Plaintiffs Against all Defendants)

110.    Plaintiffs incorporate the preceding factual allegations in paragraphs 1-109 by reference as if set forth in full.

111.    At the time of the events described in this Complaint, Supreme Court precedent and Tenth Circuit precedent had established that the Due Process Clause in the 14th Amendment to the United States Constitution protects the fundamental right of fit parents to direct the upbringing, care, custody, and control of their children. *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Troxel v. Granville*, 530 U.S. 57, 68 (2000); *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182 (10th Cir. 2010); *Thomas v. Kaven*, 765 F.3d 1183 (10th Cir. 2014).

112.    At the time of the events described in this Complaint, Supreme Court precedent and Tenth Circuit precedent had established that the fundamental right of parents to direct the upbringing, care, custody, and control of their children under the 14th Amendment to the United States Constitution includes the right of fit parents to direct the medical and mental health

decision-making for their children, even if the children disagree with the decision. *Parham v. J. R.*, 442 U.S. 584 (1979); *PJ v. Wagner*, 603 F.3d 1182 (10th Cir. 2010); *Doe v. Woodard*, 912 F.3d 1278 (10th Cir. 2019).

113.    At the time of the events described in this Complaint, Wyoming law provided that, with certain exceptions not present here, parents must be informed of and consent to medical/mental health care for their children who are under age 18. Wyo. Stat. § 14-1-101

114.    Defendants have violated and are continuing to violate Plaintiffs' fundamental right to make decisions regarding the upbringing, custody, care, and control of their children in establishing and implementing the Parent Concealment Policy that prohibits informing parents regarding their children's assertions regarding a discordant gender identity and attendant requests to affirm alternate identities, *i.e.*, socially transition, unless their minor children consent.

115.    Defendants have acted and are continuing to act with reckless disregard for Plaintiffs' fundamental parental rights by purposefully and intentionally concealing critical information regarding the upbringing, care and control of their children, particularly Mrs. Willey's daughter A.S., *i.e.*, that the child is asserting a discordant gender identity, has requested to be treated as the other sex and addressed by an alternate name and pronouns and other information and decisions associated with affirming the child's gender discordance.

116.    Through the Parent Concealment Policy, Defendants have deprived Mrs. Willey of critical information related to A.S.'s health and well-being, *i.e.,* that A.S. is identifying as a male and being treated as a male, with male name and pronouns, at school.

117.    By depriving Mrs. Willey of critical information regarding A.S.'s gender identity at school, Defendants are infringing Mrs. Willey's fundamental right to direct A.S.'s upbringing in that Mrs. Willey does not have the information necessary to make reasoned decisions

regarding what is best for A.S.'s health and well-being, particularly in light of A.S.'s history of trauma and ongoing treatment for ADHD, PTSD and symptoms of gender dysphoria.

118.    By depriving Mrs. Willey of critical information regarding A.S.'s gender identity at school, Defendants are interfering with Mrs. Willey's fundamental parental right to make decisions regarding the type of education A.S. will receive, *i.e.,* public school, private school or homeschooling. Without information regarding how A.S.'s gender identity is being addressed at school, Mrs. Willey is unaware of circumstances that have a significant bearing on her decision regarding whether public school, private school, homeschooling or some other option is best for A.S.

119.    By depriving Mrs. Willey of critical information regarding A.S.'s gender identity at school, Defendants are interfering with Mrs. Willey's fundamental parental right to make mental health decisions for A.S. Concealing information regarding how A.S.'s gender identity is being addressed at school means Mrs. Willey does not have the information necessary to determine, in conjunction with her chosen mental health professional, whether the treatment plan for A.S.'s symptoms of gender dysphoria is effective or whether Defendants' actions are interfering with the treatment plan.

120.    Defendants' continuing implementation of the Parent Concealment Policy infringes Mr. and Mrs. Willey's fundamental parental right to direct the upbringing of their children to the extent it deprives them of critical information related to their children's health and well-being, *i.e.,* whether their children are identifying and being treated as the opposite sex and addressed by opposite sex names and pronouns at school.

