Ernest G. Trakas*
MO Bar No. 33813
Mary E. McAlister*
VA Bar No. 76057
Vernadette R. Broyles*
GA Bar No. 593026
CHILD & PARENTAL RIGHTS CAMPAIGN
5805 State Bridge Road, Suite 310
Johns Creek, GA 30097

Henry F. Bailey Jr. WY Bar #5-1681
Bailey Stock Harmon Cottam Lopez LLP
6234 Yellowstone Road
Cheyenne, WY 82009
307.638.7745
hank@performance-law.com

Telephone (770) 448-4525
etrakas@childparentrights.org
mmcalister@childparentrights.org
vbroyles@childparentrights.org
*Pending Admission *Pro Hac Vice*
*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

**ASHLEY WILLEY, SEAN WILLEY**

    Plaintiffs,      Civil Case No. 23-cv-69-S

  vs.

**SWEETWATER COUNTY SCHOOL
DISTRICT # 1 BOARD OF
TRUSTEES, et al.,**

    Defendants.

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS
AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1) AND
12(b)(6)**

**INTRODUCTION**

Defendants are asking this Court to simply erase the past and disregard the constitutional injuries suffered by Plaintiffs during the 2021-2022 and 2022-2023 school years because they enacted a new names and pronouns procedure for the 2023-2024 school year **AFTER** Plaintiffs filed their First Amended Complaint and because **AFTER** Plaintiffs filed their First Amended

1

Complaint Defendants received word that one of Plaintiffs' children had transferred to another district.  Defendants incredibly claim that these post-filing actions have mooted all of Plaintiffs' claims for completed violations of their fundamental parental rights, free exercise and free speech rights. While the recent events might affect claims for prospective relief related to A.S. they do nothing to moot Plaintiffs' claims for damages related to actions taken regarding A.S. in 2021-2023, nor to any claims for Plaintiffs' other children who continue to attend District schools.

Notably, while calling into question Plaintiffs' truthfulness (Memorandum in support of MTD, p. 10 n.3) [Dkt 30](disregarding this Court's admonition regarding professionalism and decorum), Defendants have themselves misrepresented the nature of Plaintiffs' claims and their continued viability after events occurring two years after the actions that violated Plaintiffs' rights. Plaintiffs did not object to Defendants' request for a two-week extension of time, from August 3, to August 17, 2023 to respond to the First Amended Complaint [Dkt 28], and Defendants used that time to finalize a new preferred names/parent notification procedure to use to try to erase Plaintiffs' claims. Their effort is unavailing. The new procedure does nothing to erase the harms already caused by Defendants' actions under the prior procedure. Also, Plaintiffs seek compensatory damages for those prior actions, not just prospective relief. Therefore, Defendants' asserted correction of their errors in the prior policy and A.S.'s current absence from the District have no effect on the continuing viability of Plaintiffs' claims.

Defendants also try to defeat Plaintiffs' claims by alleging that the purported actions by district staff of calling A.S. by an alternate male name and pronouns were no longer occurring after Mrs. Willey requested that it stop. "Plaintiffs concede in their Amended Complaint that following meetings with the District's upper management the District agreed to refer to A.S. by the name on her birth certificate. On the face of their Amended Complaint, Plaintiffs brought an issue to the District's attention and achieved the result they were looking for." (MTD, p. 6, citing FAC ¶56). However, Mrs. Willey's testimony in support of the Motion for Preliminary Injunction

demonstrated that, contrary to Defendants' representations, District staff were continuing to violate Plaintiffs' parental rights. [Dkt. 21-1, ¶11]. Also, the face of the Amended Complaint does not show that Plaintiffs obtained "the result they were looking for." Plaintiffs allege, in keeping with Mrs. Willey's testimony:

> 94. In keeping with the Parent Concealment Policy, Mrs. Willey has not been informed whether A.S. is being treated as the female that she is and being addressed by her legal name and biologically realistic pronouns, or as a boy with a male name and pronouns.
> 95. However, again only by happenstance, Mrs. Willey has learned that at least three of A.S.'s teachers at Black Butte were treating her as a boy and referring to her with a male name and pronouns during the 2022-2023 school.

(FAC, ¶¶ 94-95 [Dkt. 26]. Defendants' claim that Plaintiffs somehow "conceded" that district staff were no longer calling A.S. by an alternate name and pronouns in Paragraph 56 is contradicted by the allegations in Paragraphs 94 and 95, which incorporate the testimony presented to the Court in support of Plaintiffs' Motion for Preliminary Injunction.

