IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

ASHLEY WILLEY and SEAN WILLEY,

        Plaintiffs,

    VS.

SWEETWATER COUNTY SCHOOL
DISTRICT #1 BOARD OF TRUSTEES;
KELLY MCGOVERN, Superintendent of
Sweetwater County School District #1;
NICOLE BOLTON, Assistant
Superintendent & Human Resources
Director of Sweetwater County School
District #1; KAYCI ARNOLDI, Director
of Student Services of Sweetwater County
School District #1; BRYANT BLAKE,
Principal of Black Butte High School,

        Defendants.

Case No.  23-CV-69-SWS

---

## ORDER GRANTING DEFENDANTS' SUMMARY JUDGMENT MOTION

This matter comes before the Court on Defendants Sweetwater County School

District #1 Board of Trustees, Kayci Arnoldi, Bryant Blake, Nicole Bolton, and Kelly

McGovern's Motion for Summary Judgment (ECF 63). Plaintiffs Ashley Willey and Sean

Willey responded in opposition to the motion (ECF 65), and Defendants replied (ECF 69).

Plaintiffs Amended Complaint alleged four causes of action against the Defendants:

Violation of Plaintiffs' Substantive Due Process Fundamental Parental Rights, Violation

of Plaintiffs' Right to Free Exercise of Religion, Violation of Plaintiff Ashley Willey's

Right to Free Exercise of Religion, and Violation of Plaintiff Ashley Willey's Right to Free

Speech. (ECF 26). The Court previously dismissed Plaintiff's Free Speech claim. (ECF

42). Defendants seek summary judgment on all remaining causes of action against them.

Having considered the arguments, reviewed the record herein, and being fully advised on

the matter, the Court GRANTS Defendants' summary judgment motion.

## UNDISPUTED FACTS

The undisputed facts are as follows. Plaintiff Ashley Willey is the mother to student,

A.S. (the "Student"), who attended Black Butte High School for the 2021-2022 and 2022-

2023 school years. (ECF 26, ¶ 12)**.** The Student transferred out of Black Butte High School

to a school out of state for the 2023-24 school year. (ECF 35, Ex. B, C). Plaintiff Sean

Willey is the Student's stepfather who has never had legal custody over the Student. (ECF

63, Ex. A, p. 53). At a district-wide training on March 29, 2022, Ms. Willey claims she

first learned from other teachers that the Student was being referred to by names and/or

pronouns other than those assigned at birth. (ECF 26, ¶ 31-35). Following the training, on

March 29, 2022, Ms. Willey sent a direct message to certain Sweetwater County School

District #1 ("District") staff and personnel informing them that the Student should be

referred to by the Student's birth name and female pronouns from that point forward. (ECF

26, ¶ 41, Ex. B).

Prior to August 15, 2022, the District did not have a written policy that governed the

use of students' preferred names or pronouns. (ECF 63, Ex. C, p. 77). However, during the

2021-2022 school year, three staff members—Chelsea Lund, Christopher Clifton, and

Jennifer Copeland—testified to referring to the Student by preferred name or pronouns. (ECF 66, Ex. 2, p. 18) (ECF 66, Ex. 3, p. 13, 15) (ECF 66, Ex. 4, p. 19).

On August 15, 2022, the District's Special Services Department adopted the SCSD #1 Special Services Non-Negotiables (the "2022-23 Non-Negotiables"). (ECF 63, Ex. B). The 2022-23 Non-Negotiables contained a Preferred/Chosen Names Procedure ("2022-23 PCNP"). (ECF 63, Ex. B). The 2022-23 PCNP required District staff to honor all students' requests to be referred to by alternate names or pronouns and stated "[s]taff must respect the privacy of all students regarding such choice." (ECF 63, Ex. B). A staff member—Jessica Polaski—testified that her understanding was that staff members were required to sign the Non-Negotiables or they would be fired. (ECF 66, Ex. 14, p. 22).

During the 2022-23 school year, on September 8, 2022, District teacher Ben Audevart referred to the Student by preferred name in an email to the Student. (ECF 66, Ex. 1). In this email exchange, Ben Audevart also provided a link to resources for LGBTQ+ youth on the Human Rights Campaign website and a link for the Trevor Project. (ECF 66, Ex. 1). This communication was not made pursuant to any policy or direction by the School District or administration.[1]

On August 14, 2023, the District's Special Services Department adopted a revised version of the 2022-23 Non-Negotiables ("2023-24 Non-Negotiables"). (ECF 63, Ex. D). The 2023-24 Non-Negotiables contained a revised version of the PCNP ("2023-24

---

[1] Rather, the District Policy Manual Code GBH, Section G provides that "[s]taff members shall not exceed their level of training or expertise by attempting to counsel, assess, diagnose, or treat a student's personal problem relating to sexual behavior, substance abuse, mental or physical health and/or family relationships but, instead, shall refer the student to the appropriate professional or agency for assistance. (ECF 66, Ex. 11, No. 12).

PCNP"). The 2023-24 PCNP still required District staff to honor all students' requests to

be referred to by alternate names or pronouns. (ECF 63, Ex. D). The 2023-24 PCNP stated:

> Wherever possible, staff should involve parents/guardians in the implementation of these guidelines to support the student's health, safety and wellbeing. If the student has not informed their parent/guardian of their chosen name or pronoun, the student should be referred to the student's counselor who will partner with the student to encourage and support the student to discuss their chosen name or pronoun with their parent/guardian, unless the counselor or other staff member, in consultation with the District's Superintendent, Human Resources Director, and legal counsel determines that such disclosure would be detrimental to the student's health or safety. When requesting a change to their preferred name and/or pronoun, students should be informed that **in the absence of a determination that the student's health or safety is at risk, the District is legally required to share all information about the student's educational status, including chosen names and/or pronouns, with the student's parent/guardian upon request.** Because the procedure is content neutral, **staff must not proactively contact parents regarding a student's chosen name and/or pronoun**. The District's policy is to respect a student's preference – not to either encourage or discourage any student from forming a preference as to chosen names or pronouns, which could be deemed discrimination based on sex as set forth above.

(ECF 63, Ex. D) (emphasis added). The 2023-24 PCNP also stated:

> Staff members who are uncertain as to how to implement this procedure or are **for any reason** unable to implement the procedure in relation to specific, identified circumstance should address their concerns with the Human Resources Director. **The District will make every effort to reasonably accommodate staff members where possible.**

(ECF 63, Ex. D) (emphasis added).

As a teacher, Ms. Willey did not use students' preferred names or pronouns during her

employment for the District.[2] (ECF 63, Ex. A, p. 40). Ms. Willey also has never lied to any

---

[2] Attempts by Plaintiff to dispute material facts set forth by Defendants misrepresent the record. As an example, Plaintiffs attempts to dispute the material fact set forth by Defendants that "Ms. Willey has never used a student's alternate name or pronoun during her employment for the District" by citing to Ms. Willey's deposition. In the cited testimony, when Ms. Willey was asked how she responded to two of her students asking to be referred to by a pronoun other than their birth pronouns, Ms. Willey responded "I didn't do it." (ECF 66, Ex. 7, p. 32, ln. 9). The

parent regarding a student's name or pronouns. (ECF 63, Ex. A, p. 58-59). Ms. Willey testified she was never disciplined or retaliated against for not using pronouns.[3] (ECF 63, Ex. A, p. 81).