121.    By nature, the Parent Concealment Policy withholds information from Plaintiffs so that Plaintiffs cannot know whether and when they are being deprived of information

regarding their children unless, as occurred with A.S., they find out by happenstance. Therefore, so long as the Parent Concealment Policy remains in effect, Plaintiffs' fundamental right to direct the upbringing, including making mental health decisions and choosing the type of education for their children, is in jeopardy.

122.    Through the Preferred Names Policy, Defendants are usurping Plaintiffs' role as parental decision makers and granting decision making authority for issues of profound importance to identity, personhood, religious beliefs, and emotional and mental well-being to children (and District personnel) thereby depriving Plaintiffs of their right to consent to and direct their children's care before consequential decisions are made.

123.    Defendants' implementation of the Policy has infringed and continues to infringe the fundamental parental rights of Plaintiffs to direct the care, custody and control of their children, including A.S. in a manner that has irreparably harmed them and continues to irreparably harm them.

124.    Defendants' reckless disregard for Mr. and Mrs. Willey's rights has resulted in deprivation of their fundamental constitutional rights in that Defendants are explicitly and intentionally excluding Plaintiffs from significant decision-making directly related to their children's care.

125.    Plaintiffs' constitutionally protected right to direct the upbringing of their child was violated as the plainly obvious consequence of Defendants' actions in a) directing District staff that students are entitled to confidentiality with respect to their own parents when they raise issues related to gender identity; b) withholding mental health information regarding A.S from Mrs. Willey; c) perhaps withholding mental health information regarding Plaintiffs' other children; d) promoting and facilitating social transition of a discordant gender identity for A.S

without Mrs. Willey's knowledge or consent, and even over Mrs. Willey's objections; and e) taking or failing to take other actions of which Plaintiffs are presently unaware.

126.    Defendants cannot assert a compelling state interest for disregarding Plaintiffs' long-established fundamental constitutional right to direct the upbringing, care, and education of their children, and Defendants' prohibition against parental notification and obtaining consent is not narrowly tailored.

127.    Defendants' violation of Plaintiffs' fundamental constitutional rights has caused and continues to cause Plaintiffs undue hardship and irreparable harm.

128.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their fundamental rights.

**SECOND CAUSE OF ACTION**
**VIOLATION OF CIVIL RIGHTS, 42 U.S.C. § 1983**
**(Violation of Plaintiffs' Right to Free Exercise of Religion**
**Under the U.S. Constitution)**
**(By All Plaintiffs Against All Defendants)**

129.    Plaintiffs incorporate the factual allegations of paragraphs 1-109 by reference as if set forth in full.

130.    The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Mr. and Mrs. Willey's right to free exercise of religion.

131.    Mr. and Mrs. Willey have sincerely held religious beliefs that include: 1) human beings are created male or female and the natural created order regarding human sexual identity cannot be changed; 2) all people are to be treated with compassion, which includes refraining from misrepresenting an individual's natural biological and created identity as either a male or a female;  3) individuals are to speak the truth, including speaking the truth regarding matters of

28

sexual identity as a male or female; 4) Children are to respect their parents and other adult authority figures; 5) Parents have the non-delegable duty to introduce and teach their children about issues related to sexual identity and personal relationships.

132.    Defendants were aware of Mrs. Willey's sincerely held religious beliefs and that treating her daughter as a boy and untruthfully using a male name and pronouns would violate her sincerely held religious beliefs.

133.    Defendants are aware of Mr. and Mrs. Willey's sincerely held religious beliefs and that treating their children as the opposite sex and untruthfully using opposite sex names and pronouns would violate their sincerely held religious beliefs.

134.    Defendants' implementation of the Policy, particularly the Parent Concealment Policy by which Defendants withheld information from Mrs. Willey regarding A.S.'s assertion of a male identity and the Defendants' treatment of A.S. as a boy with a male name and pronouns prevented  Mrs. Willey from acting pursuant to her sincerely held religious beliefs by depriving her of the information she  needed to counsel A.S. regarding  conflicts about her sex and responding in a manner consistent with her faith.

135.    Unless and until Defendants suspend, revise or revoke the Policy, particularly the Parent Concealment Policy, by which Defendants will withhold information from Mr. and Mrs. Willey if their children assert an opposite sex identity and Defendants treat their children as the opposite sex with opposite sex names and pronouns, will deprive Mr. and Mrs. Willey of information they need to act pursuant to their sincerely held religious beliefs to counsel their children regarding conflicts about their sex and responding in a manner consistent with their faith.