Defendants believe that their post-filing adoption of a new procedure and disregard for the allegations of the First Amended Complaint can render the completed violations of Plaintiffs' fundamental rights moot and somehow deprive them of standing to seek damages for those violations. Because of their assurance that they are right, Defendants have failed to analyze Plaintiffs' due process claims on their merits. Therefore, they have not satisfied the requirements for a motion to dismiss under Rule 12(b)(6). Since Plaintiffs' claims for damages for violations of their fundamental constitutional rights in 2021-2023 are not mooted by a newly effective policy for 2023-2024 or by one child's absence from the district, Defendants' motion to dismiss Counts I and II must be denied. The newly enacted procedure cannot render Mrs. Willey's claims for damages for completed violations of her fundamental rights under Counts III and IV moot. While Defendants did engage in an analysis of the merits of Counts III and IV, the analysis is flawed. Therefore, the motion to dismiss Counts III and IV must be denied.

3

**FACTUAL BACKGROUND**

Since Defendants did not analyze Plaintiffs' parental rights claims, Plaintiffs will focus the factual discussion on general allegations and the allegations relevant to the free exercise and free speech allegations in the First Amended Complaint. The procedure announced by Defendants on August 14, 2023 was not in place at the time that Defendants took actions against Mr. and Mrs. Willey and so is not relevant to Plaintiffs' claims. Plaintiffs will address the 2022-2023 procedure under which Defendants acted in violation of Plaintiffs' rights.

Ashley Willey is the mother of A.S., who was a student at Black Butte High School through the end of the 2022-2023 school year. (FAC, ¶12). Mrs. Willey and her husband Sean are also parents of four other children who attend District schools and therefore were and are subject to the District's protocols, policies, procedures, and guidance. (FAC, ¶13). Mrs. Willey is employed by the District as a general education math teacher assigned to a special education class (FAC, ¶14).

During the 2022-2023 school year, Defendant Bolton told Mrs. Willey that she and all teachers in the District, were required to accede to the wishes of a minor student who said he or she was trans, wanted to be treated as the opposite sex with an alternate name and pronouns, and did not want his or her parents told, regardless of the parents' direction or even over their objection. (FAC ¶ 47). Those instructions were pursuant to a Policy put in place during the 2022-2023 school year, that 1) required that District staff abide by children's requests to be treated and affirmed as the opposite sex and addressed by opposite sex names and pronouns ("Preferred Names Policy") and 2) that District staff must conceal information from parents regarding their child being affirmed and treated as the opposite sex unless the child consented to the parents being told ("Parent Concealment Policy"). (FAC¶ 49). The Policy provided in part:

> As you become acquainted with your students, you may encounter students wishing to use a preferred or chosen name. A preferred/chosen name is any

4

name a student chooses to use other than their legal name. For example, a student may wish to shorten their first name (*e.g.* Steven to Steve) or to be referred to by their middle name or a nickname. Sweetwater County School District Number One is committed to promoting an educational environment that is supportive and respectful to all students. Calling a person by their preferred name and pronoun shows respect and contributes to the District's commitment to providing a safe and nondiscriminatory educational environment. Accordingly, **staff must use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications. Staff must respect the privacy of all students regarding such choice.** (emphasis added).

Violations of this procedure may constitute discrimination based on sex, and may result in discipline. Students who experience problems or discrimination related to their preferred/chosen name or pronoun shall be referred to the Title IX Coordinator for resources and assistance. This procedure does not address changes to educational records to reflect legal name changes. Any requests to amend educational records shall be referred to the Director of Human Resources.

(FAC ¶ 88)

Defendants actively enforced the Policy, including by publishing warnings on the District's attendance and grade recording system that District personnel are not to mention a student's decision to adopt a different name and pronouns, particularly to parents, unless the child has consented. (FAC ¶ 76), Defendants also enforce compliance with the Policy by directing school principals to attend parent-teacher conferences to ensure that teachers do not share information about children's gender identity with the parents, but instead deceive parents by using the children's legal name and biologically realistic pronouns in the parents' presence. (FAC ¶ 77). District staff, like Mrs. Willey, are threatened with professional discipline, including termination, if they do not abide by the children's requests and refuse to conceal information from parents. (FAC ¶ 78).