## LEGAL STANDARD

Summary judgment is appropriate where a movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2016). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal quotations and citations omitted). For there to be a 'genuine' dispute of fact, there must be more than a mere scintilla of evidence,'" and summary judgment is properly granted "if the evidence is merely colorable or is not significantly probative." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022) (citing *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1259 (10th Cir. 2020)). Parties may establish the existence or nonexistence of a material disputed fact through: 1) submission of "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or 2) demonstration "that the materials cited do not establish the absence

---

Court is at a loss as to how Plaintiffs can interpret her own testimony that she did not refer to her students by preferred pronouns as evidence that she did use a student's alternate name or pronoun. Further, Ms. Willey repeatedly testified she did not refer to her students who requested to be referred to by preferred pronouns by anything other than their birth pronouns. (ECF 63, Ex. A, p. 40, ln. 9-17; p. 57 ln. 17-25).

[3] On June 2, 2023, Mrs. Willey received a Letter of Warning for the content of her conversation and walking out of a May 31, 2023, meeting with colleagues concerning co-taught classes and pull-out services for students receiving special services. (ECF 69, Ex. A to Defendants' Reply).

or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B).

On a motion for summary judgment, "we examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party, without making credibility determinations or weighing the evidence." *Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 971, n.3 (10th Cir. 2018). "And while we draw all reasonable inferences in favor of the non-moving party, "an inference is unreasonable if it requires 'a degree of *speculation* and conjecture that renders [the factfinder's] findings *a guess or mere possibility*.'" *GeoMetWatch Corp.*, 38 F.4t at 1200 (citing *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (alteration in original) (emphases added) (quoting *United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008))).

The moving party carries the initial "burden of establishing the nonexistence of a genuine dispute of material fact." *Tolman v. Stryker Corp.*, 108 F. Supp. 3d 1160, 1162 (D. Wyo. 2015), *aff'd* 640 F. App'x 818 (10th Cir. 2016). If the movant does so, the nonmovant may not rest upon its pleadings but "must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

## DISCUSSION

### 1. Sean Willey

As this Court previously noted, Sean Willey lacks standing as to claims regarding the Student. Article III standing requires an invasion of "a *legally protected interest* which is

(a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted). Sean Willey has failed to identify a legally protected interest. Sean Willey is the Student's stepfather, and it is undisputed that he has never had legal custody of the Student.[4] Without legal custody or even a biological claim, Sean Willey has no legal parental interest in the Student and thus lacks Article III and prudential standing. *See Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 17-18 (2004) (California custody order deprived father of right to sue as next friend and thus father lacked prudential standing to pursue alleged establishment clause violation on behalf of his elementary school daughter who was required to recite the pledge of allegiance every school morning).

Plaintiffs additionally state in the Amended Complaint that they are parents of "four other children who attend District schools." (ECF 26, ¶ 13). If Sean Willey has a legal interest in those children and could establish an injury in fact that is fairly traceable to the challenged action and likely to be redressed by a favorable decision, perhaps he would have standing in this case. *See Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 180-81 (2000). However, the Amended Complaint is not verified, and Plaintiffs offer no evidence of these four other children's attendance at schools in the District. Thus, Sean Willey lacks standing in this case, and the Court dismisses Claims One and Two as raised by Sean Willey.

---

[4] Plaintiffs state that, while Sean Willey has never had legal custody of the Student, the Student has been "Sealed" into the Sean and Ashley Willey family by the Church of Jesus Christ of Latter-Day Saints. (ECF 66, p. 3). Plaintiffs have set forth no case where a "Seal" from the Church of Jesus Christ of Latter-Day Saints or any other religious organization has been recognized as creating legal rights.

2. **Under Color of State Law for Claims One and Two**

Before considering the contentious constitutional issues that arise under the facts of this case, as all claims are raised under 42 U.S.C. § 1983, the Court must determine whether the alleged unconstitutional act was taken "under color of state law." "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). That the alleged unconstitutional act was taken "under color of state law" is a "jurisdictional prerequisite for a § 1983 action." *Id.* at 42. Defendants contend that "to the extent A.S. was ever referred to by alternate names or pronouns it was not at the direction of any Defendant" because there was no policy or procedure in place at that time, thus not under color of state law. (ECF 63, p. 6).[5]

In order to impose municipal liability, the constitutional violation must be the result of action taken "pursuant to official municipal policy." *Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978). "A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision. *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 770 (10th Cir. 2013). If a plaintiff alleges an official policy or custom, they must

---

[5] Defendant only contends Plaintiff's first and second claims for relief (those asserting constitutional rights as a parent of the Student) fail as a matter of law because no policies were enacted during the period the Student was referred to by preferred pronouns. Plaintiff's third claim for relief asserts her constitutional rights were violated as a teacher during the period when written policies were in place.

also allege "that the municipality was deliberately indifferent to the obvious consequences of the policy ... [and] that the policy caused the plaintiff's constitutional injury." *Lee v. Poudre Sch. Dist. R-1*, No. 24-1254, 2025 WL 1163920, at *8 (10th Cir. Apr. 22, 2025). The "official policy" requirement is meant to ensure "municipal liability is limited to action for which the municipality is actually responsible." *Schneider*, 717 F.3d at 770.

Plaintiff disputes the absence of a policy in the 2021-22 school year. Plaintiff argues that, during the 2021-22, school year, "Defendants implemented an unwritten, de facto policy/procedure requiring staff to use student requested chosen names or pronouns. (ECF 66, p. 4). Three staff members did testify to referring to the Student by preferred name and pronouns during the 2021-2022 school year. (ECF 66, Ex. 2, p. 18) (ECF 66, Ex. 3, p. 13) (ECF 66, Ex. 4, p. 19).[6] However, when asked "why" they referred to the Student by preferred pronouns, the staff either stated the Student asked them to do so or they heard other students doing so. (ECF 66, Ex. 2, p. 18) (ECF 66, Ex. 3, p. 16) (ECF 66, Ex. 4, p. 19). One staff member explicitly stated there was no policy or requirement during the 2021-2022 school year to use preferred names or pronouns. (ECF 66, Ex. 3, p. 17). An informal custom only constitutes "official policy" to create municipal liability if it "amount[s] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). Three staff members referring to the Student by preferred name and pronouns is not so widespread or

---

[6] Plaintiff cites to a fourth deposition of Derek Allison (ECF 66, Ex. 5), but the portions of the deposition included provide no context as to which school year is being discussed. Rather, the deposition discusses the Non-Negotiables and thus implies the events discussed occurred after August 15, 2022.

9

well settled to be considered "official policy" of the District. Further, as the three staff members represented they did so by individual choice without a District policy in place, Plaintiff failed to set forth any facts to demonstrate Defendants were "the moving force behind [the] alleged constitutional injury." *Lee v. Poudre Sch. Dist.*, 2025 WL 1163920, at *9.

Yet, whether an "official policy" existed during the 2021-2022 school year is not dispositive of Plaintiff's first two claims as Plaintiff also set forth facts that the Student was referred to by preferred name during the 2022-2023 school year. It is undisputed that the District had an official policy in place during the 2022-2023 school year (2022-23 PNCP), and, in an email dated September 15, 2022, a District teacher Ben Audevart referred to the Student by preferred name. (ECF 66, Ex. 1). Thus, on at least one occasion, the Student was referred to by preferred name while the District had an official policy governing the use of preferred names and pronouns in place.