136.     Defendants' implementation of the Policy as to A.S. has significantly burdened Mrs. Willey's sincerely held religious beliefs by preventing her from acting pursuant to her religious belief that it is the parents who have the duty to train their children regarding human sexual identity and the unchangeable natural created order of humans as male and female. Adherence to the Parent Concealment Policy means that Defendants affirmed the idea that the concepts of male and female are changeable with A.S. and acted according to that idea. Defendants thereby deprived Mrs. Willey of the ability to use faith-informed principles to discuss the concepts of male and female sexuality and to counter undesirable influences presented to A.S. at school.

137.     Defendants' continuing implementation of the Policy significantly burdens Mr. and Mrs. Willey's sincerely held religious beliefs by preventing them from acting pursuant to their religious belief that it is the parents who have the duty to train their children regarding human sexual identity and the unchangeable natural created order of humans as male and female. Adherence to the Parent Concealment Policy means that Defendants will affirm the idea that the concepts of male and female are changeable with Plaintiffs' children and act according to that idea. Defendants will thereby deprive Mr. and Mrs. Willey of the ability to use faith-informed principles to discuss the concepts of male and female sexuality and to counter undesirable influences presented to their children at school.

138.     Defendants' actions in excluding Mrs. Willey from decision-making regarding her daughter because of a perceived lack of "affirmation" targets Mrs. Willey's religious beliefs regarding the created order, biological reality, human nature, sexuality, gender, ethics, and morality which constitute central components of her sincerely held religious beliefs.

139.     Defendants' actions in continuing to implement a Policy that excludes Mr. and Mrs. Willey from decision-making regarding their children because of a perceived lack of "affirmation" targets Mr. and Mrs. Willey's religious beliefs regarding the created order, biological reality, human nature, sexuality, gender, ethics, and morality which constitute central components of their sincerely held religious beliefs.

140.     The Policy and Defendants' actions pursuant to the Policy are neither neutral nor generally applicable. Defendants' statements in the Policy and in public meetings that children's safety requires concealing information from parents because some parents will not affirm the child's wishes, targets Mr. and Mrs. Willey's  sincerely held beliefs that 1) human beings are created male or female and the natural created order regarding human sexual identity cannot be changed; 2) all people are to be treated with compassion, which includes refraining from misrepresenting an individual's natural biological and created identity as either a male or a female;  3) individuals are to speak the truth, including speaking the truth regarding matters of sexual identity as a male or female; 4) Children are to respect their parents and other adult authority figures.

141.     No compelling state interest justifies the burdens Defendants imposed on Mr. and Mrs. Willey's rights to the free exercise of religion.

142.     Defendants' actions are not the least restrictive means to accomplish any permissible government purpose Defendants seek to serve.

143.     Defendants' violation of Mr. and Mrs. Willey's rights to free exercise of religion has caused, is causing, and will continue to cause Mr. and Mrs. Willey to suffer undue and actual hardships.

144.    Defendants' violation of Mr. and Mrs. Willey 's rights to free exercise of religion has caused, is causing, and will continue to cause Plaintiffs to suffer irreparable injury. Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

### THIRD CAUSE OF ACTION
### Violation of Civil Rights, 42 U.S.C. § 1983
### (Violation Right to Free Exercise of Religion Under the U.S. Constitution)
### (Plaintiff Ashley Willey Against All Defendants)

145.    Plaintiff incorporates the factual allegations of paragraphs 1-109 by reference as if set forth in full.

146.    The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiff's right to free exercise of religion. This right was well-established based on U.S. Supreme Court and Tenth Circuit precedent at the time of the offending conduct alleged herein.

147.    Mrs. Willey's views related to gender identity, parental involvement in decision-making and truth-telling regarding a person's identity are motivated by her sincerely held religious beliefs, are avenues through which she exercises her religious faith, and constitute a central component of her sincerely held religious beliefs.