Defendants pejoratively describe Plaintiffs' sincerely held religious beliefs: "The essence of Mrs. Willey's allegations in support of her second claim for relief is that she maintains sincerely held religious beliefs such that she denies the existence of transgender persons while believing in

absolute parental authority and truth telling." (MTD, p. 8)[1]. In fact, Plaintiffs allege that they have sincerely held religious beliefs that human beings are created male or female and that the natural created order regarding human sexuality cannot be changed regardless of individual feelings, beliefs, or discomfort with one's identity. (FAC¶ 102). Plaintiffs also have sincerely held religious and moral beliefs that parents have the non-delegable duty to direct the upbringing and beliefs and religious training of their children, including concerning human sexuality and identity. (FAC¶ 103).

Mrs. Willey informed Ms. McGovern that the District's Policy that she, as a teacher, had to agree to change how a child is identified at school. *i.e.,* speak falsely, and conceal that information from parents violated Mrs. Willey's sincerely held religious beliefs, which include not speaking falsely or being deceitful by concealing information requested by a parent. (FAC ¶60) Mrs. Willey manually crossed out the language regarding "Preferred/Chosen Names" from the Policy before she signed it. In doing these things, Mrs. Willey put the District on notice that she was requesting a reasonable accommodation so as to not violate her sincerely held religious beliefs. Director of Student Services Ms. Arnoldi denied her requested accommodation, stating that "[u]nfortunately, we don't get to base our decisions on personal and religious beliefs. We have to follow the policy and procedures that are set forth by law and recent court cases. As an employee of the district, you will have to abide by the policies that are in place for SCSD#1." (FAC ¶68).

Therefore, Mrs. Willey as an individual employed by the District had to choose between her sincerely held religious beliefs and her job. (FAC ¶106). Placing Mrs. Willey in that coercive circumstance in 2022-2023 and the resulting damages caused by the violation of her free exercise rights during that time do not disappear with the enactment of a new procedure adopted *after* the

---

[1] Defendants again appear to be disregarding this Court's admonition against unprofessional ad hominem statements.

6

First Amended Complaint was filed. Similarly, the enactment of a new procedure in August 2023 did nothing to erase the violations of Mrs. Willey's fundamental free speech under the 2022-2023 procedure which compelled her to choose between her job and uttering a compelled message with which she disagrees and contravenes her sincerely held religious beliefs. (FAC, ¶107).

As well as interfering with Mrs. Willey's rights as an employee, the Policy interfered with the family's rights. Mr. and Mrs. Willey informed Defendants that the 2022-2023 Policy had caused adverse effects to A.S. who had suffered childhood trauma and was under the care of a private counselor pursuant to a treatment plan, which was being jeopardized by the surreptitious affirmation of a male identity for AS. (FAC ¶ 51). Mr. Willey stated publicly at a School Board meeting in September 2022 how the Policy had already adversely affected his family.

> "As a parent that experienced last year teachers withholding information from a parent with my daughter, it caused more issues with her at home than it did anything else. She was trying to live two lives, going to school being referred one way, coming home being referred another way, and it was causing her to have mental breakdowns, lash out at home with her siblings, and causing lots of other issues."

(FAC ¶ 88). Mr. Willey informed the Board and Ms. McGovern that Defendants' concealment of information, not revelation of A.S.'s gender confusion, created a rift in the parent-child relationship as well as negatively affecting A.S.'s mental and emotional health, which was already adversely affected by childhood trauma, about which school officials had been informed. (FAC ¶ 92).

The injuries to the Willey family resulting from Defendants' 2022-2023 Policy were complete during the 2022-2023 school year. The District's enactment of a new Policy in August 2023 does nothing to alleviate or eliminate those injuries. Likewise, A.S.'s absence from the District in the 2023-2024 school year does not render those completed injuries somehow moot. Defendants' last minute scramble to escape liability is ineffective.

**LEGAL ARGUMENT**

## I.    PLAINTIFFS' CLAIMS ARE NOT MOOT

### A.    Facts Occurring Subsequent To The First Amended Complaint Do Not Moot Compensatory Damages Claims for Violation of the Parents' Fundamental Rights.

Tenth circuit precedent demonstrates the fallacy of Defendants' argument that because A.S. is no longer a student within the District Plaintiffs' "First Two Claims" (Violation of Plaintiffs' Fundamental Parental Right to Direct the Upbringing of Their Children, and Violation of Plaintiffs' Right to Free Exercise of Religion) are moot. (MTD at pg. 2).