In addition to an official policy of using students' preferred names and pronouns during the 2022-23 school year, Plaintiff also contends there was an "official policy" which required staff to *conceal* students' use of preferred names and pronouns from parents. Assuming "concealment" is any instance of school staff not informing a parent of their child's use of preferred name or pronouns, then concealment could occur under the policies as written or beyond the written policies. If concealment occurred due to a staff member "respect[ing] the privacy of all students regarding such choice," then the concealment occurred explicitly under the written 2022-23 Non-Negotiables and creates municipal

liability.[7] If concealment occurred for another reason, then, in order for the District to have municipal liability, Plaintiff needs to show concealment of that kind was so "widespread … permanent and well settled as to constitute a custom or usage with the force of law." *Bryson*, 627 F.3d 788.

Plaintiff has not set forth sufficient facts to establish that, during the 2022-23 school year, concealment for reasons beyond student privacy was so widespread as to constitute a custom. Other than her own testimony, Plaintiff offers testimony of one staff member who interpreted the 2022-23 Non-Negotiables as not allowing staff members to contact parents about their child's use of preferred name or pronouns. (ECF 66, Ex. 14, p. 23). Yet, another staff member testified that he would not honor a request to keep the use of preferred names or pronouns from parents, and student privacy requests do not need to be honored "at the exclusion of sharing information from their parents." (ECF 66, Ex. 5, p. 22). Plaintiff does not establish a widespread custom of concealing information from parents beyond what is authorized by the 2022-23 Non-Negotiables. So, to the extent information was concealed in order to "respect the privacy of all students regarding such choice," that action was taken in accordance with an "official policy" and creates municipal liability for the District. If information was concealed for some other reason, although no alternative reasons were offered, then the District would not be liable for that action as it did not occur under "official policy."

---

[7] There is no evidence in the record before this Court that either Plaintiffs or any other parent was lied to by any School District employee about his or her student requesting to use an alternate pronoun. Neither is there any evidence anyone assisted students in concealing the use of an alternate pronoun from a student's parent(s).

11

Plaintiff additionally raises concerns as to Ben Audevart's e-mail communications with the Student which provided links to resources for LGBTQ+ youth "in violation of [District] Policy Manual Code GBH, Section G." (ECF 66, p. 5). To the extent Ben Audevart provided resources allegedly in violation of the District policy manual, such actions would not be taken in compliance with an official policy.[8] Additionally, Plaintiff sets forth no evidence that providing such resources to students, even if in violation of formal policies, was a widespread custom. Thus, the District is not liable for the actions taken by an individual teacher without the authority of the District. *Lee v. Poudre Sch. Dist.*, 2025 WL 1163920, at *8 ("We apply such rigorous standards of culpability and causation ... to ensure that the municipality is not held liable solely for the actions of its employees.") (quotations omitted).

In sum, any action taken during the 2021-22 school year was not taken in accordance with an official District policy, formal or as widespread custom, and thus the District does not face municipal liability for the actions that occurred in the 2021-22 school year. *See Gates v. Unified School Dist. No. 449 of Leavenworth County, Kan.*, 996 F.2d 1035, 1041-42 (10th Cir. 1993) (setting for requirements to prove existence of policy or custom). However, Plaintiff set forth facts that the Student was also referred to by preferred name during the 2022-23 school year during which the District had in place the 2022-23 Non-Negotiables. Any use of preferred name during the 2022-23 school year was taken pursuant

---

[8] The Court draws no conclusions as to whether Ben Audevart's actions were or were not in violation of District policy. It is not a claim in this lawsuit. But, to the extent Plaintiff contends Ben Audevart acted in violation of District policy when he provided resources to the Student and does not set forth evidence that such actions were well-established custom, the actions cannot be grounds for municipal liability. *See Lee v. Poudre Sch. Dist.*, 2025 WL 1163920, at *8.

to official District policy and thus creates municipal liability for the District. Concealment for any reason other than the Student's privacy was not taken pursuant to official policy or widespread custom.

### 3. Due Process

The Fourteenth Amendment Due Process Clause states "[n]o State shall … deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, §1. "The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). These substantive due process violations occur "where government action has infringed a 'fundamental' right without a 'compelling' government purpose, as well as where government action deprives a person of life, liberty, or property in a manner so arbitrary it 'shocks the conscience.'" *Abdi v. Wray*, 942 F.3d 1019, 1027 (10th Cir. 2019) (quotations and citations omitted); *see Glucksberg*, 521 U.S. at 721-22 (finding due process violation under fundamental rights analysis); *Cty. Of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (finding due process violation under "shocks the conscience" analysis). When considering substantive due process violations, "we apply the fundamental-rights approach when the plaintiff challenges *legislative action*, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious *executive action*." *Halley v. Huckaby*, 902 F.3d 1136, 1153 (10th Cir. 2018). Neither party disagrees that the District policies are legislative

action.[9] Thus, the Court will analyze the alleged substantive due process violation under the fundamental-rights approach.

The fundamental-rights approach under *Glucksberg* proceeds in three steps.

> First, the reviewing court must determine whether a fundamental right is at stake either because the Supreme Court or the Tenth Circuit has already determined that it exists or because the right claimed to have been infringed by the government is one that is objectively among those "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty" such that it is "fundamental." *Glucksberg*, 521 U.S. at 720–21, 117 S.Ct. 2258. Second, the court must determine whether the claimed right—fundamental or not—has been infringed through either total prohibition or "direct[ ] and substantial[ ]" interference. *Zablocki v. Redhail*, 434 U.S. 374, 387, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). Third, if the right infringed is a fundamental right, the court must determine whether the government has met its burden to show that the law or government action interfering with the right is narrowly tailored to achieve a compelling government purpose. *Id.* at 388, 98 S.Ct. 673. If the right is not fundamental, we apply rational basis review. *Reno v. Flores*, 507 U.S. 292, 305, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) ("[N]arrow tailoring is required only when fundamental rights are involved.").

*Abdi*, 942 F.3d at 1028.

### a. Fundamental Right

Plaintiff argues Defendants violated her fundamental right to make decisions regarding the upbringing, custody, care, and control of her child by enacting a school policy which required the use of students' preferred names or pronouns, and by using her child's preferred name and pronouns. (ECF 26, p. 25). The issue of whether a parent's right to

---

[9] The distinction between legislative and executive action for substantive due process violations is not clear. Courts that have addressed school pronoun policies and the use of a student's preferred name or pronouns have taken two different approaches based on circuit precedent. *See Foote v. Ludlow Sch. Comm.,* 128 F.4th 336 (1st Cir. 2025) (concluding a school protocol requiring staff to use students' preferred names and pronouns was legislative action); *Littlejohn v. Sch. Bd. of Leon Cnty., Florida,* 2025 WL 785143 (11th Cir. Mar. 12, 2025) (concluding the application of a preferred name policy to one person is executive action). While Plaintiff's claims reference both the policy itself and its application to the Student, both parties make their arguments according to the fundamental-rights analysis. The Court will also use the fundamental-rights analysis as there is no "specific act of a governmental officer" primarily at issue. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

direct their child's upbringing is affected when their child is referred to by the child's preferred name or pronouns at school has been raised in several jurisdictions with varying outcomes. The 1st Circuit and the 11th Circuit are the only Courts of Appeals that have conclusively addressed the merits of parental rights claims in this scenario—both concluding (through different analyses) that the schools' conduct was not unconstitutional. *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336 (1st Cir. 2025) (concluding a school protocol requiring staff to use students' preferred names and pronouns was legislative action and did not violate parents' substantive due process right to direct their child's care and upbringing); *Littlejohn v. Sch. Bd. of Leon Cnty., Florida*, 2025 WL 785143 (11th Cir. Mar. 12, 2025) (concluding the application of a preferred name policy to one person is executive action and did not shock the conscience); *see e.g. Protecting Our Children, UA v. Eau Claire Area School District, Wisconsin*, 95 F.4th 501 (7th Cir. 2024) , *cert. denied*, 145 S.Ct. 14 (U.S. Dec. 9, 2024) (dismissing action by parents because lacked standing); *John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622 (4th Cir. 2023), *cert. denied,* 144 S.Ct. 2560 (U.S. May 20, 2024) (dismissing action by parents because lacked standing).