148.    Defendants have explicitly told Mrs. Willey that she cannot abide by her sincerely held religious beliefs when a child says he or she identifies as another sex, wants to be treated as the other sex and wants to be identified  by names and pronouns that do not correspond to the child's sex. Defendants have further explicitly told Mrs. Willey that she cannot abide by her sincerely held religious beliefs regarding parental authority and truth-telling, but must conceal information and even lie to parents about their children's identity at school.

149.    Mrs. Willey cannot comply with Defendants' mandate without violating her sincerely held religious beliefs, forcing her to choose between her job and her faith.

150.    Defendants have already  taken adverse actions against Mrs. Willey as a result of Mrs. Willey's faith-based opposition to The Policy, including: 1) refusing to acknowledge and accept applicable Wyoming Professional Teaching Standards Board exemptions of certification to perform her duties as a special education math instructor; 2) refusing and failing to complete the process for Mrs. Willey to obtain necessary certifications to perform her duties as a special education math instructor; 2) effectively demoting her by prohibiting her from teaching special education students except under supervision from another teacher because of their actions in failing and refusing to promptly process Mrs. Willey's applications for exceptions.

151.    Defendants have stated that they will impose further discipline, including termination, if Mrs. Willey does not comply with the Policy.

152.    Defendants' continuing implementation of the Policy violates Mrs. Willey's right to free exercise of religion as guaranteed by the First Amendment to the United States Constitution.

153.    Defendants violate Mrs. Willey's right to free exercise of religion when they compel Mrs. Willey, under the threat of professional discipline, including termination of her employment, to violate her religious beliefs by requiring that Mrs. Willey lie to and deliberately deceive parents regarding their child's gender identity against her sincerely held ethical and religious beliefs.

154.    Defendant Arnoldi explicitly and knowingly violated Mrs. Willey's right to free exercise of religion when she told Mrs. Willey that she cannot make decisions based on her religious beliefs if she wanted to continue working for the District. (Exhibit G).

155.   Defendants' actions are neither neutral nor generally applicable, but rather specifically and discriminatorily target Mrs. Willey's religious beliefs and thus expressly constitute a substantial burden on sincerely held religious beliefs that are contrary to Defendants' viewpoint regarding gender identity and social transitioning for children.

156.   By conditioning Mrs. Willey's status as a teacher in good standing with the District (and ultimately her employment with the District) on her willingness to surrender her constitutional rights, Defendants have imposed and are imposing an unconstitutional burden on her in violation of her First Amendment rights.

157.   No compelling state interest justifies the burdens Defendants impose on Mrs. Willey's right to the free exercise of religion.

158.   Defendants' actions are not the least restrictive means to accomplish any permissible government purpose Defendants seek to serve.

159.   Defendants' violation of Mrs. Willey's rights to free exercise of religion has caused, is causing, and will continue to cause Mrs. Willey to suffer undue and actual hardships.

160.   Defendants' violation of Mrs. Willey's right to free exercise of religion has caused, is causing, and will continue to cause Mrs. Willey to suffer irreparable injury. Mrs. Willey has no adequate remedy at law to correct the continuing deprivation of her cherished constitutional rights.

### FOURTH CAUSE OF ACTION
### Violation of Civil Rights, 42 U.S.C. § 1983
### (Violation of the Right to Free Speech Under the U.S. Constitution)
### (Plaintiff Ashley Willey Against All Defendants)

161.   Plaintiff incorporates the factual allegations of paragraphs 1-109 by reference as if set forth in full.

162.    The Free Speech Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Mrs. Willey's right to freedom of speech.

163.    Mrs. Willey's right to freedom of speech includes both the decision of what to say and what not to say. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,138 S. Ct. 2448, 2463 (2018)

164.    The First Amendment requires tolerance, not coercion, of speech regarding matters of public concern. All people are free to think and speak as they wish, not as the government demands.  *303 Creative LLC v. Elenis,* Supreme Court of the United States Case No. 21-476, at *32 (June 30, 2023).

165.    Referring to students using preferred names and pronouns that differ from their biological sex carries the message that "People can have a gender identity inconsistent with their sex at birth." That is a message with which Mrs. Willey disagrees and which violates her sincerely held religious beliefs.

166.    The discussion of gender identity, including whether it is appropriate to use preferred names and pronouns that differ from biological sex, is a matter of public concern.