A.S.'s status as a District student is irrelevant to Plaintiffs' claims for damages caused by Defendants' violations of Constitutional rights when A.S. was a District student. *Garcia v. Board*, 520 F.3d 1116 (10th Cir. 2008), distinguishing *T.S. v. Indep. Sch. Dist. No. 54,* 265 F.3d 1090 (10th Cir. 2001) and *Moseley v. Bd. of Educ. of Albuquerque Public Schs.*, 483 F. 3d 689 (10th Cir. 2007). These cases affirm the longstanding acknowledgement of the distinction between compensatory and prospective relief for purposes of maintaining a viable claim.[2]

> The school district contends this appeal is moot because [the student]... is no longer compelled to attend high school.
>
> In other words, because little evidence exists indicating that [the student] intends to take advantage of any benefits she might be awarded from this suit, the school district believes there is no active case or controversy to be resolved.
>
> We cannot agree. If the Garcias' allegations are true, then [the student] suffered an actual injury…[where] courts have commonly awarded exactly the kinds of compensatory [relief sought]

---

[2] Defendants fail to acknowledge the distinction, basing their claim of mootness on *Chihuahuan Grasslands Alliance v. Kempthorne*, 545 F.3d 884, 891 (10th Cir. 2008), which provided: "If an event occurs while a case is pending that heals the injury **and only prospective relief has been sought**, the case must be dismissed." (Emphasis added). This is not a case in which only prospective relief has been sought.

8

*Garcia, id.* at 1123. See also: *Patrick G. v. Harrison Sch. Dist. No. 2,* 40 F. 4th 1186 (10th Cir. 2022), "[the]...case-or-controversy requirement 'means that, throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" (quoting *Spencer v. Kenna*, 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed. 2d 43 (1998).

As described *supra,* Plaintiffs have more than sufficiently pled that during the time relevant to the First Amended Complaint, Defendants adopted a policy and took action in accordance with that Policy which violated Plaintiffs' fundamental rights. Plaintiffs have alleged that those violations resulted in injuries for which compensatory damages can be awarded and thereby redress the injuries. At this stage, consideration of a 12(b)(6) motion to dismiss, the court must accept Plaintiffs' allegations as true. "In reviewing the district court's dismissal pursuant to Rule 12(b)(6), we assume the factual allegations are true and ask whether it is plausible that the Plaintiff is entitled to relief." *Gallagher v. Shelton,* 587 F.3d 1063, 1068 (10th Cir. 2009), citing *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1191 (10th Cir. 2009). Plaintiffs have met the requirements of Fed.R.Civ.P. 8(a)(2), which mandates that every complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Plaintiffs have alleged that as of the end of the 2022-2023 school year, Defendants' Policy and actions taken pursuant to the Policy violated their right to make decisions regarding A.S.'s mental health and burdened their fundamental right to free exercise of religion. Plaintiffs also allege that Defendants' policy and action taken pursuant to the Policy caused harm to A.S.'s mental health and to the parent-child relationship between Plaintiffs and A.S. (FAC ¶¶ 93, 123). Accordingly, Defendants do not, and cannot, escape liability for sufficiently pled past injuries they have caused because A.S. is no longer enrolled in the District and/or because Defendants adopted

9

a new Policy after the FAC Complaint was filed.

**B. Defendants' Enactment of A New Policy After The Filing of The Amended Complaint Does not Deprive Mrs. Willey of Standing.**

Defendants' enactment of the new Policy on August 14, 2023 also does not render Mrs. Willey's claims moot. Mrs. Willey alleges that the Policy in effect during the relevant period substantially burdens her rights to free exercise of religion and free speech by compelling her to either violate her beliefs or lose her job. As is true of the injuries related to the family's fundamental rights, the parent-child relationship and A.S.'s well-being, the injuries to Mrs. Willey's First Amendment rights were complete at the time that the 2022-2023 Policy was enacted and Defendants aggressively enforced it.

Mrs. Willey alleges that she requested and was explicitly denied accommodations to remedy the violations of her First Amendment rights. (FAC, ¶¶ 62-69, 76-78) Those denials violated her First Amendment rights at that time, entitling her to damages. Defendants' actions two years later, after the First Amended Complaint was filed, do not alter the conclusion that Mrs. Willey has alleged existing violations of her First Amendment rights.