A trio of Supreme Court cases defines the fundamental right of parents to direct the care, custody, and upbringing of one's children. *See Meyer v. Nebraska,* 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Troxel v. Granville*, 530 U.S. 57 (2000). In *Meyer v. Nebraska,* the Supreme Court struck down a Nebraska statute forbidding the teaching of the German language before completing eighth grade because it interfered with parents' right to "bring up children" and "control the education of their

own." 262 U.S. at 399, 401. The Supreme Court in *Pierce v. Society of Sisters* struck down an Oregon statute requiring children to attend public schools because it interfered with the liberty of parents "to direct the upbringing and education of children." 268 U.S. at 534-535. Similarly, in *Troxel v. Granville*, the Supreme Court declared a Washington statute permitting any person to petition for visitation with a child unconstitutional as it infringed on parents' interest "in the care, custody, and control of their children." 530 U.S. at 72.

This fundamental right of parents has endured as defined in *Meyer* in 1923 (the right to direct the care, custody, and upbringing of their children), but the Supreme Court and various other courts continue to consider whether governmental action interferes with that right. This Court will conduct the same analysis here.

While Plaintiff successfully identifies a fundamental right, the Court must consider whether the Defendants' conduct did, in fact, infringe on that right. *Abdi*, 942 F.3d at 1028. Plaintiff alleges Defendants infringed on her parental right by withholding mental health information about her child from her and promoting her child's social transition without her knowledge. (ECF 26, ¶ 125). Determining whether Defendant's conduct, in fact, infringed upon Plaintiff's parental rights requires consideration of the scope and contours of the fundamental right of parents to direct the care, custody, and upbringing of their children.

### b. Infringement

In considering the scope of the fundamental right of parents to direct the upbringing of their children, the Supreme Court has often been faced with determining whether certain

16

actions taken by schools the children attend infringes on those parental rights. When determining what is in the purview of the state when it comes to a child's education,

> [n]o question is raised concerning the power of the state reasonably regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare.

*Pierce*, 268 U.S. at 534. However, the use of preferred names or pronouns is distinct from typical issues of school curriculum and pedagogy that have traditionally remained within the discretion of schools. *See Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998) ("decisions as to how to allocate scarce resources, as well as what curriculum to offer or require," are the discretion of school authorities); *Bailey v. Virginia High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012), (parents did not have constitutional right to control individual components of their son's education, including participation in sports and other activities); *Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187, 1191 (9th Cir. 2006), *cert. denied,* 549 U.S. 1089 (parents did not have right to prohibit school from distributing survey which contained questions about sex); *Brown v. Hot, Sexy, & Safer Prods., Inc.*, 68 F.3d 525, 532 (1st Cir. 1995) (parents did not have right be informed of AIDS awareness classes); *Leebaert v. Harrington*, 332 F.3d 134, 140 (2d Cir. 2003) (parent had no right to opt child out of sex education classes). The question at issue here is less about the power of schools and more about whether the use of preferred names and pronouns, upon a child's request, in school infringes on parental rights as defined by the Supreme Court. This Court concludes that the use of preferred names and pronouns in

school and "withholding" that information from parents can only infringe upon parental rights if a parent first exercises those rights by inquiry.

### i.    "Withholding" of the Student's Gender Identity

Plaintiff asserts that she is not "alleging a right to receive generalized updates," but rather a right to make "decisions about the children's well-being, *i.e.*, physical and mental health." (ECF 66, p. 7). However, according to Plaintiff's logic, if a parent is not already aware of their child's use of preferred name or pronouns, then in order to make those decisions, the school would have an obligation to proactively inform the parent. Within this right as defined by Plaintiff, Plaintiff cannot prevent placing an affirmative obligation on the school to inform parents of any circumstance that occurs in school that might affect a child's "well-being." Such a finding would expand parental rights beyond their own decision-making rights to place affirmative obligations on other parties that care for their child. The Supreme Court has made clear that the Due Process Clause "cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *See Foote,* 128 F.4th at 354 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 195 (1989)). Not to mention the laundry list of circumstances that could affect a child's "well-being" even in the slightest that would require constant, detailed information sharing from the school, with constitutional consequences.

Understandably, the Supreme Court has expressed a "reluctan[ce] to expand the concept of substantive due process." *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 125 (1992). As the Court recognized that "[b]y extending constitutional protection to an

18

asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action." *Glucksberg*, 521 U.S. at 720. Thus, caution and restraint must be exercised "lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences" of the judiciary. *Id.* (citing *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 502 (1977). While the right of parents to direct their child's upbringing is a liberty that has long been protected by the Due Process Clause, to conclude that right creates an obligation on third parties would not be an exercise of caution or restraint. Several circuits have concluded the same in declining to create a "constitutional obligation on state actors to contact parents of a minor or to encourage minors to contact their parents" when they make voluntary decisions. *Anspach v. City of Philadelphia, Dep't of Public Health*, 503 F.3d 256, 262 (3d. Cir. 2007) (finding a health center was not constitutionally obligated to contact a minor's parents or encourage the minor to contact her parents before receiving emergency contraception medication); *Doe v. Irwin,* 615 F.2d 1162, 1168 (6th Cir. 1980); *see Foote,* 128 F.4th at 354-55.

Plaintiff asserts she has a right not to have information regarding her child's gender identity withheld. The Court agrees. However, the Court does not think the information can properly be deemed "withheld" to infringe on parental rights unless a parent inquired into or sought the information and it was intentionally concealed or they were lied to.[10]

---

[10] In *Lee v. Poudre Sch. Dist.*, when discussing the fundamental right asserted by the parents in that matter, the Court noted that "the parents conceded that their parental rights do not *require* the school to disclose information." 2025 WL 1163920, at *7 n.8 (emphasis in original). And, similarly, in her concurrence, Judge McHugh observed "the district's alleged policy of helping students hide sensitive information from their parents implicates the Supreme Court's prior descriptions of parents' fundamental right to control their children's upbringing." *Id.* at *11 n.1 (McHugh, J., concurring).