167.    Using or not using preferred names and pronouns to refer to students in the classroom, in public and in conversations with third parties is not curricular speech or part of Mrs. Willey's official duties.

168.    The Preferred Names Policy compels District staff, including Mrs. Willey, to use students' preferred false names and pronouns and thereby personally affirm and communicate Defendants' preferred message and viewpoint about gender identity within the classroom and in public whenever speaking about particular students.

169.     Defendants, in particular Ms. McGovern, Ms. Arnoldi and Ms. Bolton, have threatened to discipline District staff who do not use students' preferred pronouns, including ones that differ from the students' biological sex, to personally affirm and communicate Defendants' preferred message and viewpoint about gender identity.

170.     Mrs. Willey cannot comply with Defendants' mandate to personally affirm and communicate Defendants' preferred message and viewpoint about gender identity, *i.e.,* that students can have a gender identity different from their sex and their assertion of such a differential identity must be affirmed without violating her core beliefs.

171.     Lying to or deceiving parents regarding their child's gender identity is a matter of public concern and is neither curricular speech nor a part of Mrs. Willey's official duties. *See Janus*, 138 S. Ct. at 2471-73.

172.     The Parent Concealment Policy requires that District staff, including Mrs. Willey, lie to and deceive parents regarding their children's gender identity, preferred name and pronouns unless the children have consented to the staff member revealing the gender identity and preferred name and pronouns to their parents.

173.     Defendants, in particular, Ms. McGovern, Ms. Arnoldi and Ms. Bolton, have threatened to discipline District staff, including Mrs. Willey, if staff members do not lie to and deceive parents under those circumstances.

174.     Mrs. Willey cannot comply with The Parent Concealment Policy compelling her to lie and deceive those parents when speaking to them about their children without violating her core beliefs.

175.     Defendants have no compelling or even legitimate interest in compelling Mrs. Willey to lie to and deceive parents.

176.    The Policy is not narrowly tailored to serve a compelling governmental interest, nor does it serve a compelling governmental interest that cannot be achieved through means significantly less restrictive of Mrs. Willey's free speech rights.

177.    The Policy unlawfully compels, and threatens to compel, Mrs. Willey to personally affirm and communicate messages with which she disagrees, contrary to the First Amendment of the United States Constitution.

178.    The Policy has caused and is continuing to cause irreparable injury to Mrs. Willey by depriving her of her constitutional rights. Mrs. Willey has no adequate remedy at law to correct the continuing deprivation of her cherished constitutional rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

**Under The First Cause of Action:**

1.    A declaration that Defendants violated Plaintiffs' fundamental rights as parents, to direct the care, custody and control of their children under the United States Constitution through development and implementation of The Policy and associated policies and procedures, to the extent that they: (a) enabled Plaintiffs' child to change gender identity at school by*, inter alia,* being treated as the opposing sex including selecting a new "affirmed name and pronouns," without parental notification and consent; (b) prohibited teachers and other staff from communicating with parents about their children's discordant gender identity, including any desired change in treatment, name and pronouns, without first obtaining the children's consent; and (c) instructed, directed, or permitted teachers and other staff to deceive parents by, *inter alia*, using different names and pronouns around parents than are used in school;

2.     A preliminary injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Treating A.S. as any sex or gender other than female or referring to A.S. by any name other than "A." or by any pronouns other than female pronouns without the prior written consent of Plaintiffs; b) Having any private discussions with A.S. related to mental health issues, including but not limited to her assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs;   c) Referring to any of Plaintiffs' other children by any name other than their legal name or by pronouns other than those appropriate for their sex without the prior written consent of Plaintiffs; d) Having any private discussions with any of Plaintiffs' other children related to mental health issues, including but not limited to assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs.

3.     A permanent injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Treating A.S. as any sex or gender other than female or referring to A.S. by any name other than "A." or by any pronouns other than female pronouns without the prior written consent of Plaintiffs; b) Having any private discussions with A.S. related to mental health issues, including but not limited to her assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs;   c) Referring to any of Plaintiffs' other children by any name other than their legal name or by pronouns other than those appropriate for their sex without the prior written consent of Plaintiffs; d) Having any private discussions with any of Plaintiffs' other children related to mental health issues, including but not limited to assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs.