As the court has already noted, Ms. Willey must establish: (l) she suffered an injury in fact; (2) there is a causal connection between the injury suffered and the conduct and question; and (3) that it is likely, not speculative, that a favorable decision will redress the injury. [ Doc. 24, 6/3/23 Order, at 13-14]. Ms. Willey has met all three criteria.

Despite Defendants' argument, nothing has changed as a result of their adoption of a new Policy. Defendants' arguments again ignore the fact that Plaintiffs are not seeking merely prospective relief, but compensatory damages for completed harms. As such, the adverse effects of the 2022-2023 Policy on Ashley Willey's fundamental, constitutionally protected 1st Amendment rights remains real and present. Regardless of whether the newly adopted Policy will be enforced against Mrs. Willey, the fact that the relevant Policy compelled her to choose between

10

her First Amendment rights and her job is a fait accompli for which she is entitled to damages.

## II. Plaintiffs Have Sufficiently Alleged Constitutional Violations

Defendants failed to analyze the substance of Plaintiffs' claims for violation of fundamental rights under Counts I and II, claiming "It is unnecessary to address the purported merits of Plaintiffs' first and second claims for relief as they lack standing to bring such claims and/or the claims are moot in light of the fact that A.S. is no longer a student in the District." (MTD p. 11). Since Plaintiffs have standing to assert the claims in Counts I and II and the claims are not mooted by A.S.'s absence from the District, there is no basis for dismissing those claims.

Defendants' attempt to dismiss Mrs. Willey's claims in Counts III and IV based on Defendants' purported reliance on statutes, non-binding guidance and inapposite case law regarding Title IX is unavailing. Furthermore, Mrs. Willey has sufficient alleged violations of her free exercise and free speech rights.

> **A. Defendants Cannot Use Statutes, Administrative Guidance and Inapposite Case Law to Justify Violations of Plaintiffs' Fundamental Constitutional Rights.**

The Defendants' argument that they are required to follow state and federal law is without merit. Defendants' reliance on Title IX of the Education Amendments Act of 1972, 20 U.S.C. §1681, et seq. and *Bostock v. Clayton County,* 140 S. Ct. 1731 (2020) is misplaced and contradicts the Supreme Court's own statements in *Bostock v. Clayton County*, 140 S.Ct. 1731 (2020). The Supreme Court said in *Bostock*, the term "gender identity" was understood to mean "[a]n internal sense of being male, female or something else." *Id.* at 1772. As an "internal sense," gender identity is necessarily subjective and therefore incapable of precise definition for purposes of determining whether a Title IX recipient has violated the law. A student could state that he or she has an internal sense of being male one day, and then state that he or she has an internal sense of being female at a later point in time, or perhaps "nonbinary" at yet another different point in time.

Contrary to the Defendants' assertion, *Bostock* neither requires nor supports the Defendants' adoption and implementation of the Policy. *Bostock* is, by its own account, a very narrow ruling addressing a specific question about sex stereotyping in the workplace, i.e., whether a person can be fired for being a homosexual or transgender in the context of Title VII, not Title IX. **The Court explicitly refused to extend its holding to Title IX**. *Id.* at 1753. Notably, the *Bostock* decision was based on the assumption that the ordinary public meaning of the term "sex" in Title VII means biological distinctions between male and female. 140 S. Ct. at 1738–39. The Court also noted that statutory and regulatory text and structure, contemporaneous Supreme Court authorities, and the U.S. Department of Education's historic practice demonstrate that the ordinary public meaning of the term "sex" at the time of the statutes' enactment could only have been "biological distinctions between male and female." *Id.*

Here, the Defendants' attempt to expand the *Bostock* opinion in a way that the Court specifically rejected.

> *The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination.* And, under Title VII itself, they say sex-segregated bathrooms, locker rooms, and dress codes will prove unsustainable after our decision today. But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today. Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind. *The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual because of such individual's sex.*

140 S. Ct. at 1753 (emphasis added). Now, in contravention of the Court's explicit limits on its decision, Defendants seek to sweep this decision beyond Title VII to Title IX and to transgender policy affirming the use of a minor student's requests to adopt alternate names and pronouns, dress codes and restroom use without parental knowledge or consent.