Otherwise, an infinite amount of information would be deemed "withheld" by schools on a daily basis in violation of parental rights. Both *Meyer* and *Pierce* involved situations where the state was either forbidding or requiring some activity in schools. *See Meyer*, 262 U.S. 390; *Pierce*, 268 U.S. 510. In contrast, the District and its staff members merely respected the Student's voluntary choice to be referred to by preferred name and pronouns. Neither the District nor its staff members required the Student go by preferred name or pronouns nor did they "discourage students from discussing their gender identities with their parents." *Lee v. Poudre Sch. Dist.*, 2025 WL 1163920, at *9 (McHugh, J., concurring). At no point did the District or its staff members prohibit Plaintiff from participating in her child's decision. *See Doe*, 615, F.2d at 1168. Now, if a parent inquires into their child's gender identity or use of pronouns at school and a school knowingly conceals or lies to the parent (absent reasonable concerns regarding personal safety), then the school would potentially be interfering with a parent's fundamental right to control their children's upbringing—hence creating a potential constitutional violation. That didn't happen here.

Declining to place an obligation on schools to proactively inform parents of every circumstance which might affect a child's well-being could create a circumstance in which a parent is unaware of something that occurs in their child's life. However, nothing prevents a parent from inquiring into their child's well-being and gender identity at school. Once this inquiry occurs, a parent is exercising their right to direct their child's care and well-being, and any withholding of information by the school could infringe on their parental rights. The Court simply finds that inquiry, and thus an exercise of their parental right, is required before any infringement of that right can occur.

20

As Plaintiff argues, finding that inquiry is required for a parent to assert their parental rights were infringed makes parental rights contingent on a certain level of awareness by parents of the circumstances affecting their child's well-being. (ECF 66, p. 10). However, parental rights have never been found to be absolute or unqualified, but, instead, have routinely faced limitations. See *Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (stressed Meyer and Pierce are limited in scope); *Wisconsin v. Yoder*, 406 U.S. 205, 239 (White, J., concurring) ("no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society"); *Prince v. Massachusetts,* 321 U.S. 158, 166-67 (1944) ("neither rights of religion nor rights of parenthood are beyond limitation"); *Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998). The Court finds that this contingency is preferred to opening the Pandora's box of requiring proactive disclosure by schools of any circumstance or event that could impact a parent's ability to make decisions regarding their child.[11] Especially considering there is no evidence that District staff "coerced" or even encouraged the Student not to tell the Student's own parents about the choice to be referred to by preferred name and pronouns. *See Foote*, 128 F.4th at 353 ("student's decision whether to disclose their gender identity to their parents lacks the "coercive" or "restraining" conduct that other courts have found to restrict parental rights in this context").

---

[11] In this case, prior to being informed by the Student's teachers as to the use of preferred name and pronouns, Plaintiffs were aware that the Student was struggling with gender identity issues. (ECF 66, Ex. 18).

Plaintiff sets forth no facts where the District or any staff member withheld information from her or misinformed her regarding her child's use of preferred name or pronouns. Rather, Plaintiff does not dispute that when Plaintiff inquired into the Student's use of preferred name and pronouns she was informed of the Student's use. (ECF 26, ¶ 31-35). While the 2022-23 PCNP did provide that "[s]taff must respect the privacy of all students regarding such choice," Plaintiff still does not point to an instance where she inquired into the Student's use of preferred name or pronouns and the school "respected the Student's privacy" and did not disclose.[12] Plaintiff implicitly argues that she should have been informed of the Student's use of preferred name and pronouns during Section 504 meetings where they discussed the Student's accommodation plan. (ECF 26, ¶28). However, if a meeting to discuss accommodations for the Student's diagnoses of PTSD and ADHD were to serve as sufficient "inquiry" to obligate the school to inform a parent of their child's use of preferred names or pronouns, then essentially every meeting between a parent and school staff would implicate this obligation. (ECF 66, Ex. 13). Such a finding would, again, create an obligation on schools to proactively inform parents of every circumstance that might affect a child's upbringing. Further, Plaintiff does not set forth facts that she inquired into the Student's use of preferred names or pronouns at these meetings nor that the staff members present intentionally misrepresented the Student's use of preferred name and pronouns (or were even aware). *See Foote*, 128 F.4th at 353.

---

[12] Plaintiff makes a passing, general reference in the Amended Complaint that Defendants' policies are unconstitutional on their face and as applied, but Plaintiff fails to address or even make reference to any facial substantive due process challenge in the briefing. The Court will consider this argument waived.

Thus, Plaintiff's parental rights were not infringed as the school never failed to inform or misinformed Plaintiff after inquiry into the Student's use of preferred name and pronouns. Any instance where the school did not proactively inform Plaintiff that the Student was using preferred name and pronouns, when Plaintiff did not inquire, is not an infringement on Plaintiff's parental rights as it did not prevent Plaintiff from making decisions regarding her child's well-being. *See Zablocki v. Redhail*, 434 U.S. 374, 387 (1978) (infringement occurs through either total prohibition or "direct[ ] and substantial[ ]" interference). Rather, despite the District's use of the Student's preferred name and pronouns, Plaintiff "remained free to exercise [her] traditional care, custody, and control over [her] unemancipated child[]. *Foote*, 128 F.4th at 355 (quoting *Doe*, F.2d at 1168). No action taken by the District or its staff members prevented Plaintiff from doing so.

### ii.  Medical Care

Plaintiff additionally believes the information being "withheld" is unique because it affects her child's physical and mental health. (ECF 26, ¶ 119) (ECF 66, p. 7). The right to control the medical treatment of their children, including decisions surrounding mental health care, is generally considered to be part of a parent's fundamental right to make decisions regarding one's child's care. *See Parham v. J.R.*, 442 U.S. 584, 603 (1979) (this right exists absent a finding of neglect or abuse); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203 (10th Cir. 2003) (the right to control the medical care of a child falls within the sphere of a parent's protected liberty). Plaintiff argues the District is "facilitating a social transition (a mental health intervention)," and thus invading on her right to make medical decisions

for her child. (ECF 66, p. 8). However, simply the use of preferred names or pronouns upon a student's request cannot reasonably be considered "medical care" or treatment.

Plaintiff describes "social transitioning" as "changes that bring the child's outer appearance and lived experience into alignment with the child's core gender," such as "changes in clothing, name, pronouns, and hairstyle." (ECF 26, ¶ 99). Yet, as Plaintiff's expert concedes, "[s]ocial transition is used as a contrast to medical transition, which refers to various medical interventions to bring one's physical appearance closer into alignment with one's asserted gender identity, such as puberty blockers, cross-sex hormone therapy, and various medical interventions." (ECF 6, Ex. 1, Expert Affidavit of Erica Anderson, Ph.D.). Plaintiff offers no evidence that the school provided any type of "medical transition" or even "facilitated" the Student's "social transitioning." Defendants were not involved in changing the Student's clothing or hairstyle. Plaintiff did not set forth any facts that staff members even encouraged or suggested the Student engage in such behaviors, but simply that staff members passively respected the Student's request to be referred to by preferred name and pronouns.

Cases that have considered parental control of medical care have involved treatments such as institutionalization at a mental health hospital, *Parham,* 442 U.S. 584; retention of blood samples from children, *Kanuszewski v. Mich. Dept. of Health and Human Servs.,* 927 F.3d 396 (6th Cir. 2019); and physical examinations and blood tests on children, *Dubbs,* 336 F.3d 1194. The use of preferred name and pronouns by the District was an act of respecting the Student's request and "requires no special training, skill, medication, or technology." *See* Foote, 128 F.4th at 350.