4.     For nominal damages for violation of Plaintiffs' constitutional rights;

5.      For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions, including a) emotional distress, b) exacerbation of A.S.'s psychological and educational difficulties requiring ongoing counseling and other interventions, c) ongoing emotional and psychological damage to their family dynamic, requiring therapeutic interventions to rebuild trust between parents and child, and other injuries as proven at trial;

**Under The Second Cause of Action:**

1.      A declaration that Defendants violated Plaintiffs' fundamental right to free exercise of religion under the United States Constitution, through development and implementation of The Policy and associated policies and procedures, to the extent that they: a) enabled Plaintiffs' child to change gender identity at school by, *inter alia,* being treated as the opposing sex including selecting a new "affirmed name and pronouns," without parental notification and consent; b) prohibited teachers and other staff from communicating with parents about their children's discordant gender identity, including any desired change in treatment, name and pronouns, without first obtaining the children's consent; c) instructed, directed, or permitted teachers and other staff to deceive parents by, *inter alia*, using different names and pronouns around parents than are used in school; d) refused to accommodate Plaintiffs' religious beliefs by referring to A.S. by her given name and female pronouns but instead following the contrary wishes of A.S.

2.      A preliminary injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Treating A.S. as any sex or gender other than female or referring to A.S. by any name other than "A." or by any pronouns other than female pronouns without the prior written consent of Plaintiffs; b) Having any private discussions with A.S. related to mental health issues, including but not limited to her assertion of a discordant gender

identity and request to social transition, without the prior written consent of Plaintiffs;  c) Referring to any of Plaintiffs' other children by any name other than their legal name or by pronouns other than those appropriate for their sex without the prior written consent of Plaintiffs; d) Having any private discussions with any of Plaintiffs' other children related to mental health issues, including but not limited to assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs.

3.      A permanent injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Treating A.S. as any sex or gender other than female or referring to A.S. by any name other than "A." or by any pronouns other than female pronouns without the prior written consent of Plaintiffs; b) Having any private discussions with A.S. related to mental health issues, including but not limited to her assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs;  c) Referring to any of Plaintiffs' other children by any name other than their legal name or by pronouns other than those appropriate for their sex without the prior written consent of Plaintiffs; d) Having any private discussions with any of Plaintiffs' other children related to mental health issues, including but not limited to assertion of a discordant gender identity and request to social transition, without the prior written consent of Plaintiffs.

4.      For nominal damages for violation of Plaintiffs' constitutional rights;

5.      For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions, including a) emotional distress, b) exacerbation of A.S.'s psychological and educational difficulties requiring ongoing counseling and other interventions, c) ongoing emotional and psychological damage to their family dynamic, requiring therapeutic interventions to rebuild trust between parents and child, and other injuries as proven at trial;

**Under the Third Cause of Action:**

1.      A declaration that Defendants violated Plaintiff Ashley Willey's fundamental right to free exercise of religion under the United States Constitution, through development and implementation of  The Policy and associated policies, practices, and procedures, to the extent that they: a) Compel Mrs. Willey to accede to the wishes of a child that the child be treated as a different sex or gender or referred to by an alternative name and pronouns which do not match the child's legal name and sex absent written consent from parents; b) Prohibits Mrs. Willey from communicating with parents, even after parent inquiry, about their children's discordant gender identity, including any desired change in name and pronouns, without first obtaining the children's consent; c) Directs Mrs. Willey to deceive parents by, *inter alia*, using different names and pronouns around parents than are used in school.

2.      A preliminary injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Compelling Mrs. Willey to refer to any student by any sex or gender other than their biological sex, by any name other than his or her legal name or by any pronouns other than those appropriate for his or her biological sex absent prior written consent of parents; b) Compelling Mrs. Willey to refrain from informing parents about their children's assertion of a discordant gender identity and request for social transition absent documented evidence of abuse or neglect or imminent abuse or neglect by the parents; c) Compelling Mrs. Willey to deceive others by referring to a child as one sex and by one name and set of pronouns at school and as another sex and by another name and set of pronouns in conversations with parents.