Congress has repeatedly considered proposals to add "gender identity" to Title IX, but none

have become law.[3] The Defendants use *Bostock* to circumvent established federal law and precedent is without merit. The United States District Court for the Eastern District of Tennessee reached that precise conclusion when it enjoined implementation of the U.S. Department of Education's interpretation of Title IX to include discrimination on the basis of sexual orientation and gender identity in light of the Bostock decision. *Tennessee v. U.S. Department of Education*, Eastern District of Tennessee Case No. 3:21-cv-308, Memorandum Opinion and Order, Dkt. 86 (July 15, 2022).

> Both the Department and EEOC maintain that their respective guidance documents are required by the Bostock decision. However, Defendants ignore the limited reach of Bostock. The Bostock decision only addressed sex discrimination under Title VII; the Supreme Court expressly declined to "prejudge" how its holding would apply to ***other federal or state laws that prohibit sex discrimination*** such as Title IX. *Bostock*, 140 S. Ct. at 1753. Similarly, the Supreme Court explicitly refused to decide whether "sex-segregated bathrooms, locker rooms, and dress codes" violate Title VII. Id. Bostock does not require Defendants' interpretations of Title VII and IX. Instead, Defendants fail to cabin themselves to *Bostock's* holding. Defendants' guidance documents advance new interpretations of Titles VII and IX and impose new legal obligations on regulated entities.

*Id*. at 30 (emphasis added). Similarly, the Defendants are neither authorized nor correct in adopting and implementing the Policy.

Defendants' Policy redefines the concept of *in loco parentis* to mean "displace parents" when children say they identify as another sex. Defendants have determined that they can disregard Plaintiffs' decision that their daughter, a victim of childhood trauma diagnosed with ADHD and PTSD, should not have been affirmed as a boy with a male name and pronouns at school. Furthermore, Defendants' Policy effectively holds that Plaintiffs are not entitled to know that Defendants are disregarding the parents' decision, even saying that they will lie to the parents

---

[3] H.R. 2282, 115th Congress, introduced May 2, 2017, not advanced to a vote. H.R. 5, 116th Congress, introduced March 13, 2019, passed by the House of Representatives May 17, 2019, not acted on by the Senate; H.R. 5, 117 th Congress, introduced February 18, 2021, passed by the House of Representative February 25, 2021, no action by the Senate.

13

regarding their child's social transitioning at school. Lacking the necessary mental health training or decision-making authority, Defendants claim that these drastic measures are required under Title IX to keep Plaintiffs' other children who say they are transgender "safe." Title IX cannot be manipulated to justify violation of a fundamental constitutional right.

### B. Mrs. Willey Has Sufficiently Pled A Violation of Her Right to Free Exercise.

The Policy compels Mrs. Willey, a District employee, to accede to a child's wishes to socially transition as the opposite sex at school without notifying parents. The Policy requires that teachers, such as Mrs. Willey must lie to parents and disregard biological reality if they want to keep their jobs. They also must abandon their sincerely held religious beliefs that lying to parents and disregarding biological reality are wrong. (FAC ¶¶136-157). Placing Mrs. Willey in such a dilemma, to either comply with the mandates regarding names and pronouns and concealing information from parents, or face professional discipline, including the loss of her job creates a substantial burden on religious exercise. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1139 (10th Cir. 2013) (citing *Thomas v. Review Board*, 450 U.S. 707, 717-18 (1981)). "Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." *Id.*

As the Tenth Circuit said in *Janny v. Gamez,* 8 F.4th 883, 911 (10th Cir. 2021), "[a] plaintiff states a claim [his or] her exercise of religion is burdened if the challenged action is coercive or compulsory in nature." (citing *Bauchman ex rel. Bauchman v. W. High School*, 132 F.3d 542, 557 (10th Cir. 1997)). "[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Id.*

14

(citing *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021). "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature" *Id*. at 1877. Among the factors relevant to the assessment of government neutrality is "the legislative or administrative history, including contemporaneous statements made by members of the decision-making body." *Id,* at 911-912, (citing *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n* , 138 S. Ct. 1719, 1731, 201 L.Ed.2d 35 (2018)). In this case, Mrs. Willey alleges that Defendants explicitly stated that they were not going to tolerate religious beliefs that do not permit teachers to disclaim biological reality, conceal information from parents or lie to parents.   (FAC ¶¶136-157). Those allegations point away from the District's Policy being religiously neutral.