24

Because Defendants were not providing medical care by referring to the Student by preferred name and pronouns, Plaintiff's only feasible argument is that the withholding of information impeded her right to direct her child's medical care—an aspect of her fundamental right to direct her child's upbringing. However, as explained above, the parental right to direct one's child's upbringing cannot be infringed due to a lack of information sharing regarding the use of preferred names or pronouns unless a parent first inquires with the school.[13]

In sum, while the fundamental right of parents prevents schools from withholding or concealing information from parents regarding their child's well-being upon inquiry, it does not create an obligation on schools to proactively inform parents of every circumstance which might affect a child's well-being. In accordance with this finding, Plaintiff's parental rights were not infringed because, when Plaintiff inquired, she was accurately informed of her child's use of preferred name and pronouns. Plaintiff does not allege any instances where she inquired and was lied to. Furthermore, District staff members' use of the Student's preferred name and pronouns is not medical care and thus does not infringe a parent's right to direct their child's medical care. When Plaintiff, upon inquiry, learned that her child was being referred to at school by preferred name and pronouns with which she disagreed, then Plaintiff had the right to make a different choice regarding the type of education her child receives—e.g., public, private or homeschooling.

---

[13] If the school was, in fact, providing medical care to the Student, then an obligation to proactively share that information would likely exist. But that is not the case here. As explained above, using preferred names and pronouns is not medical care, and the parental fundamental right does not create an obligation on schools to proactively share every event or circumstance that might affects one's child.

See *Pierce*, 268 U.S. at 534-535. At all times and under all circumstances, Plaintiff "remained free to exercise [her] traditional care, custody, and control" over her child. *Foote*, 128 F.4th at 355 (quoting Doe, F.2d at 1168).

### c.  Constitutional Scrutiny

As the action by Defendants does not infringe on the fundamental right of parents to direct the upbringing of their children, the Court will apply rational basis review. *Reno v. Flores*, 507 U.S. 292, 305 (1993). Thus, only "a reasonable relation to a legitimate state interest to justify the action" is required to pass constitutional muster. *Glucksberg,* 521 U.S. at 722. The District's policy of using a student's preferred names and pronouns upon request states the District is "committed to promoting an educational environment that is supportive and respectful to all students." (ECF 63, Ex. B). A respectful and nondiscriminatory school environment is a legitimate state interest. Referring to students by preferred names and even declining to proactively inform parents to respect a student's choice are both rationally related to that interest. Thus, the District policies and staff members' actions pass constitutional muster, and the Court grants summary judgment in favor of Defendants on this claim.

### 4.  Freedom of Religion

The Free Exercise Clause provides that "Congress shall make no law … prohibiting the free exercise" of religion. U.S. Const. amend. 1. The Free Exercise Clause is applicable to the states through the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940). A plaintiff bears the initial burden of "showing that a government entity has burdened [their] sincere religious practice pursuant to a policy that is not 'neutral' or

'generally applicable.'" *Kennedy v. Bremerton*, 597 U.S. 507, 525 (2022).[14] If a plaintiff makes such a showing, the Court will "find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)).

Plaintiff raises two Free Exercise of Religion claims. The first, Count Two, claims Defendants violated her right to freely exercise her sincerely held religious beliefs as a parent of the Student. The second, Count Three, claims Defendants violated her right to freely exercise her sincerely held religious beliefs as a teacher at a school in the District. Plaintiff fails to set forth facts that the Defendants' actions violated her constitutional right to freely exercise her religion as either a parent to the Student or a teacher in the District.

### a. Freedom of Religion as a Parent

Plaintiff alleges that Defendants significantly burdened her "sincerely held religious beliefs by preventing her from acting pursuant to her religious belief that it is the parents who have the duty to train their children regarding human sexual identity and the unchangeable natural created order of humans as male and female." (ECF 26, ¶ 136). The Court will not question Plaintiff's "sincerely held religious beliefs," however, Plaintiff fails to set forth facts showing that those sincerely held religious beliefs were in fact burdened by Defendants' actions.

---

[14] "A plaintiff may also prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise," but Plaintiff does not make such an allegation. *Kennedy*, 597 U.S. at 525 n.1. Plaintiff does not show any expression of hostility that accompanied the Non-Negotiables.

The Supreme Court established what constitutes a burden on religious beliefs and practices in *Lyng v. Northwest Indian Cemetery Protective Association.* 485 U.S 439 (1988). It stated "that incidental effects of government programs, which may make it more difficult to practice certain religions, but which have no tendency to coerce individuals into acting contrary to their religious beliefs" do not constitute substantial burdens on the exercise of religion. *Id.* at 450-51. Neither the District's PNCP policy nor staff members' use of the Students preferred name and pronouns in school coerces or compels Plaintiff to violate tenets of her religion. Plaintiff remains completely free to "train [her child] regarding human sexual identity and the unchangeable natural created order of humans as male and female." (ECF 26, ¶ 136). This is wholly unlike *Wisconsin v. Yoder*, where Wisconsin's education law required all children to attend school until age 16 which prohibited Amish parents from withdrawing their children from high school in accordance with their religious beliefs. 406 U.S. 205. The Wisconsin law forced Amish parents to keep their children enrolled in high school contrary to their religious beliefs. Not only is Plaintiff free to "train" her child in accordance with her religious beliefs, but she is also free to make a different choice regarding the type of education her child receives. *See Pierce*, 268 U.S. at 534-535.

Plaintiff additionally contends that Defendants' failure to inform her that her child requested to be referred to by preferred name and pronouns burdened her sincerely held religious beliefs because it "depriv[ed] her of the information she needed to counsel" her child. To conclude that the District's failure to proactively inform burdened her religious beliefs as a parent, would create an affirmative obligation on the District to foster the

exercise of Plaintiff's religious beliefs. Perhaps the District's failure to proactively inform Plaintiff of her child's choice "ma[d]e it more difficult to practice" her religious beliefs but it "ha[d] no tendency to coerce [Plaintiff] into acting contrary to [her] religious beliefs." *Lyng*, 485 U.S. 450-51. The District's failure to proactively inform Plaintiff did not prevent Plaintiff from practicing her sincerely held religious beliefs.[15]

Plaintiff's allegations, more plainly, are that the District staff members' use, at the Student's request, of preferred name and pronouns were counter to Plaintiff's own religious beliefs. However, a person's constitutional right to freely exercise their own religious beliefs does not require that the state also exercise those same religious beliefs. *Bowen v. Roy,* 476 U.S. 693, 700 (the Free Exercise Clause is "written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government"). To conclude that the District's failure to act in accordance with Plaintiff's religious beliefs is a constitutional violation would turn the First Amendment on its head. *See* U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion"). The First Amendment does not "require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development *or that of his or her family.*" *Bowen*, 476 U.S. at 699 (emphasis added). Moreover, one can only imagine the endless problems were the law to require schools to inform a parent of

---

[15] The issue of what constitutes a "burden" on parents' religious exercise in the context of elementary students being instructed on gender and sexuality, contrary to the parents' religious convictions without notice or opportunity for parents to opt their child out, is currently being considered by the United States Supreme Court in *Mahmoud v. Taylor*, 102 F.4th 191 (4th Cir. 2024); Supreme Court Docket No. 24-297 (argued April 22, 2025).

any event or occurrence with their child that might interfere with or burden the parent's sincerely held religious beliefs.