3.      A permanent injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Compelling Mrs. Willey to refer to any student by

any sex or gender other than their biological sex, by any name other than his or her legal name or by any pronouns other than those appropriate for his or her sex absent prior written consent of parents; b) Compelling Mrs. Willey to refrain from informing parents about their children's assertion of a discordant gender identity and request for social transition absent documented evidence of abuse or neglect or imminent abuse or neglect by the parents; c) Compelling Mrs. Willey to deceive others by referring to a child by one name and set of pronouns at school and another name and set of pronouns in conversations with parents.

4.      For nominal damages for violation of Plaintiff's constitutional rights;

5.      For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions as proven at trial;

**Under the Fourth Cause of Action:**

1.      A declaration that Defendants violated Plaintiff Ashley Willey's fundamental right to freedom of speech under the United States Constitution, through development and implementation of The Policy and associated policies, practices, and procedures, to the extent that they: a) Compel Mrs. Willey to accede to the wishes of a child that the child be referred to by an alternative name and pronouns which do not match the child's legal name and sex absent written consent from parents; b) Prohibits Mrs. Willey from communicating with parents about their children's discordant gender identity, including any desired change in name and pronouns, without first obtaining the children's consent; c) Directs Mrs. Willey to deceive parents by, *inter alia*, using different names and pronouns around parents than are used in school.

2.      A preliminary injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Compelling Mrs. Willey to refer to any student by any sex or gender other than their biological sex, by any name other than his or her legal name

or by any pronouns other than those appropriate for his or her biological sex absent prior written consent of parents; b) Compelling Mrs. Willey to refrain from informing parents about their children's assertion of a discordant gender identity and request for social transition absent documented evidence of abuse or neglect or imminent abuse or neglect by the parents; c) Compelling Mrs. Willey to deceive others by referring to a child as one sex and by one name and set of pronouns at school and as another sex and by another name and set of pronouns in conversations with parents.

3.     A permanent injunction prohibiting Defendants, their employees, agents and third parties acting at their direction from: a) Compelling Mrs. Willey to refer to any student by any sex or gender other than their biological sex, by any name other than his or her legal name or by any pronouns other than those appropriate for his or her sex absent prior written consent of parents; b) Compelling Mrs. Willey to refrain from informing parents about their children's assertion of a discordant gender identity and request for social transition absent documented evidence of abuse or neglect or imminent abuse or neglect by the parents; c) Compelling Mrs. Willey to deceive others by referring to a child by one name and set of pronouns at school and another name and set of pronouns in conversations with parents.

6.     For nominal damages for violation of Plaintiff's constitutional rights.

7.     For compensatory damages according to proof for the injuries caused by Defendants' acts and omissions as proven at trial.

**Under All Causes of Action:**

1. For attorneys' fees and costs under 42 U.S.C. § 1988.

2. For such other relief as the Court deems proper.

Dated:  July 20, 2023.

Henry F. Bailey Jr. WY Bar #5-1681
Bailey Stock Harmon Cottam Lopez LLP
6234 Yellowstone Road
Cheyenne, WY 82009
307.638.7745
hank@performance-law.com

/s/*Ernest G. Trakas*
Ernest G. Trakas*
MO Bar No. 33813
Mary E. McAlister*
VA Bar No. 76057
Vernadette R. Broyles*
GA Bar No. 593026
CHILD & PARENTAL RIGHTS CAMPAIGN
5805 State Bridge Road, Suite 310
Johns Creek, GA 30097
Telephone (770) 448-4525
etrakas@childparentrights.org
mmcalister@childparentrights.org
vbroyles@childparentrights.org
* Admitted *Pro Hac Vice*
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of July 2023, a true and correct copy of the foregoing

AMENDED COMPLAINT was filed with the Clerk of the Court using CM/ECF system which

will send notification of such filing to the following e-mail addresses:

L. Kathleen Chaney, Esq., CPCU
Eric Hevenor
Lambdin & Chaney, LLP
4949 S. Syracuse Street, Suite 600
Denver, CO  80237
T (303) 799-8889
F (303) 799-3700
kchaney@lclaw.net
ehevenor@lclaw.net

*/s/Ernest G. Trakas*
Ernest G. Trakas