In *Ricard v. USD 475 Geary County*, the Kansas district court granted a preliminary injunction to a teacher who challenged a similar parental (non) notification policy on the grounds that it violated her Free Exercise rights. Case No. 5:22-cv-04015 Ruling on Preliminary Injunction [Dkt 21] (D. Kan. May 9, 2022) at *6. The court found that the policy was neither neutral nor generally applicable and could not withstand strict scrutiny. *Id.* As is true here, in *Ricard,* Plaintiff testified that she is a Christian and believes the Bible prohibits dishonesty and lying. She believes it is a form of dishonesty to converse with parents of a child using one name and set of pronouns when the child is using and being referred to at school by a different name and pronouns, unbeknownst to the parents. The plaintiff in *Ricard*, as is true of Plaintiff here, had to regularly communicate with parents and was faced with having to conceal information or lie if she wanted to keep her job. The court found that the teacher in *Ricard* had sufficiently demonstrated that the school's policy substantially burdened her free exercise rights. *Id* Plaintiff's similar allegations here should lead to the same conclusion. Mrs.  Willey alleges that her sincerely held religious

15

beliefs include: 1) human beings are created male or female and the natural created order regarding human sexual identity cannot be changed; 2) all people are to be treated with compassion, which includes refraining from misrepresenting an individual's natural biological and created identity as either a male or a female; 3) individuals are to speak the truth, including speaking the truth regarding matters of sexual identity as a male or female; 4) Children are to respect their parents and other adult authority figures; 5) Parents have the non-delegable duty to introduce and teach their children about issues related to sexual identity and personal relationships. (FAC, ¶¶ 131-139; 147). Defendants admit that their 2022-2023 Policy required that, as an employee of the District, Mrs. Willey is required to conceal and withhold information from parents in violation of her beliefs attest to the sincerity of the beliefs. (MTD at p. 10; FAC, ¶¶ 168-174).

Further support for the conclusion that the Defendant's Policy vitiates Ashley Willey's free exercise right by compelling her to misinform, conceal and/or lie to parents about their children's status and condition comes from a September 14, 2023 ruling from the United States District Court for the Southern District of California. In considering a school district policy similar on all fours to the Defendants' Policy, the court granted a preliminary injunction in favor of school district employee plaintiffs, prohibiting the imposition of the policy.

> [Plaintiffs] are entitled to preliminary injunctive relief from what the defendants are requiring them to do here, which is to subjugate their sincerely-held religious beliefs that parents of schoolchildren have a God-ordained right to know of significant gender identity-related events.
>
> The school's policy is a trifecta of harm: it harms the child who needs parental guidance and possibly mental health intervention to determine if the incongruence is organic or whether it is the result of bullying, peer pressure, or a fleeting impulse. It harms the parents by depriving them of the long recognized Fourteenth Amendment right to care, guide, and make health care [sic] decisions for their children. And finally, it harms plaintiffs who are compelled to violate the parent's rights by forcing plaintiffs to conceal information they feel is critical for the welfare of their students -- violating plaintiffs' religious beliefs.

16

*Elizabeth Mirabelli and Lori Ann West v. Mark Olsen and the EUSD Bd. of Educ.,* 3:23-cv-00768-BEN-WVG, (S.D. CA September 14, 2023) at 34-35.

Mrs. Willey has sufficiently alleged that the Defendants' Policy has and will harm her ability to act pursuant to her sincerely held religious beliefs. As well as substantially burdening her free exercise rights by compelling her to choose between her job and faith, Defendants' concealment of their social transitioning of A.S. prohibited Mrs. Willey from being informed of A.S.'s mental health issues and making informed important decisions to seek mental health assistance for A.S. (already an emotionally vulnerable child) in a manner that is consistent with her (Mrs. Willey's) sincerely held religious beliefs. (FAC, ¶¶ 142-146,158-160). Mrs. Willey was prevented from exercising her religious beliefs by providing faith-informed guidance to A.S. before Defendants had affirmed A.S.'s gender change and questioned the veracity of her mother's beliefs, impacting Mrs. Willey's ability to effectively guide A.S. under the tenets of her faith at a pivotal time in A.S.'s life.

**C. Mrs. Willey Has Sufficiently Pled a Claim For Violation of Her Free Speech Rights.**

Compelling Mrs. Willey to mouth support for views she finds objectionable violates the cardinal constitutional command that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." and "in most contexts, any such effort would be universally condemned." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council* 31, 138 S. Ct. 2448, 2463 (2018) (citing *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943)).