Even if Plaintiff could show that her sincerely held religious beliefs were in fact burdened by the Defendants' actions, the policy that existed while Plaintiff's child was in school in the District is a neutral policy of general applicability. Notably, Plaintiff's constitutional claims for freedom of religion as a parent are only viable during the school years Plaintiff had a child in school in the District. *See Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. at 180-81 (standing requires an injury in fact that is fairly traceable to the challenged action). While the Amended Complaint alleges that Plaintiff had four additional children in school in the District, Plaintiff sets forth no facts to support the existence of the additional children, their attendance at schools in the District, or the school years during which these children attended school in the District. Thus, the only relevant school years applicable to Plaintiff's free exercise claim are the school years the Student attended school in the District—2021-22 and 2022-23. (ECF 66, p. 1). And the only District policy that could have violated Plaintiff's constitutional right to freely exercise her sincerely held religious beliefs as a parent is the 2022-2023 Non-Negotiables.[16] The 2022-2023 PCNP contained within the 2022-23 Non-Negotiables states:

> As you become acquainted with your students, you may encounter students wishing to use a preferred or chosen name. A preferred/chosen name is any name a student chooses to use other than their legal name. For example, a student may wish to shorten their first name (e.g. Steven to Steve) or to be referred to by their middle

---

[16] The Court concluded above that no official policy regarding the use of preferred names or pronouns or "concealment" of a student's choice from parents existed during the 2021-22 school year.

name or a nickname. Sweetwater County School District Number One is committed to promoting an educational environment that is supportive and respectful to all students. Calling a person by their preferred name and pronoun shows respect and contributes to the District's commitment to providing a safe and nondiscriminatory educational environment. Accordingly, staff must use a student's preferred/chosen name or pronoun in verbal, written, and electronic communications. Staff must respect the privacy of all students regarding such choice.

Violations of this procedure may constitute discrimination based on sex, and may result in discipline. Students who experience problems or discrimination related to their preferred/chosen name or pronoun shall be referred to the Title IX Coordinator for resources and assistance. This procedure does not address changes to educational records to reflect legal name changes. Any requests to amend educational records shall be referred to the Director of Human Resources.

(ECF 63, Ex. B).

A law is not generally applicable if it (1) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or (2) "provid[es] a mechanism for individualized exemptions." *Fulton* v. *Philadelphia*, 593 U.S. 522, 533-34 (2021). The 2022-23 PCNP does not provide a mechanism for individualized exemptions, nor does it distinguish between religious and secular conduct. The 2022-23 PCNP requires all District personnel use a student's preferred name or pronoun in communications. The 2022-23 PCNP is facially neutral and generally applicable. "Neutral rules of general applicability normally do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief." *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 649 (10th Cir. 2006) (citing *Employment Div. v. Smith*, 494 U.S. 872, 879 (1990)). "Thus, a law that is both neutral and generally applicable need only be rationally related to a legitimate governmental interest to survive a constitutional challenge." *Id.* As stated in the policy, the District enacted the

31

policy to promote "an education environment that is supportive and respectful to all students," and prevent discrimination in the education environment. (ECF 63, Ex. B). A respectful and nondiscriminatory educational environment is a legitimate government interest. The policy requirement that District personnel use a student's preferred name and pronouns when requested is rationally related to that end.

Not only has Plaintiff failed to show that the 2022-23 PCNP or use of the Student's preferred name and pronouns in school burdened her sincerely held religious beliefs, but, even if she did, the PCNP in place while the Student attended school in the District is a neutral rule of general applicability. Neither the 2022-23 PNCP, District staff members' use of the Student's preferred name and pronouns in school, nor the failure to proactively inform Plaintiff of the Student's use of preferred name and pronouns violated Plaintiff's First Amendment right to freely exercise her religious beliefs.

### b. Freedom of Religion as a Teacher

Plaintiff additionally alleges that her sincerely held religious beliefs related to gender identity, parental involvement in decision-making, and truth-telling prohibit her from complying with the District's PNCPs as a teacher. And, as Plaintiff asserts, Defendant explicitly told her she cannot abide by her sincerely held religious beliefs and must comply with the policies. Plaintiff's freedom of religion as exercised as a teacher in the District involves a different "burden" than her claim as a parent. Plaintiff asserts the Defendants are interfering with her right to free exercise in her role as teacher by requiring she comply

32

with the policy in violation of her religious beliefs and by failing to provide a reasonable accommodation to allow her to continue teaching under the policy.[17]

As with her First Amendment claim as a parent, Plaintiff must first establish that her religious beliefs as a teacher were burdened by the PNCPs and Defendants' actions. Plaintiff and Defendants dispute whether or not Plaintiff has faced discipline for refusing to comply with the policy[18] (and whether or not Plaintiff has ever had to comply with the policy). Defendant asserts that Plaintiff has never had to use a student's requested preferred pronouns nor had to lie to a parent, so her religious beliefs cannot have been burdened. Plaintiff testified to those facts. (ECF 71, Ex. A, p. 40, 58-59). However, even if Plaintiff has not complied with the policy or has been disciplined for failing to do so, the threat of discipline can be enough "to coerce [Plaintiff] into acting contrary to [her] religious beliefs." *Lyng*, 485 U.S. 450-51. As a teacher in the District, the PNCPs force Plaintiff to either use students' preferred names and pronouns in violation of her religious beliefs or potentially lose her job as a teacher in the District. (ECF 66, Ex. 14, p. 22) (a staff member understood that if you failed to sign or agree to the Non-Negotiables that you would be

---

[17] The Court will consider Plaintiff's allegations that Defendants failed to provide a religious accommodation as an aspect of the "burden" placed on her ability to freely exercise her sincere religious beliefs rather than its own failure to accommodate claim. A failure to provide religious accommodations in the workplace violates Title VII of the Civil Rights Act of 1964, however Plaintiff did not bring a Title VII claim in this action, nor did she show that she had filed a discrimination charge with the Equal Employment Opportunity Commission as required before commencing a Title VII action in court. 42 U.S.C. § 2000e-5(e)(1), (f)(1).

[18] Plaintiff's focus on potential adverse employment actions taken against her—co-teaching or not being selected for different positions—suggesting that her First Amendment claim is a claim of retaliation for the free exercise of religion. However, Plaintiff never identifies her First Amendment claim as a retaliation claim, nor does she analyze the elements of a First Amendment retaliation claim in any of her briefs. Nonetheless, even if the Court were to consider Plaintiff's claim as a First Amendment retaliation claim, Plaintiff fails to allege or set forth any facts that exercising her religious beliefs was "a substantial or motivating factor" behind the co-teaching or not being selected for different positions. *Walton v Powell*, 821 F.3d 1204, 1211 (10th Cir. 2016) (the protected activity must be a substantial or motivating factor behind an adverse employment action for a First Amendment retaliation claim to survive).

fired). Thus, Plaintiff has sufficiently shown, as a teacher, that her religious beliefs were burdened by the PNCPs.

The crux of the dispute over Plaintiff's First Amendment claims is whether the PNCPs are neutral laws of general applicability or whether they receive strict scrutiny. As discussed above, the 2022-23 PNCP is a neutral law of general applicability and is rationally related to a legitimate government interest in creating a respectful and nondiscriminatory educational environment. However, the alleged violation of Plaintiff's First Amendment rights as a teacher in the District, as opposed to a parent of a student in the District, also encompass the 2023-24 school year and policy as she was employed by the District during both of those school years.