That cardinal constitutional command is no less true for Mrs. Willey because she is a public employee. *Id.* at 2473. As the Supreme Court said in *Janus*, when a public employer does not simply restrict employees' potentially disruptive speech, but commands that employees mouth a

message on the employers' behalf, then the legal analysis is quite different from the familiar public employee speech analysis under *Pickering v. Board of Education*, 391 U.S. 563 (1968) and *Garcetti v. Ceballos*, 547 U.S. 410 (2006). *Janus*, 138 S. Ct. at 2473. Under *Garcetti*, a public employer can insist that an employee deliver any lawful message that is part of his or her official duties. *Id*. "Otherwise, however, it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree. And we have never applied *Pickering* in such a case." *Id.*

The question of whether to address a child by chosen/preferred names and pronouns that are discordant to his or her sex centers on the issue of gender identity, a "sensitive political topic[]," that is " undoubtedly [a] matter[ ] of profound 'value and concern to the public.'" *Id*. at 2476 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). "We have often recognized that such speech 'occupies the highest rung of the hierarchy of First Amendment values' and merits 'special protection.'" *Id.* (quoting id. at 452).

Citing *Janus*, the Sixth Circuit found that a professor sufficiently alleged that the university's policy compelling use of gender discordant pronouns violated free speech. *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021). The Court further found that the professor's refusal to use gender-identity-based pronouns "advances an idea transcending personal interest or opinion which impacts our social and/or political lives." *i.e..,* a matter of public concern. *Id.*. at 508. Furthermore, the point of his refusal to use the gender-discordant pronouns was to convey the message that one's sex cannot be changed, certainly an "issue of contentious political debate." *Id.* "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Id.* That powerful message was all the more powerful in *Meriwether* because it also, as it does in this case, implicated the professor's core religious and philosophical beliefs. *Id.* at 509. "Finally, this case implicates an additional element: potentially compelled speech on a matter of public

concern. And '[w]hen speech is compelled ... additional damage is done.'" *Id.* at 510, (citing *Janus*, 138 S. Ct. at 2464). By contrast, the university's interest in punishing the professor's refusal to use gender-discordant pronouns amounted to "mandating orthodoxy, not anti-discrimination," and ignor[ing] the fact that "[t]olerance is a two-way street." *Id.* at 511.

This case is even more compelling than is *Meriwether* since it involves not college-age adults, but minor children who are even more vulnerable and less able to cognitively process the implications of the decisions being made. A sensitive topic of public concern is all the more consequential when being presented to children whose minds and bodies are still developing. Mrs. Willey should not be compelled to make such a presentation.

## **CONCLUSION**

Decisions and actions required by the Policy have caused immeasurable harm to A.S., a vulnerable minor child, to the parent-child relationship, and to Plaintiffs, in violation of constitutionally protected parental rights. Defendant's Policy also runs roughshod over Ashley Willey's First Amendment right to free exercise of her religious beliefs and free speech. Defendants' attempts to erase the past and deny the Willey family the opportunity to bring their claims before the court should not be honored.

For these reasons, Defendants' Motion to Dismiss the First Amended Complaint must be denied.

Respectfully submitted, September 18, 2023.

> */s/Ernest G. Trakas*
> Ernest G. Trakas*
> MO Bar No. 33813
> Mary E. McAlister*
> VA Bar No. 76057
> Vernadette R. Broyles*
> GA Bar No. 593026
> CHILD & PARENTAL RIGHTS CAMPAIGN

5805 State Bridge Road, Suite 310
Johns Creek, GA 30097
Telephone (770) 448-4525
etrakas@childparentrights.org
mmcalister@childparentrights.org
vbroyles@childparentrights.org

*\* Pro Hac Vice*

Henry F. Bailey Jr. WY Bar #5-1681
Bailey Stock Harmon Cottam Lopez LLP
6234 Yellowstone Road
Cheyenne, WY 82009
307.638.7745
hank@performance-law.com


*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of September 2023, a true and correct copy of the foregoing Response to Motion to Dismiss was filed with the Clerk of the Court using CM/ECF system which will send notification of such filing to the following e-mail addresses:

L. Kathleen Chaney, Esq., CPCU
Eric Hevenor
Lambdin & Chaney, LLP
4949 S. Syracuse Street, Suite 600
Denver, CO  80237
T (303) 799-8889
F (303) 799-3700
kchaney@lclaw.net
ehevenor@lclaw.net

*/s/Ernest G. Trakas*
Ernest G. Trakas

20