The District amended its Non-Negotiables leading into the 2023-24 school year and created a more expansive PNCP. (ECF 63, Ex. D). The 2023-24 PNCP again required that staff use a student's preferred name or pronouns in all communications, but also stated:

> The procedure applies equally to all students regardless of their gender or sexual orientation. It is specific to student's preferred/chosen names and pronouns and is intended to further the district's goal of fostering a respectful and inclusive learning environment. Wherever possible, staff should involve parents/guardians in the implementation of these guidelines to support the student's health, safety and wellbeing. If the student has not informed their parent/guardian of their chosen name or pronoun, the student should be referred to the student's counselor who will partner with the student to encourage and support the student to discuss their chosen name or pronoun with their parent/guardian, unless the counselor or other staff member, in consultation with the District's Superintendent, Human Resources Director, and legal counsel determines that such disclosure would be detrimental to the student's health or safety. When requesting a change to their preferred name and/or pronoun, students should be informed that in the absence of a determination that the student's health or safety is at risk, the District is legally required to share all information about the student's educational status, including chosen names and/or pronouns, with the student's parent/guardian upon request. Because the procedure is content neutral, staff must not proactively contact parents regarding a

student's chosen name and/or pronoun. The District's policy is to respect a student's preference – not to either encourage or discourage any student from forming a preference as to chosen names or pronouns, which could be deemed discrimination based on sex as set forth above.

Staff members who are uncertain as to how to implement this procedure or are for any reason unable to implement the procedure in relation to specific, identified circumstance should address their concerns with the Human Resources Director. The District will make every effort to reasonably accommodate staff members where possible.

(ECF 63, Ex. D).

Plaintiff asserts that the 2023-24 PNCP is not neutral or generally applicable because the last paragraph provides for accommodations. The Supreme Court has consistently held that a law that "provid[es] a mechanism for individualized exemptions" is not generally applicable. *Fulton*, 593 U.S. 533; *Kennedy*, 597 U.S. at 526; *Lukumi*, 508 U.S. at 537. However, a mechanism for exemptions is only "individualized" if it opens the door to "individualized government assessment of the reasons for the relevant conduct." *Smith*, 494 U.S. at 884; *see Lukumi*, 508 U.S. at 537-38 (finding a determination of what is "unnecessary" requires individual judgment and singles out religious practice for discriminatory treatment). The 2023-24 PNCP provides reasonable accommodations "for any reason." (ECF 63, Ex. D). Defendants argue these accommodations are not "individualized exemptions," because they require no individualized government assessment, but, rather, are offered to anyone who asks. The Court agrees.

"The Supreme Court has never explained with specificity what constitutes a 'system' of individualized exceptions." *Grace United Methodist Church*, 451 F.3d at 650 (citations omitted). However, the Tenth Circuit has found that "[t]o ensure that individuals do not suffer unfair treatment on the basis of religious animus, subjective assessment systems that

'invite consideration of the particular circumstances' behind an applicant's actions ...

trigger strict scrutiny." *Id.* at 651 (quoting *Smith*, 494 U.S. at 884). When creating the

"individualized exemptions" carve-out, the Supreme Court in *Smith* considered laws which

afforded accommodations for "good cause" or "personal reasons," to conclude such

individualized government assessments require compelling justification. 494 U.S. at 884.

The 2023-24 PNCP provides reasonable accommodations "for any reason," without

qualification. Defendants contend that a staff member simply has to ask for a reasonable

accommodation and no subjective assessment of the "reason" for the accommodation is

conducted—as the text of the 2023-24 PNCP reads. (ECF 69, p. 8). Plaintiff has not offered

any evidence that, under the 2023-24 PNCP, "for any reason" was pretextual, that

subjective decision-making was involved, or even that anyone has been denied a reasonable

accommodation when requested.

Plaintiff provides an email from the Director of Special Services where the Director

implicitly stated Plaintiff must abide by District policies despite any "personal and

religious beliefs." (ECF 66, Ex. 21). If this email was in response to a request for an

accommodation based on religious beliefs by Plaintiff, then this communication could

perhaps be evidence that "for any reason" was merely pretextual and the District was

conducting individualized assessments. However, this email was sent on August 15,

2022—the day the 2022-23 PNCP, which does not provide for any accommodations, was

enacted. Plaintiff does not set forth any evidence that accommodations were not offered

"for any reason" by the District during the 2023-24 school year. Rather, although it is

unclear during which school year, Plaintiff testified that she had a conversation with Kris

36

Cundall, the principal of the junior high school, about a religious accommodation and Kris Cundall allowed Plaintiff to tell her students she had to go by what was in Powerschool. (ECF 66, Ex. 23) (ECF 71, p. 39). Thus, Plaintiff sets forth no evidence that the 2023-24 provided for anything other than exemptions "for any reason" rather than individualized exemptions that requires government consideration of the particular reasons. There is no devaluing of religious reasons because exemptions may be made "for any reason." *See Does 1-11 v. Board of Regents of University of Colorado*, 100 F.4[th] 1251, 1277-78 (10th Cir. 2024) (policy not "generally applicable" because it granted secular exemptions on more favorable terms than religious exemptions). A policy which provides exemptions "for any reason" without any subjective government assessment remains a neutral law of general applicability. *See Smith,* 494 U.S. at 884 (a mechanism for exemptions which requires "individualized government assessments" is not generally applicable).

As both PNCPs applicable to Plaintiff as a teacher are neutral laws of general applicability, they "do not raise free exercise concerns" and "need only be rationally related to a legitimate governmental interest to survive a constitutional challenge." *Grace United Methodist Church*, 451 F.3d at 649 (citing *Smith*, 494 U.S. 872, 879 (1990)). The 2023-24 PNCP is rationally related to the same legitimate government interest in promoting a respectful and nondiscriminatory educational environment as the 2022-23 PNCP. Thus, both survive Plaintiff's constitutional challenge.

## ORDER AND CONCLUSION

For those reasons set forth above, Plaintiff Sean Willey lacks standing to pursue the claims asserted against Defendants and must be dismissed. However, Mrs. Willey as a

37

parent of the Student and employee of the District, has standing to pursue the claims alleged. It is well established that parents have a fundamental right to control their children's upbringing. In order to exercise that right, upon inquiry parents must be given access to information concerning their children's education and, absent reasonable concern for the child's safety, that information cannot be intentionally withheld or knowingly misrepresented. The undisputed facts establish that Defendants did not withhold or knowingly misrepresent any information regarding the Student from or to Plaintiff, and thus did not interfere with this right. Neither did Defendants' conduct burden Plaintiff's First Amendment right to freely exercise her religious beliefs as a parent or unconstitutionally interfere with her right to freely exercise her religious beliefs as a teacher.

**THEREFORE, IT IS HEREBY ORDERED** that Plaintiff Sean Willey is dismissed from the action.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgement (ECF 63) is **GRANTED**. Summary judgment is granted in Defendants' favor and against Plaintiff Ashley Willey on all remaining claims—Counts I, II and III.

**IT IS FINALLY ORDERED** that all pending motions are denied as moot. The Clerk of Court will please enter a final judgment terminating this case and all settings.

Dated this <u>28th</u> day of April, 2025.

Scott W. Skavdahl
United States District Judge